Emily E. Howe, State Bar No. 293964
LAW OFFICES OF EMILY E. HOWE
405 Via del Norte, Ste B
La Jolla CA 92037
Telephone: (619) 800-6605
Email: emh@howelaws.com

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.M. on behalf of himself and others similarly situated<br><br>                    Plaintiff-Petitioner(s),<br><br>        vs.<br><br>U.S. CUSTOMS AND IMMIGRATION ENFORCEMENT; EXECUTIVE OFFICE OF IMMIGRATION REVIEW CORE CIVIC; CHRISTOPHER LAROSE, warden of Otay Mesa Detention Center; PAMELA BONDI, Attorney General of the United States, in her official capacity, KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY, TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego, SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection, GREGORY J. ARCHAMBEAULT, Director of U.S. Immigration and Custom Enforcement and Removal Operations (ERO), San Diego, DOES 1 through 20, Defendant-Respondent(s). | Case No.: 25CV1412 JO AHG<br><br>**THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT OF HABEAS**<br><br>**[28 U.S.C. § 2241]** |

Plaintiff-Petitioner and asylum seeker A.M. brings this complaint to assert his and protect others' constitutional, statutory, and human rights and petition[1] for a writ of habeas under 28 U.S.C.§ 241 against officials from the Department of Homeland Security to stop the arbitrary detention of his person or liberty, in violation of various rights secured by the U.S. constitution and laws, grant stay of removal and to adjudicate his claims with a neutral arbiter.

## **INTRODUCTION**

1.    This case arises out of the sweeping immigration enforcement actions that the government began unannounced at the Edward J. Schwartz Federal Building and Courthouse in the Southern District of California. As a part of an official memo, policy, or directives, Respondents, including leadership and agents of the U.S. Immigration and Custom Enforcement, planned to and did arrest noncitizens, detaining them at the courthouse without notice or an opportunity to be heard, set for immediate expulsion from the United States at an unprecedented speed.

2.    Plaintiff-Petitioner A.M. is a thirty-four (34) year old Sahrawi man detained at the Otay Mesa Detention Center on June 3, 2025.  He submitted a habeas petition under 28 U.S.C. § 2241 for a judicial check on Respondents' administrative decisions to detain him under 8 U.S.C. § 1225(b)(1), INA §235(b)(1), and their plan to initiate  expedited removal proceedings against him under 8 U.S.C. § 1225(b)(1)(A), INA § 235(b)(1)(A), *despite* lacking such authority because **A.M. was—and still is—in (i) pending removal proceedings under 8 U.S.C. § 1229a, INA § 240,** and (ii) A.M. **does not satisfy either threshold inadmissibility ground for expedited removal proceedings**. And *because* the government purported to hold him under § 1225(b)(1), it has not

[1] The underlying allegations have moved at a such a fast and breakneck speed that the original filings were merged together, initially to file as a complaint, writ for habeas, and a preliminary temporary restraining order, and the writ allegations are *amended* herein.

1

provided him an individualized bond hearing to challenge his detention under 8 U.S.C. § 1226(a), INA § 236(a), contravening his rights under the Immigration and Nationality Act and the Fifth Amendment's Due Process Clause.

3.    Prior to a scheduled evidentiary hearing on Monday, June 23, 2025, Respondents advised that **A.M. was released on June 19, 2025**, in the afternoon.

4.    Plaintiff-Petitioner respectfully seeks the court enjoin the abusive, overly broad, and harassing practice of using the courthouses to conduct civil courthouse arrests without a bench warrant signed by a federal judge, impose indefinite 'mandatory' detention, and forced removal without due process as asylum seekers and noncitizens lawfully appear for their mandated courtroom appearances.

5.    DHS's actions reflect the recent unparalleled levels of practices that violate the immigration laws, statutory law, foreign treatises, and the U.S. Constitution.

6.    On June 3, 2025, Plaintiff-Petitioner was unlawfully detained absent a bench warrant signed by a federal or magistrate judge, and without probable cause or exigent circumstances that he may escape at the courtroom door of what had been scheduled for his individual merits hearing.

7.    Defendant-Respondents' current practice of

 (i) the **overzealous courthouse arrests of *anyone*** whom the government has "credible information that a target…will be at a specific location" like the federal building and U.S. courthouse,

 (ii) **deprivation of due process in detaining applicants** who are lawfully asserting their rights to seek asylum,

 (iii) **unlawful policy, practice, or conduct** of revoking the notice to appear to place into immediate removal and deprive noncitizens and asylum seekers of due process, has a profound chilling effect on the fundamental pillars of the rule of law, access to the courts, and access to justice.

///

This unlawful government behavior of courthouse arrests was enjoined in *Elizeo Velazquez-Hernandez, et al., v. U.S. Immigration and Customs Enf't, et al.*, No. 3:20-CV-2060 (DMS)(KSC), 2020 WL 6712223 (S.D. Cal. Nov. 16, 2020). Courts[2] have similarly prohibited this conduct.

8.    Respondents' actions violate their own memos, the constitution and statutory protections. On or about May 27, 2025, Respondents revoked its own rules without notice that prohibited arrests at or within the courthouses but also have not followed its own updated policy guidance. The expansive quotas under the ICE Directive Enforcement Actions have incentivized improper actions in or near Courthouses.

9.    The most recent policy, practice, or conduct in San Diego believed based on the *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (May 27, 2025)[3], replacing the January 21, 2025 Directive and the has unlawfully applied an **overly broad interpretation, arbitrary and capricious practice, and complete rules reversal emboldening ICE officers or agents to conduct unfettered civil immigration enforcement actions in or near courthouses** when they believe the targeted [noncitizen] is or will be present at a specific location" and patently ignores the previous directive "where such action is not precluded by laws imposed by the jurisdiction" or the agency's own published instructions that they will refrain entirely due to the irreparable damage. Defendants hold the main access to their universe of information. Accordingly, Plaintiff alleges the following and will seek to amend.

---

[2] See, e.g., *Ryan v. U.S. Immigr. & Customs Enf't*, 467 F. Supp. 3d 228 (D. Mass. 2020); *State of New York v. U.S. U.S. Immigr. & Customs Enf't*, No. 19-cv-8876, 2020 WL 2117584 (S.D.N.Y. May 12, 2020); *Liu v. Chertoff*, No. C07-2566, 2007 WL 1211290 (N.D. Cal. Apr. 23, 2007) (injunction issued to limit ICE arrests at courthouses to protect access to immigration hearings); *Nken v. Holder*, 556 U.S. 418 (2009) (recognizing the importance of fair process in immigration hearings).

[3] *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (May 27, 2025).

## **EXHAUSTION OF REMEDIES**

Plaintiff-Petitioner has no adequate administrative remedy available and exhaustion is *not* required because the claim is collateral to removal proceedings and raises systemic due process violations. A.M. has a right to appeal until July 3, 2025; he was not a flight risk; upon efforts to preserve his rights, all were thwarted: (i) USCIS rejected his asylum claim between the brief stint of leaving the court and filing that day due to his current and pending case at the Executive Office of Immigration and Review (EOIR), (ii) the Bureau of Immigration & Appeals could not find his name or alien number, (iii) the final ICE alternative is a discretionary stay of removal, however, Respondents' agents flatly noted those are not approved.

## **FACTUAL BACKGROUND**

10.   Petitioner-Plaintiff ("Petitioner") A.M. is and has been a human right defender and leader at a well-acclaimed international non-governmental organization that has contributed to critical reporting to the United Nations, European Commission on Human Rights, Cornell Law School Legal Clinic, Robert Kennedy Human Rights, and global organizations.

11.   He was a champion who fled for his life when he refused to promote Morocco on an international stage in or about August of 2023.

12.   A.M. suffered persecution.  Moroccan authorities incarcerated his grandfather, killed his grandmother with landmines, incarcerated his uncles, and threatened him and his family of human rights activists. The authorities raped, tortured, and blinded his colleague and friend whom he was a leader when she was detained.  He was physically harmed and his life threatened.

13.   On or about January 29, 2024, U.S. Customs and Border Patrol officers apprehended A.M. in or about San Ysidro Port of Entry, after he had already effected an entry into the United States.  A.M. entered and presented himself to seek asylum and claim a fear of persecution on or about January 30, 2024. After a CPB officer briefly detained him, a supervisory officer representing the

4

government made a conscious decision to release him with a Notice to Appear under 8 U.S.C. 1182(a)(6)(A)(i), INA§212(a)(6)(A)(i) of the Immigration and Nationality Ac, as an 'alien' being present in the United States without being admitted or paroled.  The NTA directed him to appear for an initial hearing in Immigration Court in New York, in the spring.

14.   The DHS officers released A.M. on his own recognizance.

15.   In spring of 2024, an immigration judge at the Immigration Court in San Diego granted A.M.'s request to appear in San Diego and file his I-589 application for asylum.

16.   A.M. complied with the rules, notices, and court appearances, prepared to present his lawful claim to asylum with I-589, Application for Asylum and Withholding of Removal filings in July of 2025, appearance in August, supplemental I-589 in October of 2024, presented self in November, briefing in January of 2025, supplemental filings in the spring and May of 2025.

