

Emily E. Howe, State Bar No. 293964
LAW OFFICES OF EMILY E. HOWE
405 Via del Norte, Ste B
La Jolla CA 92037
Telephone: (619) 800-6605
Email: emh@howelaws.com

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.M. on behalf of himself and others similarly situated | Case No.: 25CV1412 JO AHG |
| Plaintiff-Petitioner(s), | |
| vs. | **MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY INJUNCTIVE RELIEF FOR PETITIONER A.M.** |
| U.S. CUSTOMS AND IMMIGRATION ENFORCEMENT; EXECUTIVE OFFICE OF IMMIGRATION REVIEW CORE CIVIC; CHRISTOPHER LAROSE, warden of Otay Mesa Detention Center; PAMELA BONDI, Attorney General of the United States, in her official capacity, KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY, TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego, SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection, GREGORY J. ARCHAMBEAULT, Director of U.S. Immigration and Custom Enforcement and Removal Operations (ERO) San Diego, DOES 1 through 20, Defendant-Respondent(s). | Hearing Date: July 2, 2025<br>Time: 9:30 a.m.<br>Courtroom: 4C<br>Judge: Hon. Jinsook Ohta |

# I.    <u>Introduction</u>

Plaintiff-Petitioner A.M. (hereafter "Plaintiff") respectfully moves pursuant to Fed. R Civ. Proc. 65, for a preliminary injunction granting an extension of this Court's stay of removal to protect A.M.—and to restrain DHS officers' current implementation of conducting civil arrests of parties, witnesses and others' attending, being present at, or departing from the courthouses in the Southern District of California, and return him to a pre- status quo prior to his detention.

The motion is predicated on Plaintiff's strong likelihood of prevailing that Defendants violated the law in detaining Plaintiff during his 8 U.S.C. § 1229a, INA §240 proceedings and the irreparable harm of Defendants' reckless and/or careless behavior in chilling his ability to assert his rights as detailed in the complaint and petition for a writ of habeas corpus pursuant to 28 U.S.C § 2241 (*See* Third Am. Compl.-Pet. for Writ of Habeas Corpus ("Am. Compl. Pet."), ECF. 56; Declaration of A.M. ("A.M. Decl.").)  Specifically, Petitioner contends that Defendants-Respondents ("Defendants") detained him without any process, let alone sufficient process, and violate his rights though there is no change in his circumstances compelling his detention or deprivation of his, his witnesses, and public's rights.

Plaintiff seeks this Court's protection from Respondents' chaotic disruption of his mandated court proceedings and the coercive actions of immigration raids of masked men at the courtroom that caused him harm and still causes him and others' irreparable harm. Similar actions preventing the public's access to the courts was enjoined[1] and then stopped as a matter of sound policy in 2020. Courts have similarly prohibited this conduct under Administrative Procedures Act, the First, Fourth, Fifth Amendment, and public's Sixth, Fourteenth Amendment rights under the U.S. Constitution, statutory, and common law. [2]

---

[1] Elizeo Velazquez-Hernandez, et al., v. U.S. Immigration and Customs Enf't, et al., No. 3:20-CV-2060 (DMS)(KSC), 2020 WL 6712223 (S.D. Cal. Nov. 16, 2020)

[2] See, e.g., *Valdez v. Joyce*, No. 1:25-cv-04627(GBD)(S.D.N.Y. June 18, 2025), Dkt.15; *Ryan v. U.S. Immigr. & Customs Enf't*, 467 F. Supp. 3d 228 (D. Mass. 2020); *State of New York v. U.S.*

# FACTUAL BACKGROUND

### A. Plaintiff A.M.'s Asylum Case under INA 240 Proceedings

Plaintiff Asylum seeker A.M. is a 34-year-old Western Sahara National, who fled for his life from Western Sahara, the occupied territory in Morocco. (*See* Exhibit 1, Declaration of A.M., ¶ 4). He was detained at the Otay Mesa Detention Center in San Diego County and who, is still at risk of removal due to Defendants' actions.

He is seeking asylum, withholding of removal, and CAT protections because he fears being killed arbitrarily imprisoned, beaten and tortured by the Moroccan police since they have already done so to him. *Id*. He is persecuted for his Sahrawi race and ethnicity. His family members have been killed or forced to flee due to the human rights activism on the abuses, torture, and injustices in Morocco. (Am. Pet. at ¶¶ 12-14.) A.M.'s past persecution raises a presumption of eligibility for relief, a presumption the Government is unable to rebut.

Upon leaving Petitioner's June 3, 2025, hearing, Defendants DHS/ICE agents arrested Petitioner and took him into custody. A.M. Decl. With no advance notice to the noncitizens, As Petitioner left the immigration courtroom, he was detained by plainclothes ICE agents. *Id*. Defendants are moving for Immigration Judges to dismiss people's removal proceedings; arresting and detaining people who have appeared for their court hearings as directed; and placing them in expedited removal proceedings, thereby denying them any meaningful opportunity to be heard before quickly removing them.  (*See* Decl. of Ian M. Seruelo.)  No change of circumstances has occurred since Petitioner was released by CBP on or January 30, 2024.  Petitioner has not attempted to flee and has attended all scheduled court appearances. (Am. Pet. 30).

*U.S. Immigr.  & Customs Enf't*, No. 19-cv-8876, 2020 WL 2117584 (S.D.N.Y. May 12, 2020); *Liu v. Chertoff*, No. C07-2566, 2007 WL 1211290 (N.D. Cal. Apr. 23, 2007) (injunction issued to limit ICE arrests at courthouses to protect access to immigration hearings); *Nken v. Holder*, 556 U.S. 418 (2009) (recognizing the importance of fair process in immigration hearings).

1.   This case arises out of the sweeping immigration enforcement actions the government began unannounced at or about the Edward J. Schwartz Federal Building and Courthouse in the Southern District of California. As a part of official internal memos, Respondents, including Department of Homeland Security leadership and agents, planned to and did arrest alleged noncitizens, detaining them at the courthouse without notice or an opportunity to be heard, set for immediate expulsion from the United States at an unprecedented speed.[3]  (*See* Decls. A-M.)

2.   *Courthouse arrests under Fourth, Fifth, Sixth:* Petitioner respectfully seeks the court issue a injunctive relief to enjoin the abusive, overly broad, and harassing practice of using the courthouses to conduct civil administrative arrests without a bench warrant[4], to impose indefinite 'mandatory' detention, or immediate forced removal without due process, as asylum seekers, noncitizens, and members of the public *lawfully appear for their mandated courtroom appearances. (See* Lyons memo). Defendants-Respondents have  not provided client with any evidence, policy, or proof that his statutory, constitutional, or international rights are or will be respected.  Instead, Plaintiff is informed and believes that A.M. and others similarly situated have been whisked away **by men wearing balaclavas and full masks** to a privately owned Detention Center. Plaintiff A.M. was interrogated without an attorney.