17.   During this time period, he worked with his organization on human rights reporting to the United Nations and other international organizations.

18.   On or about February 4, 2025, his individual merits hearing was set.

19.   On or about June 3, 2025, A.M. was prepared to present his asylum claims at his scheduled individual merits hearing, which had been set for four months since February of 2025.

20.   A.M. was finally eligible to apply for work authorization with the Employment Authorization Document (EAD)(Form I-765); his asylum clock had been tolled for A.M. to seek representation and had fully prepared his case over the course of nearly five hundred (500) days.

21.   Plaintiff-Petitioner's witnesses were prepared to testify from overseas that day even despite recent hospitalization and unknown availability due to their health at a later date.

22.   Plaintiff is informed and believes a memo was sent to the judges to

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR A WRIT OF HABEAS CORPUS

increase dismissals of cases, including asylum hearings.

23.    Due to hearing about the alleged in court arrests, Petitioner filed a supplemental paper in an abundance of caution to ensure the court knew that the previously filed witness list was via WebEx or telephonic appearance, not in person.

24.    Noticeably upon entry, the courthouse climate had changed. Petitioner is informed and believes he could **hear ICE agents by the door throughout the hearing and could see them upon entering and exiting.**  Nearly ½ a dozen grown men, some with full face masks, were hovering by the courtroom doors. Petitioner was summarily arrested as he stepped out of the courtroom within the Edward J. Schwartz building once the immigration judge dismissed his case upon the U.S. government's request, and despite the court expressly stating A.M. has a lawful right to seek asylum, withholding of removal, and/or convention against torture protections under the Immigration and Nationality Act.

25.    Petitioner is informed that Respondents knew or should have known that this deprivation of the notice and right to be heard was an overt intentional tactic and policy abuse to prevent the adjudication of a strong asylum claim and remove A.M. without due process forcing him into terrifying and ambiguous proceedings of immediate removal or indefinite detention when he had been fully compliant.

26.    A.M. timely endeavored to appeal the IJ's later order granting that motion, meaning the IJ's order was—and is—not final, and those proceedings remained—and are still—pending. Thus, ICE had no authority to detain her under 8 U.S.C. §1225(b)(1), INA § 235(b)(1), and proceed with expedited removal. A.M. also lacks the threshold inadmissibility necessary for expedited removal, which is available only for those inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or (a)(7), INA §§ 212(a)(6)(C), (a)(7)

27.    Though the government knew that A.M. is represented because they whisked him away from court, received his updated G-28, and was contacted on

6

multiple occasions, and Petitioner had requested his attorney, A.M. is informed and believes the government refused to provide access to his counsel, even knowing he was going to be interrogated, had court hearings.

28.    Plaintiff-Petitioner believes he was told to sign away his rights on or about June 3, 2025, outside of counsel, did not sign or was deprived of a translator or counsel, and then told he must be fingerprinted and interrogated all outside of the presence of counsel or a translator.

29.    Plaintiff-Petitioner is informed and believes that an estimated 10 to 12 similar arrests occurred daily, with others subjected to a chaotic detention within the federal building and courthouse.

30.    Other impacted individuals entered in November 2023, was released into the community after a Notice to Appear, was arrested on or about May 22, after DHS moved to dismiss his proceedings and the immigration judge dismissed despite counsel's request for a continuance.

31.    Plaintiff-Petitioner is informed and believes there are other similarly situated applicants who don't speak English fluently, detained at their court hearings, have not been unable to access counsel and seek protections and relief with an emergency stay of removal, to be able to access their rights and counsel.

32.    Absent review by this Court, no neutral adjudicator will examine or ensure protections of A.M. Respondents will continue—unchecked—to proceed at their whim. He thus urges this Court to review the lawfulness of his arrest, detention, subjection to expedited removal, and resetting back to zero forced to restart the whole process, declaring that his detention under 8 U.S. C. § 1225(b)(1), INA § 235(b)(1), is unlawful.

### Federal Building-Courthouse Arrests - Habeas Corpus and Due Process

33.    In recent statements, behavior, and practice, Respondents-Defendants have demonstrated little interest or regard for adhering to the America's foundational and bedrock principles of due process, habeas corpus, and rule of law. Recently, on

7

or about May 20, 2025, at her confirmation hearing, Respondent-Defendant KRISTI NOEM[4] erroneously responds: "Habeas corpus is a constitutional right that the President has to be able to remove people from this country".

34.    Here, in San Diego, A.M. who presented himself lawfully for his asylum hearing was separated from his attorney and upon is informed and believes, not clearly advised on why he is being detained or explained the process protecting his procedural and substantive due process rights, after the United States Government withdrew his notice to appear in court to terminate his asylum case.  Respondents' agents could not advise on the process, next steps or ensure protections.

35.    Defendants-Respondents stated ICE is not granting any requests for stays of removal.

36.    Notably, Defendants- Respondents' agents were confused, unclear, and unfamiliar on the process, next steps, or information on Petitioner, and could provide no policies or protections that his rights are preserved as a matter of law.

37.    Plaintiff-Petitioner is informed and believes hours of independent research to discover that Respondents shifted the protections from the Mayorkas memo and reverted to refusing to recognize courthouses as "Sensitive Locations" and maintains that Respondents in the **San Diego Field Office leadership** in particular "The Assistant Field Office Director and Assistant Special Agents in Charge" possesses full authority and discretion to civilly arrest individuals in and around any courthouse.

38.    **The courthouse arrest policy purports to re-vest ICE with the unbridled and boundless discretion to make civil arrests in and around virtually *any* courthouse location when the U.S. Government deems a person**

---

[4] *See* Testimony of Kristi Noem, Dep't of Homeland Sec. (May 20, 2025), *available* at https://www.bbc.com/news/videos/ce8113z7k17o; https://www.c-span.org/classroom/document/?23993

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR A WRIT OF HABEAS CORPUS

**is an "alien" at a specified location.[5]**

39.   Defendants-Respondents have not stated or provided this DHS policy.

40.   Defendants-Respondent's newly enacted policies, practices, and procedures fail to account for significant issues, including the historic sanctity of courthouses and the chilling impact the policies have on the people released on bond by a federal court.

41.   Shortly after taking office, the President issued ICE Directive *Enforcement Actions in or Near Courthouses* (Jan. 21, 2025) DHS Directive *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025) and where such action is not precluded by laws imposed by the jurisdiction in which the civil immigration enforcement action will take place.[6] The new memorandum supersedes the Mayorkas memorandum entitled 'Guidelines for Enforcement Actions in or Near Protected Areas' (October 27, 2021), replacing with ICE Policy No. 11072.4 Interim Guidance: Civil Immigration Enforcement Actions in or Near Courthouses. (May 27, 2025). *Id.*

42.   Plaintiff-Petitioner is informed and believes Respondents-Defendants' engaged in a concerted effort to dismiss their case to deprive them of due process.[7] Plaintiff-Petitioner is informed and believes that there were complaints of detainees were removed or deported on the same day.

---

[5]  *See* Memorandum on ICE Directive *Enforcement Actions in or Near Courthouses* (Jan. 21, 2025); DHS Directive *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025); *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (May 27, 2025).

[6]  *See Id.;* Memorandum on ICE Directive *Enforcement Actions in or Near Courthouses* (Jan. 21, 2025); DHS Directive *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025).

[7] *See e.g.,* Chris Gross, Molly Sheets, *ICE agents arrest migrants at courthouses in San Diego*, Across Country CBS 8 San Diego, May 22, 2025, https://www.cbs8.com/article/news/local/ice-agents-arrest-migrants-at-courthouses-in-san-diego/509-1b3d0519-2132-49fa-ad76-fdb58af37a32 ; *See e.g.,* Alex Cheney, *ICE tactics spark fear as migrant arrested post-heraing in San Diego, Across US,* CBS 8 San Diego, May 27, 2025, https://www.cbs8.com/article/news/local/ice-tactics-migrants-arrested-post-hearing-san-diego/509-e66acde1-18bd-42d5-b40b-1bb479d963e4;

43.   Ultimately, the courthouse arrest policy simply formalizes aspects of Directive or unknown instructions, which vest ICE with unfettered discretion to use courthouses as a trap to arrest *anyone* they suspect of being a noncitizen at any location —including asylum seekers who are honoring their conditions and mandates imposed by Respondents.

44.   With these Directives and memos, the President abandoned past programs and protections and called for the deportation of **anyone potentially removable, i.e. lawful green card holders, parolees, and in practice, asylum seekers--- with published mandatory quotas of 3,000 daily removals in disregard of the fundamental principles of due process. Today,** A recent [8]memo to immigration judges obtained by NBC News provides fresh insight into how the Trump administration is pulling off a new tactic — dismissing pending immigration cases, then immediately moving to arrest the immigrants — that is part of its bid to quickly increase the number of immigrants it is detaining.