3.   *Access to the Courts and Counsel under First:* Plaintiff A.M. alleges that he was not been able to access counsel or speak with counsel in any meaningful fashion since his arbitrary detention on or about June 3, 2025.  (A.M. Decl.) Despite Respondents' knowing Plaintiff's represented, Defendants would not schedule a time to meet and instead interrogated Plaintiff.  Petitioner's Respondents have access to his I-589, Application for Asylum and for Withholding of Removal and supplemental filings, G-28 Notice of Entry of Appearance as

---

[3] A more fulsome treatment of the facts in this case is in the amended petition, ECF 56, Petitioner A.M. has sworn to the facts.  See Declaration of A.M. (June 24, 2025), ECF 49-1..

[4] The publications are solely for judicial notice that this publication occurred.

Attorney and coerced him to fingerprint removal instructions. *Id*.

4. **Respondents' actions violate their own memos, the constitution and statutory protections.** On or about May 27, 2025, Respondents revoked its own rules without notice that prohibited arrests at or within the courthouses but also have not followed its own published guidance. The *expansive quotas* under the ICE Directive Enforcement Actions have incentivized improper actions in or near Courthouses. Defendants-Respondents hold the universe of that information.

5. Based on reports from Plaintiffs, legal providers and observers, the DHS officers' actions have systematically commandeered the Edward J. Schwartz federal building and courthouse complex to serve as **a trap to arrest** those they perceive to be "[noncitizens]" without regard to the serious impact the arrests have on court participants, the public and the court itself. (See Declarations A-M.)

6. Plaintiff respectfully move the Court for Injunctive Relief under Rule 65 barring the summary removal of A.M. and those similarly situated under the Expedited Removal or any applicable pretexts, (ii) enjoin Defendants from their coercive, menacing, deleterious behavior of conducting warrantless civil arrests in or about courthouses, (iii) any relief this court deems proper or just.

The Lyons memo purportedly provides protections and caution[5]:

---

[5] Aliens Subject to Enforcement Actions
*Generally, ICE's civil immigration enforcement actions in or near courthouses include actions against targeted aliens, including but not limited to:*
  • *National security or public safety threats;*
  • *Specific aliens with criminal convictions;*
  • *Gang members;*
  • *Aliens who have been ordered removed from the United States but have failed to depart; and/or*
  • *Aliens who have re-entered the country illegally after being removed.*
*Other aliens encountered during a civil immigration enforcement action in or near a courthouse, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding, may be subject to civil immigration enforcement action on a case by-case basis..*

> "ICE officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings (e.g. Family Court, small Claims Court). When an enforcement action in the above situation is operationally necessary, the approval of the respective Field Officer Director (FOD), Special Agent in Charge (SAC), or his or her designee is required prior to conducting the enforcement action.

If Defendants-Respondents have knowingly and willingly engaged in an **overt 'bait-and-switch' of arbitrary arrests and detentions** of law-abiding individuals and not respected the basic process at or about the courthouse, Plaintiff has good cause to believe that Respondents' harmful, irreversible behavior will continue.

**B. Expedited Removal Directive and Unlawful Removals**

Here, Expedited Removal does not and cannot apply, as Plaintiff was already fully in proceedings due to an intentional choice of the Government. Plaintiff is informed, based on the government's actions, statements, conduct, or omissions has or plans to commence immediately unlawful removals pursuant to a Directive, memo, and/or internal policy to deprive Plaintiff of their due process rights.

In past regulations, expedited removal has applied to those who were in the country less than fourteen (14) days and within 100 miles of the border. 8 C.F.R. 235.3(b). Here, this initiative specifically targets people who are in regular removal proceedings in immigration court, many of whom are pursuing asylum and other relief. *See generally* Howe Decl. (N.Y. Times, May 30, 2025); *id,* (Wash. Post, May 23, 2025). The initiative has three basic components. First, DHS is orally moving to dismiss noncitizens' removal proceedings, with no advance notice, when people appear in immigration court for court mandated hearings (the equivalent of arraignments or pretrial conferences in criminal court), on the grounds that such proceedings are no longer in the best interests of the government under 8 C.F.R § 239.2(a)(7).[6] DHS is doing so even though the government's own Immigration Court Practice Manual requires that "filings must be submitted at least

---

[6] *See Declarations.*

fifteen (15) days in advance of the master calendar hearing if requesting a ruling at or prior to the hearing." *See* Celleri Decl. ¶9 (Exec. Off. For Immigr. Review 2025); *see also* Jacobs Decl. ¶ 8. Despite that requirement, the Department of Justice issued written instructions to immigration judges stating that they may allow the government to move to dismiss orally, in court, without a written motion, and to decide that motion without allowing the noncitizen an opportunity to file a response. *See* AIILA Exhibit.

Here, Plaintiff A.M.'s case illustrates the government's misuse of expedited removal to circumvent due process and judicial oversight by yanking him out of . He was issued an expedited removal order despite being non-detained, under 8 U.S.C. § 1229a, INA § 240, Petitioner complied with the law and reliably appeared and without warning, Defendants change their rules. *See* Amend. Compl.

Defendants have not complied with the statutory protections thus far. Plaintiff faces imminent and irreparable harm if this court does not intervene, which is tantamount to harm to his person, torture, and death. *See* Fadel Declaration. A.M. has strong asylum claims. He was detained, without access to counsel, and at risk of removal from the United States without access to a fully and fair hearing on his protection claims. *Id*. Once removed, the harm– including persecution, torture, or death is irreversible and incapable of being remedied under judicial review.

**B. Congress's Comprehensive Reform of Immigration Law and Protections of A.M. under Statutory, International Treatises and Obligations of the United States.**

Congress prescribed safeguards for noncitizens seeking protection from persecution and torture. *See INS v. Cardoza-Fonseca*, 480 U.S, 421, 439-40 (1987) (describing the United States' adoption of the United Nations' post-war refugee protections). One of Congress's "primary purposes" was "to bring United States refugee law into conformance" with international treaties and the bedrock principle that individuals may not be returned to countries where they face persecution, torture, or death. *Id.* at 436.

First, the **asylum statute**, 8 U.S.C. § 1158, provides that any noncitizen in the United States has a right to apply for asylum. *See* 8 U.S.C. § 1158(a)(1) (providing that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum").