45.   **Despite widespread opposition to this practice, Respondents have not only refused to stop it but has issued official policies authorizing civil courthouse arrests. DHS's courthouse arrest policies, and its extensive practice of conducting civil arrests at asylum hearings, are unprecedented in United States history.**

46.   At the same time, Respondents have prohibited that the use of Web Ex or virtual appearances by Plaintiffs-Petitioners and required that asylum seekers appear physically in person in the federal immigration court.

47.   Plaintiff is informed and believes **Respondents are authorizing their agents to be wearing Balaclava, full face covering masks**, while hovering at or about the courtroom doors.

---

[8] Many of those who saw loved ones handcuffed and taken away had accompanied their family members to ongoing immigration processes seeking asylum or hoping to make a case before a judge to stave off deportation, a legal process long afforded to immigrants and spelled out for immigration judges in court practice manuals.

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR A WRIT OF HABEAS CORPUS

48.   On or about May 22, 2025, Plaintiff is informed and believes that Respondents' carelessness and neglect seeks to arrest the wrong man who hyperventilates and collapses to the ground.  DOES 1 through 10 used force against asylum seekers, shoved attorneys and members of the public.

49.   ICE went to detain a man who collapsed to the ground and started to hyperventilate.  Plaintiff is informed and believes a DOE Officer responded, "calm down, it's not that big of a deal." Plaintiff is informed and believes that DOE officers shoved attorneys and members of the public.

50.   During the week of May 18, 2025, Respondents' commenced immigration raids at or about the Edward J. Schwartz Building.

51.   On or about May 22, 2025, Plaintiff is informed Respondents arrested detained at least 13 individuals at or about the courtroom door.  Plaintiff is informed and believes that the pre-meditated list was sent to the Executive Office of Immigration Review, including the judges and attorneys.

52.   On or about May 23, Plaintiff is informed and believes Respondents detained at least 7 people.

53.   During the week of May 23, 2025, Plaintiff is informed and believes an approximated dozen individuals were detained at their courtroom hearings.

54.   On or about May 27, Plaintiff is informed and believes that ICE conducts warrantless arrests at or about the courtroom doors, including arrests and physical contact with witnesses despite court-ordered continuances.

55.   On or about May 28, Plaintiff is informed and believes witnesses heard Respondent's making jokes about being the 'Gestapo'.

56.   On or about May 30, 2025, Plaintiff is informed and believes DOE Officers arrested an individual seeking legal representation.

57.   During this week, Plaintiff is informed and believes multiple witnesses

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR A WRIT OF HABEAS CORPUS

observe ICE supervising agents discussing a list with the government attorneys who were seeking to dismiss the cases.  Plaintiff is informed and believes that list was being provided to the EOIR.

58.   On or about June 2, 2025, Plaintiff is informed and believes ICE officers are continued to make warrantless arrests, including following court attendees into the restroom, and detaining and separating parents from their children without notice or an opportunity to be heard.[9]

59.   On or about this day, June 2, Plaintiff is informed and believes ICE Officers were laughing and jovial about all those detained who did not have an attorney.

60.   On or about June 3, 2025, at least 10 officers were alleged to have threatened and cornered two members of the public and an independent journalist, and discussed detention lists of intended detainees with a government attorney.

61.   On or about June 2 through 6, Plaintiff is informed and believes another dozen of applicants were detained at their asylum hearings via warrantless arrests.

62.   On or about June 9, 2025, Plaintiff is informed and believes a DOE Supervisor stated an attorney must determine who would be detained of his two clients, it was irrelevant to him who was detained.

63.   During the week of June 16, 2025, Plaintiff is informed and believes that Respondents' officers continued to make warrantless arrests in or about federal courthouses, including in the San Diego & Imperial Counties.

64.   Plaintiff is informed and believes that immigration attorneys are reporting

---

[9] Many of those who saw loved ones handcuffed and taken away had accompanied their family members to ongoing immigration processes seeking asylum or hoping to make a case before a judge to stave off deportation, a legal process long afforded to immigrants and spelled out for immigration judges in court practice manuals.

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR A WRIT OF HABEAS CORPUS

that their clients are not showing up to court due to Respondents' Policies Practices and Procedures.

65.    Plaintiff is informed and believes a Memorandum of Understanding, directive, policy was instructing these raids.

66.    DHS has made clear that *anyone* who is subject to arrest by DHS may be arrested in the courthouse, and courthouse arrests are not limited to defendants in criminal matters – the arrests are of asylum seekers, witnesses, or anyone **DHS believes is a "targeted alien…" who is or will be present at "a specific location."**

67.    **Curiously enough, the updated memo expressly provides, "ICE officers should generally avoid enforcement near non-criminal or specialized courts.**

68.    Petitioners-Plaintiffs have complained of overzealous, aggressive arrests, no notice, and chaotic scenes in which the public were refused entry or deterred from asserting their lawful rights in the federal building and courthouse.

69.    To be clear, Defendants- Respondents have already had Plaintiffs in custody and processed their biometrics and backgrounds, including all information necessary for civil immigration enforcement purposes. They have no interest or need in re-arrest for those reasons. Respondents' only interest is to keep Plaintiffs incarcerated or removed expeditiously from the country

70.    Plaintiffs-Petitioners have established that their incarceration is not required for their immigration cases, as they reliably appeared for court hearings.

*Common Law and Constitutional protections*

71.    ICE practices are interfering with the public's access to the federal building and the courthouses. In addition to deviating from prior policy**, the U.S. Supreme Court long ago recognized a privilege against civil arrests for those attending court on official business—a privilege that traces its roots back to English common law and rests on the common-sense principle that the judicial system**

**cannot function if parties and witnesses fear that their appearance in court will be used as a trap.**

72.  DHS's decision to flout the long-standing common-law privilege against civil courthouse arrests and to commandeer the courtrooms of the Southern District of California for federal civil immigration purposes has led Plaintiff-Petitioner(s) to reasonably fear civil arrest should they appear in court at their upcoming court dates. They know that when their case ends, an immigration agent lurking in the courtroom will be ready to civilly arrest them and place them in removal proceedings. DHS's policy to civilly arrest them in court following the conclusion of their misdemeanor prosecutions forces the Petitioners-Plaintiffs to choose between coming to court as ordered and exercising their common-law right to be free from civil arrest in court.

73.  In addition to the Plaintiffs- Petitioners' own fear of civil arrest, the First, Fifth, Sixth, and Fourteenth Amendment rights to receive equal protection and present witnesses and to a public trial are violated because the policy instills fear in potential witnesses and court observers who have reason to fear civil arrest at or about the Edward J. Schwartz federal building and U.S. courthouse.

74.  DHS's civil-courthouse-arrest policies not only undermine the administration of justice, they are also illegal for at least four reasons.

75.  First, DHS's courthouse arrest policies are arbitrary and capricious in violation of the Administrative Procedures Act (APA) because the policies are insufficiently explained, fail to consider all relevant factors, and depart from prior policy without reasoned explanation. Further, DHS's implementation of the policies is inconsistent. ICE's policy states that arrests will take place "inside" the courthouses or at "non-public entrances and exits," but arrests do not always take place inside the courthouse. For example, officers chased a client and his lawyer down Broadway Street adjacent to the courthouse and arrested the client. The

lawyer asked the officers to identify themselves and to produce a warrant, and the officers refused and further ordered the lawyer to back away under threat of arrest if he did not cooperate. ICE arrests outside of a courthouse are an arbitrary and capricious application of its policy. *See Washington v. U.S. Dep't of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837, at *26–27 (W.D. Wash. Apr. 10, 2020) (ruling that ICE's practice of arresting immigrants outside courthouses, instead of inside as the policy states, presents a plausible claim that the policy is arbitrary and capricious under the APA).

76.   Second, Congress never authorized DHS to conduct civil courthouse arrests because it never abrogated the longstanding and well-settled common-law privilege against such arrests. The Supreme Court has recognized that the common-law privilege against civil courthouse arrests is "well settled." *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916). When Congress acts in an area governed by "long-established and familiar" common-law principles, Congress is presumed to retain those principles. *United States v. Texas*, 507 U.S. 529, 534 (1993). Here, where Congress granted the federal government a general civil-arrest power to enforce civil immigration laws, Congress retained traditional common-law limitations on that arrest power—including that such arrests cannot be made against parties and witnesses attending court on official business. Because the INA does not grant the federal government authority to conduct civil courthouse arrests in violation of the common-law privilege, DHS's policies authorizing such arrests, and its policies to conduct such arrests, exceed DHS's statutory authority and must be set aside under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2).

77.   Third, DHS's policies violate the constitutional right of access to the courts, which prohibits "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits." *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002). Conditioning litigants' ability to access the courts on

risking civil arrest creates precisely such impermissible frustration. Indeed, common-law courts created the privilege against civil courthouse arrest to prevent the intolerable chilling effect of such arrests, explaining that the fear of arrest would "prevent [parties and witnesses'] approach," obstructing "the administration of justice." *Halsey v. Stewart*, 4 N.J.L. 366, 368 (N.J. 1817). Plaintiffs found, however, that if they come to court as ordered they face the specter of civil courthouse arrest whether they win or lose their case.