Second, the **withholding of removal statute**, 8 U.S.C. § 1231(b)(3), provides that noncitizens "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground. A grant of withholding is mandatory if the individual meets the statutory criteria. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999), and gives the statute broad application where the government seeks to return a noncitizen to a country where he fears persecution, *see Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1089 (9th Cir. 2020), *vacated as moot sub nom. Innovation Law Lab v. Mayorkas*, 5 F.4th 1099 (9th Cir. 2021).

Third, **protections under the Convention Against Torture** ("CAT") prohibit returning noncitizens to a country where it is more likely than not they would face torture. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18 (implementing regulations).

Here, however, Defendants are believed to be publishing quotas[7], and explained mandatory detention and removal—including Plaintiff—whom they forced to fingerprint a document without counsel allowing for his removal, in contravention of statutory processes, and without any judicial review. *See A.M. Decl.*

**C. Warrantless Courthouse Arrests**

Since Petitioner and others must return to court, the Court's urgent intervention

---

[7] José Olivares, Trump Administration Sets Quota to Arrest 3,000 People a Day in Anti-Immigration Agenda, The Guardian (May 29, 2025), https://www.theguardian.com/us-news/2025/may/29/trump-ice-arrest-quota.

is needed. DHS officers' practice of conducting civil immigration arrests in court is unlawful for at least four distinct reasons, and **the Court should issue a Preliminary Injunction** to prevent unlawful arrests. First, the courthouse arrest policies are *arbitrary and capricious* because they are insufficiently explained, fail to consider all factors, and depart from prior policy without reasoned explanation.

Second, *Congress never authorized DHS to conduct civil courthouse arrests* because it never abrogated the well-settled common-law privilege against such arrests. It has long been recognized that when lawmakers pass a statute, absent express indication otherwise, the new law "brings the old soil with it." *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (citation omitted). The "old soil" here—the privilege against civil courthouse arrests—traces its roots to common law.

Third, DHS's policies *violate the right of access to the courts* which frustrates Plaintiff's First, Fifth and the public's Sixth and Fourteenth Amendment rights.

Fourth, and finally, DHS conducts the *civil arrests without a warrant* as required by statute and the Fourth Amendment, with a *non-licensed staff member* signing an administrative civil paper to **indefinitely detain, immediately expel, or send an individual who has been complying with all the rules, to one's persecution, torture, or likely death, without notice or due process of the law**. Thus, we respectfully seek this Court's urgent action to protect the integrity of the judicial process by enjoining Defendants' from making civil arrests at or about the courthouses and federal building within in the Southern District.

## PETITIONER'S DETENTION

The Supreme Court has "long held"—and recently reaffirmed—that "[t]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings," such that "*no person* shall be removed from the United States" without due process, including reasonable notice and a meaningful opportunity to be heard. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (2025).

The Fifth Amendment's Due Process Clause prevents the Government from depriving any person of"]ife, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment-from government custody, detention, or other forms of physical restraint- lies at the heart of the liberty [the Due Process Clause] protects." *Zadvydas v. Davis,* 533 U.S. 678,690 (2001 ). It is well established that due process protections extend to noncitizens. including those in removal proceedings. *See Zadvydas,* 533 U.S. at 693 ("'[T]he Due Process clause applies to *all* 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Reno v. Flores,* 507 U.S. 292,306 (1993). Even noncitizens have a liberty interest in continued freedom from *civil* immigration confinement.

## THE IMPLEMENTATION OF COURTHOUSE ARREST POLICY

### *"It's de ja vu all over again"*

On Tuesday, June 3, 2025, Plaintiff A.M. lawfully appeared at what was scheduled as his final individual merits hearing to show his profound and credible fear of persecution, torture, or death if returned from where he fled for his life. ECF No. 59, Declaration of A.M. ("A.M. Decl.") ¶ 2. Little did he know that on the same day of his long scheduled 'World Series', Respondents sought to change the rules in the very last inning. To reach a published quota[8], Plaintiff is informed and believes that an Executive memo instructed the government to increase dismissals, which would deprive him of the statutory protections of under the Immigration and Nationality Act.  That day reportedly became the most immigrant arrests in recent history, including at the Edward J. Schwartz Federal Building and Courthouse in San Diego, California.

Here, in the Southern District of California, DHS has implemented this directive by conducting dozens of immigration courthouse arrests of individuals

---

[8] This process is being challenged in *Make the Road N.Y. v. Noem,* No. 1:25-cv-00190-JMC, (D.D.C. Apr. 12, 2025)*.*

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

who were lawfully appearing for their asylum hearings. These arrests have occurred inside the Edward J. Schwartz federal building adjacent to the courthouse—and even stepping inside a courtroom. It is undisputed the courthouse arrests at issue are for civil enforcement only (deportation) and not for arrest due to commission of a crime, or to apprehend an individual who poses a risk to safety.

For more than 20 years under both the Bush, Obama, and Biden Administrations, published policies governed the federal government's immigration priorities and exercise of prosecutorial discretion. *See* Exhibits A-L. In recognition of the significant disruption that results when civil immigration arrests are made in public, DHS also specified locations where, immigration arrests were not permitted. These included schools, hospitals, places of worship, weddings, and funerals. See 1/20/2021 Directive, Mayorkas Memo (October 27, 2021, Guidelines on Enforcement Actions in or Near Protected Areas).

In January, then ICE Acting Director Caleb Vitello issued a directive (Policy Number 11072.3), in accordance with the Memorandum from the Acting Secretary of Homeland Security Benjamin Huffman published Enforcements Actions in or Near Protected Areas (Jan. 20, 2025), superseding the Mayorkas memorandum entitled, Guidelines for Enforcement Actions in or near Protected Areas. On January 21, 2025, the instructions maintained: "When practicable ICE officers and agents should generally avoid enforcement actions in or near Courthouses."

Yet, on May 27, 2025 DHS Acting ICE Director TODD LYONS rescinded those memos with his own memo that still purported to protect. *See* Exhibit L at 2. Acting Director Lyons noted: "ICE Officers and agents should generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings - examples include family court and small claims court." When an enforcement action is operationally necessary, the approval of the respective Field Office Director (FOD), Special Agent in Charge (SAC), or the designee is required prior to conducting the enforcement action.

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

The Executive Branch announced that "Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has credible information cause to believe … at a specific location."*Id*. at 4. Similarly, here the procedure provides: "ICE officers or agents may conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location".[9]

Previously, the Secretaries allowed for the "exercise of prosecutorial discretion" for arrests "on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director." *Id*.