78.    Fourth, DHS conducts the civil courthouse arrests without a judicial warrant authorizing the arrests as required by law. 8 U.S.C. § 1357(a)(2). Pursuant to section 1357(a)(2), DHS must have "reason to believe" that the arrestee is violating immigration law *and* that the arrestee is "likely to escape before a warrant can be obtained. . . ." But Petitioners-Plaintiffs consistent appearance at court demonstrates otherwise. DHS could have sought a warrant in the months while Plaintiffs' cases were pending.  DHS did not. Failure to obtain a warrant during the pendency of the cases is the product of indolence, not necessity, and it violates Petitioners-Plaintiffs' statutory and constitutional rights.

79.    For these reasons, and as set forth below, Plaintiffs ask this Court to declare that DHS's policies authorizing civil arrests in the U.S. courthouses of the Southern District of California are unlawful, to declare that DHS's current practices and tactics including failing to obtain a warrant and courthouse arrests is illegal, and to enjoin DHS from such activity.

*The common-law privilege against civil arrest*

80.    The common-law privilege against civil arrest while attending court on official business is longstanding, tracing its origins back at least to the English courts in the eighteenth century.

81.    In England, and in the early years of this country, civil arrest, or civil capias, was a common means for initiating civil proceedings. *See* Nathan Levy, Jr., *Mesne Process in Personal Actions at Common Law and the Power Doctrine*, 78

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR A WRIT OF HABEAS CORPUS

Yale L.J. 52, 61-70 (1968). The possibility that such civil arrests could take place in court, however, posed a significant problem for the judiciary: If a party or witness's appearance in a case could be as a trap for a civil arrest in *another* case, many parties and witnesses would not attend court. To avoid this problem, courts both in England and the United States—including the U.S. Supreme Court—recognized and strictly enforced an "inflexib[le]" privilege against the civil arrest of parties or witnesses attending court. *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923). As the Supreme Court explained, "the due administration of justice requires that a court shall not permit interference with the progress of a case pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation." *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932).

82.    The common-law privilege against civil arrest while attending court on official business is longstanding, tracing its origins back at least to English courts in the eighteenth century. Blackstone's *Commentaries on the Laws of England* explained the common-law rule that "[s]uitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning." 3 William Blackstone, *Commentaries on the Laws of England* 289 (1769); *see also* 6 Matthew Bacon, *A New Abridgment of the Law* 530 (London, A. Strahan, 7th ed. 1832) ("[A]ll [] persons whatsoever, are freed from arrests so long as they are in view of any of the courts at Westminster, or if near the courts, though out of view, lest any disturbance may be occasioned to the courts or any violence used."). This principle was repeatedly endorsed by the English courts, which held that, "for the purpose of justice," and "to encourage witnesses to come forward voluntarily," they are privileged from arrest "in coming, in staying, and in

returning". *The King v. Holy Trinity in Wareham*, 99 Eng. Rep. 531 (1782); *see also Meekins v. Smith*, 126 Eng. Rep. 363 (1791) ("[A]ll persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not, (in which bail were included,) were [e]ntitled to privilege from arrest *eundo et redundo*, provided they came bona fide."); *Spence v. Stuart*, 102 Eng. Rep. 530 (1802); *Ex Parte Byne*, 35 Eng. Rep. 123 (1813).

83.    The U.S. Supreme Court adopted this privilege and held that it bars service of any other civil process while attending court. For instance, in *Stewart v. Ramsay*, 242 U.S. 128 (1916), the Court described the privilege as "well settled," explaining that a litigant "should be permitted to approach [the courts], not only without subjecting himself to evil, but even free from the fear of molestation or hindrance. He should also be enabled to procure, without difficulty, the attendance of all such persons as are necessary to manifest his rights." *Id.* at 129. The Court described it as particularly firmly established that there was an "exemption from arrest," or "capias," and held that this exemption applied to any civil process to protect the "necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify." *Id.* at 130. The Court later emphasized the "necessity of [the rule's] inflexibility" in order to serve its purpose of protecting litigants and witnesses in appearing in court. *Page Co.*, 261 U.S. at 448; *see also Long v. Ansell*, 293 U.S. 76, 83 (1934) (Brandeis, J.) (describing "the common-law rule that witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit, are immune from service in another"); *Lamb*, 285 U.S. at 225.

84.    Each applicant was not a flight risk as they lawfully appeared for their hearings in pursuing their statutory rights.  In fact, Respondent-Defendants *rely on* Plaintiffs' lack of flight risk, lying in wait to arrest and punish them when they do

appear for their hearings.  By insisting Plaintiffs be re-arrested for their removal or seeking the asylum process, these agencies threaten the integrity of the proceedings and ignore the reasonable alternative, namely that their interests in initiating the removal process for these Plaintiffs – individuals who have been found to be neither flight risks or dangers to the community and who indeed appear when the government asks them to – can be accomplished without having to arrest them. Petitioners-Plaintiffs seek to enjoin the profound disregard of common law, statutory protections, international treatises, and basic rule of law in San Diego

85.  **DHS's reinstated the previously enjoined practice of civilly arresting people in the federal building and courthouses of the Southern District of California who are present for official court business unduly infringes on Plaintiffs-Petitioners' shared common-law right to be free from civil courthouse arrest:**

*DHS officers are routinely present in the U.S. courthouses in the Southern District of California to effectuate civil immigration arrests of Plaintiffs when they appear in court for their asylum hearings*

86.  Immigration agents are believed to have arrested scores of people and plan to do so for even more in perhaps the hundreds or thousands inside the federal building and courthouses of the Southern District of California.

87.  Defendants- Respondents agents attend these hearings so they can effectuate a civil courthouse arrest. That means ICE officers are present and poised to conduct administrative arrests at every immigration hearing in the Southern District of California where the government requests dismissals.

88.  When immigration officers attend the Plaintiffs' hearings, they patrol the hallways and hover next to the exit of the courtroom at the time of the proceeding.

89.  The officers are equipped with handcuffs and plan to effectuate a civil arrest to place the defendant in immigration custody at the conclusion.

*DHS officers conduct courthouse arrests without official warrants in or about the U.S. Courthouses in the Southern District of California*

90.    On information and belief, Plaintiffs believe that DHS intends to effectuate warrantless immigration arrests of plaintiffs coming to court, while present at court, or leaving court in connection with their pending immigration cases.

91.    **If at all, Defendants-Respondents have deployed administrative signed by staff, not court-ordered judicial warrants by a magistrate or federal judge.**

92.    Plaintiffs-Petitioners have been out of custody for months, are in compliance with the conditions including attending all court hearings, and they do not present a risk of flight before DHS could obtain a warrant.

*DHS's civil courthouse arrest policies harm Plaintiffs by forcing them to appear in court believing that they could be subjected to an unlawful civil arrest in the courthouse at any time.*

93.    Plaintiffs-Petitioners are appearing for their defensive asylum hearings. At trial, their credibility would surely be challenged on cross-examination. But the Plaintiffs-Petitioners are all alleged to be undocumented aliens in the United States and their character witnesses may be similarly undocumented.

94.    Plaintiffs'-Petitioners' decision on whether to testify at trial and call character witnesses, or other witnesses, in support of their asylum case is chilled by the looming presence of immigration officers in court, targets certain groups, and used to harass or retaliate. Plaintiffs fear that full exercise of their rights to present a defense could lead to the arrest of undocumented witnesses or members of the public who come to court to observe the proceedings.

**A. Asylum, Withholding of Removal, Convention Against Torture**

95.    Plaintiffs-Petitioners sought fairness, due process protection, and the rule of law in the United States:

96.    A.M. has long filed an asylum application and requested a credible fear interview. He fears for detention and harm from Morocco and now faces arbitrary detention in the United States.  He seeks protections against being placed on a

plane to a country where he has no ties, El Salvador, Sudan, or back to the country where he fled for his life from persecution, torture, and death threats.

97.   A.M. and others are being subjected to expedited removal despite Respondents having knowledge of their claims for asylum and credible fear of persecution the Convention against Torture. The agency's refusal to provide a meaningful credible fear determination, arrest, resetting the clock, and detaining the asylum seeker violates procedural due process and statutory rights under 8 U.S.C. § 1158 and § 1231(b)(3).  The restarting of proceedings is highly prejudicial and serves no legitimated government basis other than to harass, intimidate, delay, and increase taxpayers' money especially as A.M. was scheduled for his asylum individual merits hearing on the day he was arrested.

98.   Plaintiffs-Petitioners assert their rights to be free from *civil* arrest in this Complaint. To be clear, Plaintiffs do not argue that the Defendants-Respondents could not effectuate criminal arrests in the courthouse. **Notably, DHS arrests that merely place a person in immigration proceedings are civil arrests.** *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1974) (holding that deportation proceedings are "purely" civil); *Arizona v. United States*, 567 U.S. 387, 407 (2012) (holding that "it is not a crime for a removable alien to remain present" in the United States and that deportation proceedings are civil).