Back in January 10, 2018, ICE formalized its Civil Courthouse Arrest Policy in ICE Directive No. 11072.1, entitled "Civil Immigration Actions Inside Courthouses." Rather than recognizing courthouses as "Sensitive Locations," ICE's civil courthouse arrest policy *targets* courthouses as opportune locations for civil immigration arrests, searches, and surveillance. The courthouse arrest policy vests ICE with the unbridled and boundless discretion to make civil arrests in and around virtually any courthouse location when ICE deems it "necessary."

And that courthouse arrest policy did not *limit* its arrests to these "target aliens." The Policy provides that "[a]liens encountered during a civil immigration enforcement action inside a courthouse" who are not "targeted alien[s] . . . will not be subject to . . . enforcement action, *absent special circumstances*." However, the Policy provides no information concerning what ICE considers "special circumstances," and simply stated that "ICE officers and agents will make

---

[9] Lyons Memo.

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

enforcement determinations on a case-by-case basis in accordance with federal law and consistent with U.S. Department of Homeland Security (DHS) policy." *Id*.

ICE's website has a list of frequently asked questions including what types of arrests will take place at courthouses. The new memo cautions to be cognizant of **non-criminal or specialized areas**, but ICE has not treated or does not consider courthouses sensitive locations, and the answers make clear that courthouses arrests are legal in ICE's view and will continue unabated.

On January 20, 2025, President Trump issued Executive Order 14159. 90 Fed. Reg. 8,443. Consistent with the President's goal of rapidly deporting millions of immigrants, the Executive Order directed the DHS Secretary to "take all appropriate action" to apply expedited removal procedures "to the aliens designated under" 8 U.S.C. § 1225(b)(1)(A)(iii)(II). 90 Fed. Reg. at 8,445.

On January 21, 2025, DHS issued a notice, effective immediately, that authorizes application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for at least two years. 90 Fed. Reg. 8,139 ("Rule").[10]

Similar to the first Trump administration, a new memo was published and signed by acting TODD LYONS. And the next sentence of the answer provides for the "arrest of non-targeted individuals" during some undefined "exigent circumstances." *Id.* All this was enjoined, as ultimately, the memorandums, directives and website answers simply formalize a Directive, which vested DHS with unfettered discretion to use courthouses as a trap to arrest *anyone* suspected of a civil immigration violation—including criminal defendants, victims, witnesses, and parties to civil proceedings.

## 1. IMMIGRATION RAIDS AT OR ABOUT THE COURTROOMS

In the recent weeks, immigration officers have arrested scores of people inside the federal courthouses and building for the Southern District of California.

---

[10] The Rule is also attached as Exhibit 1 to the Steinberg Declaration.

Immigration officers hover by the door in full face masks, to effectuate a civil courthouse arrest. That means immigration officers are present and poised to conduct civil immigration arrests at every mandated court hearing.

*Nothing speaks 'justice' like masked men in black at the courtroom door.*

Attached as exhibits are a number of declarations[11] by seasoned iattorneys, community leaders, and legal observers regarding the invasive practice of attending court appearances occurring to date. First, Despite the fact that the practices are seemingly coordinated and planned, the arrests appear to take place without a warrant, indiscriminate of who is on the administrative paper, and with a callous disregard for civility…the Plaintiffs have been out of custody for months, are in compliance with the conditions, and do not present a risk of flight risk.

Second, ICE officers, in coordination with DHS trial attorneys, are stationing themselves in immigration courts—in the hallways or even in courtrooms—so that they can ambush noncitizens, immediately arresting and detaining them upon their court hearings.[12]

Finally, in cases where IJs have granted the government's motions to dismiss, the government has placed individuals in expedited removal—and, in some cases, deported people within a matter of days. *See, e.g.*, A.M. Decl; Legal Observers.

This initiative is unprecedented. *See, e.g.*, Declaration of Attorneys. Despite their stated intentions, Defendants are nonetheless sweeping up people who are statutorily ineligible for expedited removal because they have been present in the U.S. for over two years. *See, e.g.*, Celleri Decl.. ¶¶.

Defendants are even targeting people who have pending applications for relief, including for asylum. *See* Celleri Decl. ¶¶ 7, 18-24, 32-33.

---

[11] The attached declarations are redacted and concurrently filed to be included in the record unsealed. All declarants provided to use authorizations and their names. In an abundance of caution, Plaintiffs redacted personally identifying information and omitted their signatures.

[12] *See* Howe Decl., Ex. A (N.Y. Times, May 30, 2025) (describing coordination policy); Seruelo Decl. ¶, Celleri Decl. ¶ (describing how plainclothes ICE officers "swarmed" noncitizens near the bathroom); Rowland-Kain Decl. ¶ 16 (arrests in the elevator of New York immigration court); Jacobs Decl. ¶¶ 7, 10 (arrests in hallway of San Diego Immigration Court); McGoldrick Decl. ¶ 4 (arrests in hallwayChavez Decl. ¶ 16 (arrests in hallway, lobby).

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

The government's new policy has already deterred people from attending their removal proceedings. *See* Koop Decl. ¶ 16 ("The ICE arrests—as well as the noticeable presence of ICE agents near the entrance to and in the hallways outside of the Immigration Court—appear to have already caused people to miss their Immigration Court hearings")

The government is systematically pursuing its new initiative in San Diego. *See* Celleri Decl. ¶ 8; Jacobs Decl. ¶¶ 7, 10. As a result—absent this Court's intervention—Plaintiff Make the Road New York's members with scheduled court dates in New York's immigration courts face the imminent risk of being placed in expedited removal and deported from the United States without due process. *See* Smith Decl. ¶¶ 19-26, 29 ("[T]he campaign to target individuals attending their immigration court proceedings for placement into expedited removal and detention by ICE has sent shock waves. In the first week of June, Defendants also launched a series of workplace raids reflecting yet another "new phase of the Trump administration's immigration crackdown." Steinberg Decl., Ex. 37 (N.Y. Times, June 7, 2025). A DHS spokesperson stated that "2,000 immigrants per day were arrested" during the first week in June. *Id.* It is therefore a near-certainty that A.M. and others are still at risk.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A plaintiff may obtain a preliminary injunction under a "sliding scale" by raising "serious questions" to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

Irreparable harm is nearly as crucial as the success factor: "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."