99.   DHS officers attend asylum and immigration hearings relating to whether they have experienced persecution, likely to be persecuted, eligible for asylum, withholding of removal or and ready to civilly arrest Petitioners-Plaintiffs once the hearings are pre-determined to be dismissed.  The anticipated arrests occur regardless of the veracity or strength of the claim - whether it be through a Government or Court's granting the motion to dismiss– the officers are waiting to effectuate a warrantless civil arrest at or about the courtroom.

100. Petitioner is informed and believes this opaque and obfuscatory policy, procedure, and/or practice is denying credible claims to statutory protections, and

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR A WRIT OF HABEAS CORPUS

subjecting eligible applicants with colorable claims to persecution, torture, or death against United States and international law.

**B. Expedited Removal**

101. This is time-sensitive because the current U.S. government has been alleged to have sent asylum seekers, lawful permanent residents, and even U.S. citizens overseas without due process, and have not been able to retrieve or account for their whereabouts.

102. Expedited removal has applied to those who were in the country less than fourteen (14) days and within 100 miles of the border. 8 C.F.R. 2385.3(b).

103. Specifically, this Court has jurisdiction under 28 U.S.C. § 2241 to review A.M.'s detention and her challenge to his placement in expedited removal proceedings. Federal district courts possess broad authority to issue writs of habeas corpus when a person is held "in custody in violation of the Constitution or laws or treaties of the United States" (28 U.S.C. § 2241(c)(3)), and this authority extends to immigration detention challenges that survived the REAL ID Act's jurisdictional restrictions. Unlike challenges to the outcome of completed expedited removal proceedings, A.M.'s claim that he was improperly subjected to expedited removal in the first instance falls within the statutory exception exception permitting review of whether the noncitizen is eligible for such review. See 8 U.S.C. § 1252(e)(2), INA § 242(e)(2).  Because A.M. sought the habeas remedy of release from unlawful detention rather than further administrative review, his petition presents precisely the type of threshold legality-of-detention question that §2241 was designed to address. *See INS v. St. Cyr*, 533 U.S. 289, 301 (2001); see also *Lopez-Marroquin* v. *Barr*, 955 F.3d 759, 759 (9th Cir. 2020) (citing *Singh*, 638 F.3d at 1211-12)). And no court has ruled on the legality of A.M.'s detention.

104. Defendants-Respondents are using dismissing a section 240 case to trigger removal in an overt evasion of procedural due process and statutory protections.

105. Defendants-Respondents' refer to section 235(b)(1) of the Immigration and Nationality Act (INA), as mandating that noncitizens subject to expedited removal be detained throughout the process.

106. Courts have provided protections against Expedited Removal.

107. Defendants-Respondents' actions are retaliatory for those engaging in protected activity like filing an asylum claim or appearing at their mandated court cases. The government should not be forcing expedited removal as Petitioners-Plaintiffs have a right and sought a motion to appeal at the Bureau of Immigration of Appeals. BIA could not find Petitioners to seek an emergency stay.

108. The government has not guaranteed the due process rights of noncitizens. A Proclamation signed on March 14 and published on March 15, the President invoked a war power, the Alien Enemies Act of 1798 ("AEA"), to summarily remove noncitizens from the U.S. and bypass the immigration laws Congress has enacted. *See* Invocation of the Alien Enemies Act (Mar. 15, 2025) 1 ("Proclamation"). The Proclamation accused Venezuelan noncitizens of being part of Tren de Aragua ("TdA"), a criminal gang. On the evening of March 15, 2025, the D.C. District Court issued an order temporarily pausing removals pursuant Proclamation of a provisionally certified nationwide class. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *2 (D.C. Cir. Mar. 26, 2025). That order was appealed by the government, but the court of appeals denied a stay. *Id*.

109. In April 2025, the Supreme Court ruled that immigrants even under the Alien Enemies Act are entitled to advance notice of their removal and a meaningful opportunity to challenge their deportation through legal avenues. On April 7, in a 5-4 decision, the Supreme Court granted the government's application to stay on the basis Petitioners would proceed through habeas, emphasizing those are **"entitle[d] to due process" and notice "within a reasonable time and in such manner as will allow them to actually seek habeas relief"** before removal. *Trump v. J.G.G.*, No. 24A931, 2025 WL 102409 (U.S. Apr. 7, 2025).

110. **The government has not indicated the type of notice they intend to provide or how much time they will give individuals before seeking to remove them.** However, in a hearing in other jurisdictions in the Southern District of Texas on Friday, April 11, the government said they had not ruled out the possibility that individuals will receive no more than 24 hours' notice; the government did not say whether it was considering providing even less than 24 hours. In light of the Supreme Court's ruling that challenges to the Proclamation must be brought in habeas, Petitioners file this action in his district of confinement and arrest.

111. At or about the end of May of 2025, Respondents started to show up at the immigration courts at valid asylum hearings and arrest the applicants at their court hearings in San Diego, at or about 880 Front Street, Edward J. Schwartz Federal Building and U.S. Courthouse, and stating that they will remove those applicants who are apprehended and withdrew the notice and opportunity to be heard.

112. On June 4, 2025, with uncertainty and lack of clarity, A.M. petitioned this court for a writ of habeas corpus, a complaint for declaratory and injunctive relief, and emergency temporary restraining order (which this court granted), for fear of those in immigration custody in danger of imminent removal from the United States (less than 24-hour notice) – and this court could potentially permanently lose jurisdiction. Petitioner fears of the imminent danger of being transferred outside of the Southern District of California *en route* to removal without a notice to appear, indefinite detention, and the lack of the opportunity to be heard and thus request an injunction on any transfer out of the Southern District of California, as well as a 30-day notice of any intent to remove and due process protections.

## JURISDICTION AND VENUE

113. This Court has subject matter jurisdiction under 28 U.S.C. § 2241 *et seq.* (habeas corpus), as protected under Art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. § 1651 (All Writs Act).

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR A WRIT OF HABEAS CORPUS

114. This Court has original jurisdiction pursuant to 42 U.S.C. § 1983. Federal jurisdiction exists under 28 U.S.C. § 1331 (federal question). This court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C.§ 1367 (a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  Plaintiffs bring this action under the laws of the United States and the U.S. Constitution.

115. This case arises under the First, Fourth, Fifth, Sixth, Fourteenth Amendments to the United States Constitution, federal asylum statutes, the Administrative Procedure Act.  the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq*. and its regs.; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); the All Writs Act, 28 U.S.C. § 1651.

116. The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

117. Venue is proper in the Southern District of California pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the  events, acts, or omissions giving rise to the claims occurred in the County of San Diego including at the time of filing Petitioner is detained in the Respondents' custody, in the Southern District of California; Respondents JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego, SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection, GREGORY J. ARCHAMBEAULT, are believed to reside in this district; Respondents are agencies or officers of the United States in their official capacity.

///

///

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR A WRIT OF HABEAS CORPUS

# PARTIES

## A. Petitioners-Plaintiffs ("Petitioners")

118. Plaintiff-Petitioner is a 34-year-old Western Sahrawi man who has been a human rights defender at an internationally well-respected non-governmental organization that has presented to the United Nations and European Commission of Human Rights, and other organizations. She fled Western Sahara and Morocco because she suffered past persecution and fears future persecution, harm, or torture, and she arrived in the United States on January 29, 2024, to seek asylum. Respondents detained her on June 3, 2025 at her hearing which had been scheduled for an individual merits hearing.

119. A.M. is seeking asylum on the basis of his political views, membership in a social group, race-ethnicity, fear of harm, persecution, and mistreatment from his government due to his immutable characteristics and human rights leadership.

120. A.M. is diabetic and has medical complications due to past persecution and requires access to daily medications and consistent medical care.

121. The U.S. government has publicly stated that those with asylum claims would proceed with their credible fear and asylum rights as a matter of law.

122. However, after lawfully presenting himself for his asylum hearing, he was arrested at the downtown Courthouse on June 3, 2025.

123. He fears being deported, being unable to speak with his attorney, being denied adequate medical care, and being sent back to a country where he will be imprisoned, tortured, and likely killed by the Moroccan police since they have done previously to him. He fears that the Moroccan authorities will target him because of his political opinion, because he and his family are known human rights activists, and he was a gold medalist who refused to promote the government.

124. The government did not provide adequate notice or an opportunity to be heard on why he is being detained but planned to ship him overseas and out of this jurisdiction without due process rights.

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR A WRIT OF HABEAS CORPUS

125. A.M. and other Plaintiff-Petitioner are those **who were similarly arrested at the downtown courthouse, 880 Front Street, deprived of their credible fear interviews, and are at risk of being sent on an airplane out of the jurisdiction or country without an opportunity to access or speak with an attorney despite their credible fear claims.**

126. To the extent able, Petitioner preserves the right under Federal Rules of Civil Procedure 23(a) and 23(b)(2)[10] on behalf himself and as an emergency and/or preliminary injunctive relief claim to protect the rights of all other persons similarly situated who have been arrested or detained for appearing at their court hearings, deprived the right of speaking to an attorney and are being subjected to be sent overseas without notice or an opportunity to be heard on their credible fear claims in the Southern District Court of California.

127. Petitioners-Plaintiffs share the similar commonality in having complied with and the U.S. government's rules until the rules were arbitrarily changed.