*Winter v. Natural Res. Def. Council, Inc.*, 555. U.S. 7, 22-24 (2008) (emphasis in original). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## ARGUMENT

The Court rightly found that Plaintiff is likely to prevail on the merits as he has already suffered irreparable harm, and the others who have pending cases will suffer irreparable harm in the absence of relief. The balance of hardships is clearly in his favor, and the public interest favors relief because unlawful civil arrest in court chills public participation in the judicial process. Plaintiff is still suffering, and the balance of the harms and equities support a preliminary injunction.

### A. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.

To succeed on this element, "at 'an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation.'" *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009) (quoting *Dep't of Parks & Recreation v. Bazaar Del Mundo, Inc.*, 448 F. 3d 1118, 1124 (9th Cir. 2006)). Hre, DHS's civil arrest authority is subject to constitutional, statutory, and common law limits. *See Arizona v. United States*, 567 U.S. 387, 413 (2012); *Civil Aeronautics Bd. V. Delta Air Lines Inc.*, 367 U.S. 316, 322 (1961) (where an agency is "entirely a creature of Congress," the "determinative question is not what the [agency] thinks it should do but what Congress has said it can do").

Defendants' courthouse arrest policies violate the Administrative Procedure Act (APA) in at least two ways. First, the Policy is arbitrary and capricious because ICE failed to adequately explain the basis for its policy, failed to consider all relevant factors, and vastly departed from prior policies without sufficient explanation. Second, the Courthouse Arrest Policy violates the APA because it is contrary to a long established and firmly entrenched common-law privilege against

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

civil courthouse arrest, which has already been enjoined in this district.

### 1. Plaintiff is likely to succeed because DHS's change in courthouse arrest policy violates the Fifth Amendment

"Procedural due process rules are meant to protect against the mistaken or unjustified deprivation of life, liberty, or property." *A.A.R.P.*, 145 S. Ct. at 1367 (cleaned up). Indeed, the Supreme Court has "long held that 'no person shall be' removed from the United States 'without opportunity, at some time, to be heard.'" *Id.* (quoting *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)).  The Rule and Guidance violate the fundamental due process rights—to meaningful notice and the opportunity to a fair hearing before a neutral decisionmaker—of people who have already entered the United States and therefore have a strong liberty interest in avoiding removal from the country. The Rule expands expedited removal far beyond its previous limits—individuals who, like the petitioner in *DHS v. Thuraissigiam*, were apprehended soon after crossing the border and thus could not "be said to have 'effected an entry.'" 591 U.S. 103, 140 (2020). The expansion challenged here applies to people who have effected physical entry and have been present in the United States for up to two years.

### 2. ICE's Arrest Policy is arbitrary and capricious in violation of the APA

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). To ensure that agency action is lawful and properly reasoned, reviewing courts conduct a "thorough, probing in-

depth review" of the agency's reasoning along with a "searching and careful" inquiry into the facts supporting it. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971). Following that review, a court "shall" set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in according with the law." 5 U.S.C. § 706(2)(A).

Agency policy, and not just formal rulemaking, is subject to arbitrary-and-capricious review. *See, e.g.*, *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931-35 (D.C. Cir. 2008) (agency policy that was not subject to notice-and-comment rulemaking nonetheless held arbitrary and capricious); *Bechtel v. FCC*, 10 F.3d 875, 887 (D.C. Cir. 1997) (same). And agency policy need not be reduced to writing fully (or at all)to trigger judicial review. *Venetian Casino Resort*, 530 F.3d at 929-30 (although the details of agency's unwritten policy remained "unclear"); *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Agency action . . . need not be in writing to be final and judicially reviewable.").

Agency policy may be found arbitrary and capricious for many reasons, including if the agency fails adequately to explain the basis for its decisions, fails to consider all relevant factors, or departs from prior policies without a "reasoned explanation." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, DHS's courthouse arrest policies have not been and are insufficiently explained and do not account for the agency's change from its prior policy. The abrupt behavior is so sudden and not noticed that the Defendants-Respondents' representative purported not to know of any in existence.

First, DHS has not set forth the courthouse arrest policies in a way that can be understood by those affected by it. Although DHS agents repeatedly have confirmed that no policy exists, witnesses have seen and heard in court the conversations of the lists of pre-determined arrests at or about the court hearing; in fact judges have commented on there being a list distributed to government attorneys [*See* Decls. A-M]; it has given ambiguous statements about whether and

when it will be employed against victims, witnesses, and other noncitizens who pose no threat to public safety. DHS fails to meaningfully explain how the courthouse arrest policies can operate without contravening Congress's directives *requiring* certain noncitizens to participate in legal proceedings. *See* 8 U.S.C. § 1101(a)(15)(U) (encouraging victims to help with local investigations).

Here, the Declarations show the gravity of the situation.(See A-I); Respondents conducted mask-filled raids that have arrested the wrong individual and shoved attorneys, legal observers, and members of the public alike.

Second, the DHS's courthouse arrest policies fail all three requirements that an agency must follow when it reverses a prior policy. DHS's public statements and memorandum, ICE's written Directive, and ICE and CBP FAQ documents nowhere "display awareness" of the preceding 20 years of published immigration enforcement priorities, *See Encino Motorcars*, 136 S. Ct. at 2126; *Washington v. U.S. Dep't of State*, No. C18-1115RSL, 2019 WL 5892505, at *8 (W.D. Wash. Nov. 12, 2019) ("[G]iven the agency's prior position . . . it must do more than simply announce a contrary position."). DHS likewise provides no "good reasons for the new policy." *Encino Motorcars*, 136 S. Ct. at 2126,

Third, DHS has not balanced the reasons for its new policy against serious reliance interests engendered by its prior courthouse policies, which led individual litigants and court officials to expect that noncitizens could appear in court without risk of civil arrest. Failure to appear could result in significant consequences and permanent loss of access to the applicant's claims.  Plaintiff knows that appearing will subject them to involuntary and indefinite civil courthouse arrest. The new policies do not acknowledge these "serious reliance interests," let alone take them "into account." *Fox Television Stations, Inc.*, 556 U.S. at 515. Because the arrest policies are not clear and do not explain its departure, it fails APA review.

Last, the courthouse arrest policies fail to consider the serious and predictable harms to the Plaintiffs' individual constitutional rights by frustrating

their access to the courts. Even where an agency explains the basis for its action, it will still flunk APA review if the agency fails to articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. In order to be "reasoned decision making," agencies must "look at the costs as well as the benefits" that will flow from their actions. *Id*. at 52. Where an agency "entirely failed to consider an important aspect of the problem," its action is arbitrary and capricious. *Id.* at 43. DHS failed to consider the Courthouse Arrest Policy's impact on Plaintiff's First[13], Fifth[14] and arguably the public's Sixth[15] and Fourteenth Amendment rights and therefore fails APA review.