128. Under current DHS practice, numerous other asylum-seekers are being arrested and detained at their asylum, hearings.

129. Plaintiffs have seen immigration officers waiting in court presumably to arrest him/her at prior court appearances if the case had concluded and believes that he/she and/or their witnesses face likely civil immigration arrest in court following conclusion of the hearing.

130. There is overwhelming medical evidence that the incarceration of a person will have a negative impact on their well-being especially where there are other traumatic factors at work, and that damage can be permanent.

---

Julia Ainsley, *Trump Admin Tells Immigration Judges to Dismiss Cases in Tactic That Could Speed Arrests*, NBC News (June 11, 2024) https://www.nbcnews.com/politics/national-security/trump-admin-tells-immigration-judges-dismiss-cases-tactic-speed-arrest-rcna212138.

[10] In a separate motion for emergency- injunctive provisional class certification, Plaintiff-Petitioner briefs the issue insofar that the eligible class has been detained, may be unrepresented, have not been able to access attorneys that A.M. seek to protect his and their rights under time-sensitive, unprecedented circumstances.

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR A WRIT OF HABEAS CORPUS

131. For these reasons set forth herein, Plaintiff ask this court to declare that DHS's policies authorizing civil arrests in the federal building and courthouses of the Southern District Court of California are unlawful, to declare that DHS's practice of filing to obtain a warrant for courthouse arrests is illegal, and to enjoin DHS from sending noncitizens to countries without notice and a credible fear interview.

### B. Respondents-Defendants ("Respondents")

132. Respondent CHRISTOPHER J. LAROSE is the Senior Warden at the Otay Mesa Detention Center. Respondent is a legal custodian of Petitioners.

133. Respondent PAMELA BONDI is the Attorney General of the United States, which is a cabinet-level department of the United States Government. In this capacity, she directs each of the component agencies within DHS: ICE, USCIS, and CBP. As a result, Respondent BONDI has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. C. § 1103, is empowered to grant asylum, or relief. She is sued in her official capacity,

134. Respondent KRISTI NOEM is the Secretary of the U.S. Department of Homeland Security, which is a cabinet-level department of the United States Government. In this capacity, she has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. 1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of Petitioner. She is sued in her official capacity;

135. Respondent U.S. DEPARTMENT OF HOMELAND SECURITY, is a cabinet-level department of the United States federal government and subagency of DHS that is responsible for the initial processing and detention of noncitizens. Its components include Immigration and Customs Enforcement ("ICE"). Respondent DHS is a legal custodian of Petitioner.

136. Respondent TODD LYONS is the Acting Director of U.S. Immigration and Customs Enforcement. Respondent Lyons is the senior official responsible for

28

ICE's policies, practices, and procedures, including those relating to the courthouse arrest and detention of immigrants during their removal procedures. Plaintiff is informed and believes Respondent Lyons signed the authorized memo of increased immigration enforcement near courthouses. Respondent Lyons has policymaking knowledge and custody of Plaintiff.  Defendant is sued in his official capacity.

137. Respondent JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego. Respondent Aguilar is responsible for the Office of the Principal Legal Advisor (OPLA) and ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Respondent Aguilar is believed to be the person responsible for executing relevant provisions of ICE Directive Enforcement Actions in or Near Courthouses, issued on January 21, 2025, and a legal custodian of Petitioners. Respondent Aguilar is sued in his policymaking capacity, not a legal counsel role. Respondent Aguilar is sued in his official capacity.

138. Respondent SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection. Respondent Aki is responsible for the Office of the Principal Legal Advisor (OPLA) and ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Plaintiff is informed and believes that Respondent Aki is sued in his policymaker role under a policymaking memo that divests authority to the Assistant Field Office Director and Assistant Special Agents in Charge. Respondent Aki is a legal custodian of Petitioners. Respondent Aki is sued in his official capacity.

139. Respondent GREGORY J. ARCHAMBEAULT, Director of U.S. Immigration and Custom Enforcement and Removal Operations (ERO) San Diego, which is responsible for ICE enforcement and the detention facilities, including the Otay Messa Detention Facility and San Diego Area.  Respondent Archambeault's place of business is in the Southern District of California; he is believed to reside

29

in the County of San Diego, and he is an immediate legal custodian responsible for the arrest and detention of Petitioners. He is sued in his official capacity

140. Respondent U.S. CUSTOMS AND IMMIGRATION ENFORCEMENT is the subagency of DHS that is responsible for carrying out removal orders and overseeing detention. Respondent ICE is a legal custodian of Petitioners.

141. Respondent EXECUTIVE OFFICE OF IMMIGRATION REVIEW (EIOR) is the federal agency that administers the immigration court system, which decides whether an individual should be allowed to stay in the country or not.

142. Respondent CORE CIVIC is the private prison company, believed to earn multi-millions of dollars on the detention of the individual humans beings detained at the Otay Mesa Detention Center. Core Civic is a legal custodian of petitioners.

143. Plaintiff is informed and believes there are other Respondents DOES 1 through 10 are agents who usurped their power as detailed herein.

144. Plaintiff is informed and believes there are DOES 11 through 20, who are responsible for U.S. government, the Office of the Principal Legal Advisor (OPLA) and ICE's policies, practices, and procedures, including those relating to the detention of immigrants against their due process rights.

145. Plaintiff is limited at this time as Defendants have access to the full universe of their policies, practices, and procedures.  Accordingly, Plaintiff presents under information and belief and will seek to amend the complaint.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Statutory Violation

### (All Respondents)

146. All of the allegations are repeated and realleged as if fully set herein. Respondents lack statutory authority to detain A.M. under 8 U.S.C. § 1225(b)(1), INA § 235(b)(1), because that statute requires that the individual be an "arriving alien" (8 U.S.C. § 1225(b)(1)(A)(i), INA § 235(b)(1)(A)(i)) or fall within specific

designations (8 U.S.C. § 1225(b)(1)(A)(iii), INA § 235(b)(1)(A)(iii)), and be inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7), INA §§ 212(a)(6)(C), (a)(7).

50. As A.M. does not meet these criteria, his detention must be governed by 8 U.S.C. § 1226(a), INA § 236(a), which provides discretionary detention authority and requires ICE to make an individualized custody determination.

147. Under § 1226(a), individuals may be detained as a matter of discretion, released on their own recognizance, or released on a bond.

148. Respondents' failure to apply the correct statutory framework violates the INA and exceeds the government's detention authority 'voluntary departure, notice or an opportunity to respond, or asylum protections.

The application of the unstated process is therefore ultra vires.

## SECOND CLAIM FOR RELIEF

### Ultra Vires, Violation of 50 U.S.C. § 21, et seq.

### (All Respondents)

149.  All of the allegations are repeated and realleged as if fully set herein.

150. The government has not provided an explanation for its actions or the appliable law but has incarcerated countless individuals alleged to be noncitizens at their court hearings.. Notably, even the AEA does not authorize the removal of noncitizens from the United States absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory incursion" into the United States by a "foreign nation or government." *See* 50 U.S.C. § 21..

151. However, Petitioners-Plaintiffs are being subject to immediate removal without any guarantees the Respondents-Defendants will afford the privilege of voluntary departure, notice or an opportunity to respond, or asylum protections.

152. The application of the unstated process is therefore ultra vires.

///

///

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR A WRIT OF HABEAS CORPUS

## **THIRD CLAIM FOR RELIEF**

### **Violation of 8 U.S.C. § 1101, *et seq.***

### **(All Respondents)**

153. All of the foregoing allegations are repeated as if fully set forth herein.

154. The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established By Congress for the removal of noncitizens.

155. The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C. § 1229a(a)(3).

156. The current policy, conduct creates an alternative removal mechanism outside of the immigration laws set forth by Congress in Title 8.

157. The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States. Because the current process or conduct provides for the removal of Petitioners without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

158. As a result, the application of the Directive to Petitioners-Plaintiffs, which will result in their removal from the United States, is contrary to law.

### **FOURTH CLAIM FOR RELIEF**

### **Violation of 8 U.S.C. § 1158, Asylum**

### **(All Respondents)**

159. All of the allegations are repeated and realleged as if fully set herein.

160. The INA provides, "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, shall apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C §1158(a)(1).

161.  Petitioners-Respondents arrest after a hearing violates federal asylum, law because it impedes their ability to pursue their asylum claims.

162. Respondents' application of Expedited Removal to Petitioners prevents them from applying for asylum under 8 U.S.C. § 1158(a)(1) and is contrary to law.

## FIFTH CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1231(b)(3), Withholding of Removal

### (All Respondents)

163. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

164. The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

165. Respondents' Process violates the withholding of removal statute because it does not provide adequate safeguards to ensure that Petitioners are not returned to a country where it is more likely than not they would face persecution. Accordingly, Respondents' actions against Petitioners are contrary to law.

## SIXTH CLAIM FOR RELIEF

### Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") codified at 8 U.S.C. § 1231 note

### Convention Against Torture

### (All Respondents)

166.  Plaintiffs realleges all prior paragraphs as incorporated fully herein.

167. The United States is bound by the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), which prohibits returning any individual to a country where it is more likely than not that they would be subjected to torture.