Here, the courthouse arrest policies seem to be expansive and provides for "anyone whom the government thinks may be an alien" and "located at a specific location; this could include staff, clerks, jurors, even jurists.  In fact, these policies are so lacking any objective standard that Respondents' agents told an attorney to pick between which client would be detained.  *See* Declaration of Maria Chavez. Respondents' Attorneys purportedly had a list pre-determined.  *See Ian Seruelo.* Instead, they were hovering by the door to scoop up the lawful litigant. Legal observers reported seeing agents following individuals into the restrooms to detain them, shoving members of the public over.  (*See* Declaration of Michelle Celleri; Alor Calderon)

DHS offers "no findings and no analysis . . . to justify the choice" to adopt a policy with such significant implications for the orderly administration of justice. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962). In light of this failure, the APA "will not permit" the courthouse arrest policies to remain in place. *Id.* DHS failed to adequately explain the basis for its decisions, failed to consider all relevant factors, and departed from prior policies without a reasoned explanation. . The unannounced, unwritten arrest policies violate the APA.

---

[13] *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002).
[14] *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).
[15] *See e.g.*, *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987); *Illinois v. Allen*, 397 U.S. 337, 338 (1970).

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

**3. DHS's courthouse arrest policies are in violation of clearly established law and it violates Plaintiff and the public's rights of access to the courts.**

A deeply rooted common-law privilege against civil arrest at the courthouse protects Plaintiffs' right to access the court "free from the fear of molestation or hindrance" as well as the Court's interest in "the necessities of [] judicial administration." *See Stewart v. Ramsay*, 242 U.S. 128, 130 (1916). This deeply rooted right to be free from civil arrest in court is centuries old, and it prohibits DHS's practice of effectuating courthouse arrests

**a. The U.S. Supreme Court recognizes a longstanding federal common-law privilege against civil arrest while attending court.**

Before the United States was founded, civil suits were initiated in England through the arrest, of the defendant by a government official to secure the defendant's appearance. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). This practice deterred parties from "com[ing] forward voluntarily" for fear they would be seized at the courthouse and held. *The King v. Inhabitants of the Holy Trinity in Wareham*, (1782) 99 Eng. Rep. 530, 531. Court arrests risked "perpetual tumults" that were "altogether inconsistent with the decorum which ought to prevail in a high tribunal." *Orchard's Case*, (1828) 38 Eng. Rep. 987, 987. To protect "the purposes of justice," English courts adopted a privilege barring government officer from making civil arrests at court. *Holy Trinity in Wareham*, 99 Eng. Rep. at 530. The freedom from arrest extended beyond the courtroom and the courthouse grounds, covering parties and witnesses traveling to and from court. *See, e.g.*, William Tidd, *The practice of Superior Courts of Law in Personal Actions and Ejectment, Ect.* 88-89 (9th ed. 1833).

The Supreme Court long ago affirmed that this common-law privilege against civil arrests at the courthouse persists under federal law. In *Stewart v. Ramsay*, the Court restated the privilege, explaining "[t]he true rule, well founded in reason and sustained by the greater weight of authority, is that suitors . . . as well

as witnesses… are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going." 242 U.S. at 129. William Blackstone, *Commentaries on the Laws of England 766* (1877). Blackstone is unequivocal "no arrest" shall take place in court.

This fundamental shift in governmental structure must be accounted for when interpreting the common-law right against civil administrative arrest. By protecting litigants, the privilege also protects the courts' ability to adjudicate disputes. Thet rationale resonated with the United States Supreme Court in *Stewart*, which reasoned that the common-law rule against civil arrest in court extended to the service of civil process in court in part because of "the necessities of [] judicial administration." *See Stewart*, 242 U.S. at 130.

By choosing to forego judicial process and conduct civil arrests as part of civil immigration proceedings, the Executive places itself in the same position as any citizen—it's abusing **lawful attendance at court to snatch up a person into an unknown abyss,** thus disrupting court and terrifying future litigants and witnesses. The Court should, therefore, rule consistently with the Court in *Stewart* as well as the Washington and New York district courts and find that the centuries old common-law right against civil arrest bars DHS's courthouse arrests.

**b. The INA incorporated the privilege against civil courthouse arrest**

Plaintiffs anticipate that Defendants will argue that the INA conferred broad arrest authority under 8 U.S.C. §§ 1226(a) and 1357(a)(2) to justify their courthouse arrest policies. However, neither provision abrogates the federal common-law privilege against civil courthouse arrest. The courthouse arrest policies therefore exceeds agency authority in violation of the APA.

"A deportation proceeding is a purely civil legal action[.]" *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). The INA authorizes civil arrests of noncitizens whom ICE has probable cause to believe are removable. *Tejada-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980). Section 1226(a) provides that "[o]n a

warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."

Section 1357(a)(2) authorizes warrantless civil arrests where **an agent has probable cause to believe a noncitizen is removable and "is likely to escape before a warrant can be obtained for his arrest."**

Specifically, "Congress is understood to legislate against a backdrop of common law . . . principles." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). In this case, far from "speak[ing] directly" about immigration arrests at courthouses, the INA's civil arrest provisions are silent about where arrests may occur. 8 U.S.C. §§1226(a), 1357(a)(2). Accordingly, this Court should "take it as a given that Congress has legislated with an expectation that the common law principle will apply" as a limit on ICE's civil arrest authority. *Texas*, 507 U.S. at 534; *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (agencies have only those powers "authoritatively prescribed by Congress."). DHS's courthouse arrest policies ignore the INA's incorporation of longstanding common law, resulting in disruptive violations of courthouse arrest privileges.

    **c. Plaintiffs are likely to succeed because DHS's practice of arresting "anyone" whom they believe to be an "alien" in court without a warrant is clearly prohibited by statutory, constitutional, and common law.**

The practice of conducting warrantless civil arrests on the Plaintiffs violates both 8 U.S.C. § 1357(a)(2) and the Fourth Amendment of the Constitution.

    **d. ICE's practice of making courthouse arrests without a warrant violates 8 U.S.C. § 1357(a)(2).**

Immigration officers are authorized to conduct warrantless arrests in a narrowly circumscribed set of circumstances. The only statutory authorization for warrantless civil immigration arrests is 8 U.S.C. § 1357(a)(2):

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant . . . to arrest any alien in the United States, if he ***has reason to believe that the alien so arrested is in the United States in violation***

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

*of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest* . . .