168. Article 3 of the CAT, as implemented by the Foreign Affairs Reform and

Restructuring Act of 1998 (FARRA), and its regulations at 8 C.F.R. § 208.16–18, require that no person be removed to a country where they are likely to face torture at the hands of the government or with its acquiescence.

169. Petitioner has expressed a credible and well-supported fear of torture upon return to Morocco, supported by evidence including country conditions, medical/psychological documentation, affidavits, and testimony.

## SEVENTH CLAIM FOR RELIEF

### *Ultra Vires*, Violation of 50 U.S.C. § 22

### (All Respondents)

170. All of the allegations are repeated and realleged as if set forth herein.

171. The Directive requires that noncitizens whose removal is authorized unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which to settle their affairs before departing. *See* 50 U.S.C. § 22. The Directive on its face denies Petitioners any time under Section 22 to settle their affairs, because it declares everyone subject to Expedite Removal, including asylum seekers who have already filed their I-589 and established they have fear of returning to their country due to torture, persecution, or death.

172. The current practice contravenes 50 U.S.C. § 22 and is *ultra vires.*

## EIGTH CLAIM FOR RELIEF

### Violation of Due Process Under the First Amendment

### (Right to Provide Legal Advice, Right to Counsel, Petition the Government)

### (All Respondents)

173.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

174. The First Amendment to the United States guarantees fundamental freedoms, including freedom of assembly, freedom of speech, the right to petition the government, free exercise.

175. Upon information and belief, Defendants-Respondents' policies, practices, and conduct are denying access to counsel and obstructs certain freedoms.

176. Plaintiffs-Petitioners have certain rights to access their counsel.

177. Plaintiffs-Petitioners are informed and believe Defendants-Respondents' policies, practices, and conduct are denying noncitizens their rights to communicate with counsel, in violation of the First Amendment.

## NINTH CLAIM FOR RELIEF

### Violation of Due Process Under the Fourth, Fifth, Fourteenth Amendment

### (All Respondents)

178.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

179. A.M.'s detention without any valid reason violates constitutional and Statutory protections..

180. The Fourth Amendment guarantees against unlawful searches and seizures.

181. The Due Process Clause of the Fifth Amendment provides for fair and adequate hearing and an opportunity to be heard.

182. The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to A.M. and Petitioners-Plaintiffs.

183. The Fourteenth Amendment guarantees equal protection for the government

184. A.M. have a life and liberty interest under the Due Process Clause.

185. A.M. was denied a fair opportunity to present their case, Respondents' actions prevented a lawful hearing, and intimidated from accessing the courts.

186. The arrest at an asylum hearing violates procedural due process because it furthers no legitimate purpose other than chill or prevent access to the court system with those attempting to comply, not to mention a compelling government interest.

187. The mechanics of how ICE courthouse arrests occur is unnecessary, confusing, and not related to advancing the governments interest.

188. The U.S. Constitution prohibits arbitrary detention without prompt notices of charges or meaningful opportunity to be heard.

## TENTH CLAIM FOR RELIEF

### Violation of Habeas Corpus

### (All Respondents)

189. Plaintiffs realleges all prior paragraphs of this complaint and incorporate the same herein by this reference.

190. The protection of habeas corpus is enshrined in Article I, section 9 of the United States Constitution.

191. Detainees have the right to file for habeas corpus to challenge the legality of their detention or raise claims related to their detention or the basis of removal.

192. The detention of Petitioners under Expedited Removal has violated and continues to violate their right to habeas corpus. *See* 28 U.S.C. § 2241; U.S. Const. art. I, § 9, cl. 2 (Suspension Clause).

## ELEVENTH CLAIM FOR RELIEF

### (Administrative Procedure Act)

### (All Respondents)

193. All of the allegations are repeated and re-alleged as though set herein.

194. The APA prohibits agency action that is arbitrary and capricious.

195. The detention of asylum seekers at their immigration hearings without a legitimate justification is arbitrary and capricious and accordingly violates the APA. 5 U.S.C. §706.

196. There is no legitimate purpose in detaining Petitioners at the asylum hearing as they were about to adjudicate their claims and now costs the U.S. increased costs to detain or ship off to an unknown location overseas..

197. The Administrative Procedure Act (APA) instructs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

36

Accordingly, defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

## COUNT I
### DHS's Courthouse Arrest Policy is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

198. DHS's enforcement policy any "alien" may be arrested at a known location is a final agency action subject to review under the Administrative Procedure Act.

199. DHS's policies regarding courthouse arrest are arbitrary and capricious because Respondents-Defendants do not sufficiently explain to whom the policies apply, fail fully to consider the foreseeable harms and/or costs of the policies, do not adequately explain its prioritizing of civil arrests in or near courthouses over the severe harms triggered by those arrests, and do not adequately justify the change from Respondents-Defendants' prior policies.

200. DHS's application of their policies are further arbitrary and capricious as applied to the Plaintiffs because all of the Plaintiffs have been ruled *not* to be a risk of flight when the magistrate set bond in their criminal prosecutions. Plaintiffs are all in compliance with the conditions of their pretrial release, which is further evidence that their arrest at court does not further a legitimate need by ICE to arrest them because their removal can be accomplished without detaining them anew. Moreover, Defendants are not complying with their own policies.

201. Plaintiffs-Petitioners have been lawfully playing by the rules. At the least they should be provided voluntary departure.

202. DHS's courthouse arrest policies are arbitrary and capricious for a multitude of reasons including their failure to explain this historic deviation in policy, the application of the policies is inconsistent, and the policies fail to advance legitimate immigration enforcement interests.

203. Defendants' violation causes ongoing and irreparable harm to Plaintiffs.

///

## COUNT II

**DHS's Courthouse Arrest Policies Exceed Statutory Authority in Violation of the Administrative Procedures Act, 5 U.S.C. § 706(2)(C)**

### (All Respondents)

204. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

205. The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations...." 5 U.S.C. § 706(2)(C).

206. There exists a longstanding common-law privilege against civil arrest of witnesses, parties, and others attending court on official business recognized by both federal and state courts.

207. The validity of DHS authorizing civil arrest of parties and witnesses attending court depends on whether the grant of power to conduct civil arrests somehow abrogated the well-settled common law privilege that civil arrests cannot be used to arrest parties, witnesses and those attending court on official business.

208. Given the "longstanding [] principle that statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles," a statute must "speak directly to the question addressed by the common law" to "abrogate a common-law principle." *Texas*, 507 U.S. at 534 (1993) (internal quotation marks and alterations omitted). The statute authorizing DHS to conduct civil immigration arrests does not "speak directly to the question addressed by the common law"—*i.e.*, it does not speak to whether DHS can use a party or witness's appearance in court as a trap for purposes of a civil arrest. Instead, the statute simply authorizes arrest and detention, while saying nothing about how, when, or where such arrests may take place. *See* 8 U.S.C. §§ 1226(a), 1357(a). Thus, the power Congress granted to DHS to conduct civil arrests inherently contains within it the common-law limitation that parties, witnesses, and

others attending court on official business are privileged from civil arrest.

209. To the extent there is any ambiguity concerning whether the INA incorporates or abrogates the common-law privilege, the constitutional concerns raised by DHS's courthouse arrest policies, resolve that ambiguity in favor of interpreting the statute to limit DHS's authority. *See Clark v. Martinez*, 543 U.S. 371, 380-82 (2005) (when there are "competing plausible interpretations of a statutory text," courts should apply "the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

210. Abrogating the common-law privilege violates the Constitutional right of access to the courts, which prohibits "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits." *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002). Such "frustrat[ion]" includes not only policies that ban access outright, but also obstruct access. *E.g.*, *id.* at 413. Forcing noncitizens to risk civil arrest at the courts creates such impermissible frustration.

211. DHS's most recent policies authorize civil courthouse arrests that Congress never authorized DHS to conduct and contravene their **own policies, regulations, and procedures that asylum seekers relied upon.** The policies are thus "in excess of statutory jurisdiction, authority, or limitations," and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." conduct should be unlawful and set aside under the Administrative Procedure Act.

212. The courthouse arrests impact noncitizen communities broadly, instilling fear and distrust of the government, law enforcement, and the judiciary.

213. Congress' general grant of power to DHS to conduct civil arrests did not abrogate the well-settled common law privilege that prohibits civil arrests of parties, witnesses and others attending court on official business.

214. If asylees show up to court, they might get arrested, detained indefinitely, or sent back to the country where they fled persecution, but if they do not appear, a

judge may rule adversely against them and permanently lose their rights.

215.   DHS's courthouse arrest policies authorizing civil arrests of people in, or traveling to or from, courthouses, and DHS's practice of carrying out civil arrests against individuals attending federal immigration courthouses within the Southern District of California, thus exceed DHS's statutory authority.

216.  The policies are "in excess of statutory jurisdiction, authority, or limitations" in violation of the Administrative Procedure Act, 5 U.S.C. §706(2)(C).