Thus, warrantless arrests are permitted only where there is (1) reason to believe the alien is in the United States **in violation of immigration laws**, and (2) reason to believe the **noncitizen is likely to escape** before an arrest warrant can be obtained. Courts have uniformly held that "the 'reason to believe' phrase in §1357 'must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause.'" *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015); *Tejeda–Mata v. Immigration & Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir. 1980) ("The phrase 'has reason to believe' [in § 1357] has been equated with the constitutional requirement of probable cause.").

The mere fact that a person is not lawfully present in the country is insufficient to establish probable cause that the person "is likely to escape before a warrant can be obtained for his arrest." *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding that arrests under § 1357(a)(2) require an individualized determination of flight risk). Such an interpretation would be contrary to the statute itself, which requires that immigration officers must have reasonable belief *both* that the alien is in the country illegally *and* that the alien is likely to escape before a warrant can be obtained. *Nava v. Dep't of Homeland Sec.*, 435 F. Supp.3d 880, 891–92 (N.D. Ill. 2020) ("The prescribed particularized determination of a detainee's flight risk is not substantively related to the question whether a non-citizen can lawfully be removed from the United States.").

It is impossible for immigration officers to satisfy the second prong of §1357(a)(2) where they have been aware of an alien's presence for months or even years. If immigration officers were permitted to satisfy the prong by simply refusing to obtain a warrant until the last minute, it would obviate the warrant requirement of § 1357(a)(2). *See also* 8 C.F.R.§ 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained except when the designated immigration officer has reason

to believe that the person is likely to escape before a warrant can be obtained.").

DHS has had ample time to obtain warrants in each of the Plaintiffs' cases. Here, Respondents' have known about Petitioner for more than seventeen months—more than enough time to obtain a warrant, if even qualified to be obtained. DHS officers cannot manufacture an exigency to get around the warrant requirement. Any contrary holding would incentivize immigration officers *not* to seek a warrant, which is contrary to both the language and purpose of the statute. Unlike federal law enforcement officers who can make warrantless arrests without a risk-of-escape requirement, **Congress specifically limited immigration officers' authority to make warrantless arrests to situations where arrestees pose a risk of escape before a warrant can be obtained**. *Compare* 8 U.S.C. § 1357 *with* 18 U.S.C. §§ 3051(a), 3052, 3053, 3056(c)(1)(C).

It is particularly difficult to establish probable cause that a person is going to flee when the authorities know where the person lives and the person has repeatedly shown up for legal proceedings. Ultimately, there are two independent reasons that immigration officers' civil courthouse arrests violate 8 U.S.C. § 1357(a)(2): immigration officers have had in every case many months in which to obtain the required warrant; and given the circumstances of the Plaintiffs' cases, there is no evidence from which immigration officers could conclude that there is probable cause that Plaintiffs are likely to escape. Plaintiffs are likely to prevail on either basis: they need only show a likelihood of prevailing on one, as success on either argument would justify the issuance of a temporary restraining order and ultimately a permanent injunction.

**e. The administrative arrests violate the Fourth Amendment.**

A warrantless arrest is reasonable under the Fourth Amendment where the arrest is in public and there is probable cause to believe that a criminal offense has been or is being committed. *United States v. Watson*, 423 U.S. 411, 417–24 (1976). Thus, where an immigration officer has probable cause to arrest someone for

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

committing a criminal offense, the Fourth Amendment is satisfied even if § 1357(a)(2) is not. When an immigration officer arrests an individual solely for a civil law violation, there is no independent authority for the arrest. In that context, failure to comply with the statute constitutes a Fourth Amendment violation.

And "Mere unauthorized presence in the United States is not a crime." *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012). Thus, the only lawful authority to arrest is under § 1357(a)(2). If immigration officers fail to comply with the requirements of that statute, the arrest is not only unlawful—it's <u>unconstitutional</u>. DHS's courthouse arrest policies violate both the statute and the Constitution, and the Plaintiff demonstrated a likelihood of success on the merits.

### B. Absent Relief, Plaintiff and the Public Have Suffered and will Continue to Suffer Irreparable Harm.

Plaintiff has already suffered significant injuries as a result of Defendant's conduct, and those injuries will only continue without an injunction It is well established that the deprivation of constitutional rights constitutes irreparable injury. *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005). A party seeking preliminary injunctive relief must "demonstrate that irreparable harm is likely in the absence of an injunction," *Winter*, 555 U.S. at 22, but Plaintiffs may show a "sufficient causal connection" between Defendants' conduct and Plaintiffs' injury that can only be addressed by an immediate injunction. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.,* 408 F. Supp. 3d 1057, 1121 (N.D. Cal. 2019) (citing, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018); *Perfect 10, Inc. v. Google, Inc.* 653 F.3d 976, 981-82 (9th Cir. 2011)).

The Supreme Court has repeatedly held that the removal of people from within the United States implicates a "weighty" liberty interest. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *see Bridges v. Wixon*, 326 U.S. 135, 164 (1945)

(Murphy, J., concurring) ("[D]eportation . . . may result in poverty, persecution, and even death."); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (Deportation "may result . . . in loss of both property and life, or of all that makes life worth living"); *see also Ardestani*, 502 U.S. at 138 (acknowledging "the enormity of the interests at stake" in immigration proceedings). The stakes are even higher for people who fear persecution, torture, or death if removed. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is always a harsh measure; it is all the more replete with danger when the [noncitizen] makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country."); *accord, e.g.*, *Kaweesa v. Gonzales*, 450 F.3d 62, 69 (1st Cir. 2006) (a noncitizen "seeking asylum or protection under the Convention Against Torture . . . clearly has a weighty interest in avoiding deportation").

People being subjected to the Memo—including in courthouses across the nation—illustrate these weighty liberty interests. For example, many people subjected to courthouse arrests have pending asylum applications and a fear of persecution; others have U.S. citizen children and spouses. *See, e.g.*, A.M. Decl. ¶¶1-20; Cortes Decl. ¶ 8 (courthouse arrests of noncitizens who had asylum applications pending and expressed fear of return); Fadel Decl. ¶ 8 (same); Eugenio Decl. ¶ 9 (same); Barca Decl. ¶ 11.

Urgent action for declaratory protections and stay of removal for A.M. is required because Plaintiff was detained and his and others' court dates are fast approaching, including those who may be lawful green card holders or U.S. citizens, and they fear unlawful civil courthouse arrest absent court intervention as legal providers, observers, and members of the public have reported arbitrary arrests, detentions, transfers, and lack of access to counsel caused by Respondents.