217.   Defendants' violation causes ongoing harm to Plaintiffs.

## COUNT III
### DHS's Courthouse Arrest Policies Violate the Right of Access to the Courts

218. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

219. Defendants' actions deprive Plaintiffs of meaningful access to the federal courthouses of the Southern District of California in violation of Plaintiffs' rights under the United States Constitution.

220. Policies that ban access outright and policies that obstruct the right of access to courts in more subtle ways are prohibited.

221. Forcing noncitizens who have been fully compliant to choose between exercising their right to present asylum claims or risk being subjected to a civil arrest at a federal courthouse in the Southern District of California impermissibly frustrates the right of access to courts, as protected by the First, Fifth, Sixth, Fourteenth Amendments to the United States Constitution.

222. DHS's courthouse arrest policies, practices, and conduct were adopted by Defendants without any consideration of the foreseeable harms of their policy, without adequate explanation of their prioritizing civil arrests in or around courthouses over those harms, and without adequate justification of the change from Defendants' prior policies on courthouse arrests.

223. The courthouse arrest policies are therefore unconstitutional because they

40

infringe on Plaintiffs' right to access the courts free from fear of civil arrest.

224. These policies, practices, and procedures cause ongoing harm to Plaintiffs.

## COUNT IV
### DHS's Warrantless Courthouse Arrests Violate 8 U.S.C. § 1357(a)(2) because Plaintiffs Are Not a Flight Risk and the Arrests therefore Violate the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), (C)

225. Plaintiffs incorporate by reference the allegations set forth fully herein.

226. Plaintiffs allege that DHS has not obtained a warrant for their arrest in compliance with 8 U.S.C. § 1357(a)(2). Section 1357(a)(2) authorizes DHS to make warrantless arrests only if (1) there is "reason to believe" the alien is present in the United States in violation of immigration law; and (2) the alien "is likely to escape before a warrant can be obtained for his arrest. . . ."

227. Courts have continually recognized and required strict adherence to § 1357. *See Arizona v. United States*, 567 U.S. 387, 408, 410 (2012) (holding that an Arizona statute was preempted because it purported to give Arizona law enforcement greater warrantless arrest authority "than Congress has given to trained federal immigration officers," emphasizing that warrantless arrest authority is limited to situations where there is a likelihood of escape before a warrant can be obtained); *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding that this statute requires an individualized determination of flight risk); *United States v. Meza-Campos*, 500 F.2d 33 (9th Cir. 1975) (applying an individualized likelihood-of-escape analysis).[11]

---

[11] *See also*, *De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015) ("[E]ven if an agent has reasonable belief, before making an arrest, there must also be a likelihood of the person escaping before a warrant can be obtained for his arrest."); *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) (quoting § 1357(a)(2)) ("Without a warrant, immigration officers are authorized to arrest an alien only if they have "*reason to believe that the alien so arrested* is in the United States in violation of any [immigration] law or regulation and *is likely to escape before a warrant can be obtained for his arrest.*"); *United States v. Harrison*, 168 F.3d 483, 1999 WL 26921, at *4 (4th Cir. 1999) (unpublished) (explaining that "the critical question remains did the INS believe Harrison was likely to flee before a warrant could be

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR A WRIT OF HABEAS CORPUS

228. DHS cannot show that Plaintiffs pose a risk of escape before it can obtain a warrant. Plaintiffs are all out of custody on bond in their petty offense prosecutions, and their release on bond required a magistrate judge to rule that they do not pose an unreasonable risk of flight. Moreover, Plaintiffs' criminal cases have all been pending for many months, and DHS could have used this time to obtain a warrant. Even if DHS can establish a reason to believe that Plaintiffs are present in the United States in violation of immigration law, it cannot establish that Plaintiffs are "likely to escape" when it has failed to obtain a warrant during the months while Petitioners-Plaintiffs' cases have been pending.

229. Petitioners-Plaintiffs seek to enjoin DHS from arresting them without a federal warrant while at court, and on their way to and from court appearances mandated by their petty offense prosecutions. Plaintiffs conclusively show that they are not "likely to escape before a warrant can be obtained," § 1357(a)(2), because they are in compliance with the court-ordered conditions of bond.

230. Petitioners-Plaintiffs' cases have been pending for months or nearly two years and the length of time has afforded DHS sufficient time to obtain a warrant.

231. Petitioners-Plaintiffs' compliance with court orders for the pendency of their Immigration cases and appearance in court as ordered defeats any argument that they pose a risk of flight before a warrant can be obtained. The Court should therefore enjoin DHS from arresting Plaintiffs without a warrant while on their way to court, at court, or departing court in connection with their asylum rights.

///

///

obtained. In making such a determination, a court examines the objective facts with the knowledge of the INS Agents"; rejecting the Government's position "that in every case in which an alien is deportable an arrest can be made without a warrant"); *Westover v. Reno*, 202 F.3d 475, 479-80 (1st Cir. 2000) (commenting that an immigration arrest was "in direct violation" of § 1357(a)(2) because "[w]hile INS agents may have had probable cause to arrest Westover by the time they took her into custody, there is no evidence that Westover was likely to escape before a warrant could be obtained for her arrest").

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR A WRIT OF HABEAS CORPUS

**COUNT V**

**DHS's Warrantless Federal Building Courthouse Arrests Violate Plaintiffs' Fourth Amendment Rights**

232. Petitioners-Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

233. The Fourth Amendment guarantees Plaintiffs the right to be free from "unreasonable searches and seizures. . ." Plaintiffs assert DHS intends to arrest them when they appear in court without a warrant.

234. "[U]nlike illegal entry, mere unauthorized presence in the United States is not a crime." *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012). DHS's warrantless courthouse arrests are not in response to new criminal activity; rather, DHS's administrative arrests are used to place people immediate removal.

235. DHS's warrantless courthouse arrests are not authorized by law, and the arrests violate Plaintiffs' Fourth Amendment rights to be free from unreasonable government seizure and arrest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs-Petitioners pray for judgment as follows:

    A.   Assume and retain Jurisdiction over this matter and enjoin Respondents from transferring Petitioner out of this district's jurisdiction (inclusive of against a transfer to Morocco) pending the resolution of these proceedings;

    B.   Stay the removal of the Petitioner-Plaintiff pending further proceedings.

    C.   Issue the writ of habeas corpus on the immediate release and continued relief for Petitioner (*see* 28 U.S.C §2243).

    D.   Grant injunctive relief including but not limited to the restoration of the individual merits hearing or affirmative asylum adjudication, habeas relief of Petitioner's continued release and reset the clock to pre-detention (e.g. enjoin resetting the asylum clock-process for Petitioner's Employment Authorization Designation and resetting the whole application process) and

prohibit Defendants-Respondents from preventing alleged Petitioner's meaningful access to counsel or from relying on pressure to convince noncitizens to surrender their rights.

E.   Declare unlawful the purported practice and policy, or Directive of terminating standard removal proceedings and detaining noncitizens at the San Diego Immigration court unlawful;

F.   An order enjoining the practice of detaining individuals in and around immigration, federal, and state courtrooms; Declare DHS's courthouse arrest policies and practices are in excess of Defendants' statutory jurisdiction, authority, or limitations in violation of 5 U.S.C. §706(2)(C).

G.   Enjoin Defendants and all of their officers, employees, agents, and anyone in concert with them, from implementing, applying, or taking any action whatsoever under the DHS's courthouse arrest policies and from civilly arresting parties, witnesses, and others attending, being present at, or departing from U.S. courthouses in the Southern District of California

H.   Order continued release, or in the alternative, order a constitutionally adequate bond hearing complying with the procedural requirements in *Singh*; or, in the alternative order the government to terminate the expedited removal proceedings.

I.   Award Petitioners' counsel Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d), 5 U.S.C. §504, or attorneys' fees and costs under applicable law,

J.   Any and all other further relief as this Court deems just or proper.

Respectfully submitted,

DATED: June 20, 2025            LAW OFFICES OF EMILY E. HOWE

*By /s/* Emily Howe
Emily Howe
Attorneys for Plaintiffs
emh@howelaws.com

THIRD *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR A WRIT OF HABEAS CORPUS

**VERIFICATION BY SOMEONE ACTING ON PETITIONER'S BHEALF PURSUANT TO 28 U.S.C § 2242.**

I, Emily Howe, do depose and state:

    I represent Petitioner A.M. in his habeas corpus proceedings.  I understand that A.M. was being held in detention at the Otay Mesa Detention Center and has not been able to appear in my office to sign this Verification.

    I understand that Petitioner is informed and believed he was released on his own recognizance with conditions after being told he must fingerprint and sign a document without a translator or counsel of record.  I have reviewed the record of his detention and discussed the matter with A.M. and his supporters.  I verify that the information contained in the foregoing petition is true and correct to the best of my knowledge and belief based on that record, his supporters' testimony, and petitioners, by and through their counsel of record, to which I believe their recollection to be true.

                    Respectfully submitted,

DATED: June 20, 2025           LAW OFFICES OF EMILY E. HOWE

                            *By /s/* Emily Howe

                             Emily Howe
                             Attorneys for Plaintiffs
                             emh@howelaws.com