Here, DHS's component agencies have established a routine practice preventing noncitizens from having access to the courts and their attorneys upon their arrest. Plaintiff is ordered to appear in court for a mandated hearing and

physically touched, arrested, and detained. The attached declarations make clear that ICE uses the court appearances as an opportunity to effectuate a civil removal arrest. *See* Declarations A-M. Plaintiff is forced to choose between asserting their rights with their rights to be free from civil arrest at court.

If Plaintiffs are arrested by DHS officers in court, there is no legal mechanism to reverse the arrest. The harm is complete, and Plaintiff cannot be made whole. DHS's courthouse arrest policies *only* target immigrants who demonstrate that they are not a flight risk by adhering to court orders and appearing when required. The harm to DHS is minimal because Plaintiffs have all proven that they are not a risk of flight. But the harm to Plaintiffs of unlawful civil arrest and arbitrary detention in court is great.

DHS's courthouse arrest policies cause Plaintiffs' ongoing and irreparable harm by infringing on their right to access the courts be free from civil arrest. DHS's courthouse arrest policies similarly harm the public's right to be present in court, and it further infringes on the Court's orderly adjudication of matters before it. Plaintiffs suffer continued harm from the omnipresent specter of courthouse arrest because it impairs their ability to present their meritorious claims and defenses in court. Thus, Plaintiff satisfies the *Winter* factor.

## 2. C. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN PLAINTIFF'S FAVOR.

The balance of equities and public interest weigh strongly in Plaintiffs' favor because Defendant's courthouse arrest policies permit Plaintiffs and members of the public alike to be arrested in court. The remaining *Winter* factors weigh heavily in favor of granting further injunctive relief. A preliminary injunction is appropriate where: (1) the balance of equities tips in favor of the applicants; and (2) an injunction is in the public interest. *Winter*, 555. U.S. at 20. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555.

U.S. at 20 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The government "cannot reasonably assert that it is harmed in any legally cognizable sense" by being compelled to follow the law. *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). The balance of equities favors preventing the violation of "requirements of federal law." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014), and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (emphasis added).

Here, the balance of equities tips sharply in Plaintiffs' favor. The Declarations in support for why courthouse arrests harm its members, underscores Plaintiffs' arguments. (*See* Declarations A-M.[16]) During the inspection stage, the individual is detained and denied the ability to contact or rely on the assistance of counsel. "Because the person is detained, he or she generally has no way to gather evidence." Declaration of Kara Hartzler ("Hartzler Decl.") ¶ 13.[17]

This aggressive new implementation of unknown policies has sown fear the public, as court attendees, who have been complying with their legal obligations now face the risk of arrest and summary deportation at their next court dates. Defendant's policy chills access to the courts for all people who want to attend court as a party, witness, or observer.[18] Unlawful courthouse arrests are even more invasive and insidious because they threaten all present in the courtroom with arrest. DHS's courthouse arrest policies chill the public and Plaintiff'' access by

---

[16] The chilling effect has already begun: See, e.g. Exhibit A. Declaration of Michelle Celleri, Esq. (explaining ¶9: Defendants pushing attorneys and the wrong individuals and saying "It's not that big of a deal"); Exhibit B: Declaration of Ginger Jacobs, Esq. (P5: Defenndants "pushing attorneys"; ¶7 "Unreprecedented and coordinated arrests; ¶8: clients missed hearings); Exhibit C: Declaration of Brian J. McGoldrick, Esq.(page 4, ¶11-14 "clients are terrified"; page 7:2); Exhibit D: Declaration of Alor Calderon (¶¶2-3 received "high number of calls…of clients skipping their court dates"); Exhibit E: Declaration of Ian M. Seruelo (¶11-13 explaining the dismissals); Exhibit F. Declaration of Cheri Attix, Esq. (Attix ¶ "new practice of detaining asylum applicants at their court hearing is not only crue and arbitrary…waste of time, government, money, and government resources); Exhibit G. Declaration of Maria Chavez, Esq.(Chavez Decl. ¶ 9-10 discussing "terrified because there is nothing I can do to protect them" and "surprise detention");Exhibit H-M: Declarations of R.M. and legal observers (discussing arresting indiscriminately without a warrant; shoving attorneys; witnesses; wearing balaclavas; intimidating and terrifying the public; frivolity claiing they're the "Gestapo"; coercive & threatening behavior.)
*See* Declaration in *Make the Road N.Y. v. Noem*, No. 1:25-cv-00190-JMC, (D.D.C. Apr. 12, 2025), *ECF. 50-1.*

---

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

dissuading meaningful participation in the court system.

The Defendant's policy requires Plaintiffs to choose between presenting a robust defense and potentially having a witness arrested by DHS officers in court. Choosing between pursuing one's case and getting oneself deported or indefinitely detained is not a choice our system of justice condones or requires. By contrast, Defendants will suffer no cognizable harm if the Court enjoins their conduct.

The threat of immigration arrest impermissibly impedes the public's access to the courts and thus weighs strongly in favor of granting a temporary restraining order. Urgent action is needed from the Court to prevent irreparable injury to Plaintiffs when they next appear in court at or about the Edward J. Schwartz federal building and courthouse. DHS's courthouse arrest policy fails APA review because it is arbitrary and capricious and as is contrary to a "well settled" common-law privilege against civil arrest in court. The injunctive order is further in the best interest of the public because it will halt DHS's courthouse arrest practice and in so doing cease to chill public participation.

An injunction would serve the public interest. Here, Plaintiffs establish "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiff has established that both the public interest and balance of the equities favor [injunctive relief]." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Moreover, enjoining the masked arrests at the courthouses restores the public's confidence in the fundamental First Amendment right to assemble, Fourth Amendment right to be free from unlawful seizures, Fifth Amendment right to Due Process, Sixth Amendment Right for a fair trial, and Fourteenth Amendment right to equal protection. The balance of the equities favor Plaintiff's injunctive relief.

### Conclusion

Plaintiffs' respectfully request the Court grant Plaintiff's motion for a preliminary injunction pending the adjudication of this case on the merits.

DATED: June 25, 2025                               Respectfully submitted,

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

LAW OFFICES OF EMILY E. HOWE

*By /s/* Emily Howe

  Emily Howe
Attorneys for Plaintiffs
emh@howelaws.com

MOTION AND MEMORANDUM OF LAW FOR PROVISIONAL RESTRAINING ORDER

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of California by using the CM/ECF system.  I have copies of signatures on file if needed.

DATED: June 25, 2025                     Respectfully submitted,

LAW OFFICES OF EMILY E. HOWE

*By /s/* Emily Howe
Emily Howe
Attorneys for Plaintiffs
emh@howelaws.com