Emily E. Howe, State Bar No. 293964
LAW OFFICES OF EMILY E. HOWE
405 Via del Norte, Ste B
La Jolla CA 92037
Telephone: (619) 800-6605
Email: emh@howelaws.com

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| A.M. | Case No.: 25CV1412 JO AHG |
| Plaintiff-Petitioner(s), | |
| vs. | **FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT OF HABEAS** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; EXECUTIVE OFFICE OF IMMIGRATION REVIEW; CHRISTOPHER LAROSE, warden of Otay Mesa Detention Center; PAMELA BONDI, Attorney General of the United States, in her official capacity, KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY, TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego, SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection, GREGORY J. ARCHAMBEAULT, Director of U.S. Immigration and Custom Enforcement and Removal Operations (ERO), San Diego, OTAY MESA DETENTION CENTER/CORE CIVIC, INC. DOES 1 through 20, | **[28 U.S.C. § 2241]** |
| Defendant-Respondent(s). | |

Petitioner-Plaintiff and asylum seeker A.M. respectfully petitions this Court for a writ of habeas corpus under 28 U.S.C.§2241 and for declaratory and injunctive relief to remedy Respondents' unlawful detention of Petitioner at a federal courtroom and reinstate Petitioner's pre-detention timeline in lieu of their current unlawful proposal requiring that Petitioner restart his asylum application process, and states:

## INTRODUCTION

1.    Petitioner-Plaintiff Asylum seeker A.M. is a 34-year-old Western Sahara ("Sahrawi") man, who fled for his life from Western Sahara, a United Nations' recognized non-self-governing, occupied territory by Morocco. He alleges being subjected to an unlawful detention and the continuous deprivation of his rights, while seeking humanitarian protection and pursuing his asylum claims at court and detained at the Otay Mesa Detention Center in San Diego County.

2.    He submits this *habeas corpus* petition under 28 U.S.C. §2241 for a **judicial check on Respondents' administrative decisions and procedural deprivations to detain him and the collateral consequences** under 8 U.S.C.§ 1225(b)(1), INA § 235(b)(1), and then initiate expedited removal proceedings against him under 8 U.S.C. § 1225(b)(1)(A), INA § 235(b)(1)(A), despite lacking such authority because **A.M. was—and still is—in pending removal proceedings under 8 U.S.C. § 1229a, INA § 240, and A.M. does not satisfy either threshold inadmissibility ground for expedited removal proceedings.** There was no final order of removal nor were Respondents lawfully in place under any exigency to deprive him of his liberty or freedom of movement.

3. And because the government still purports to hold him with continued custodial monitoring and deprivation conditions under §1225(b)(1) expedited removal proceedings, it has not provided him with an individualized bond hearing to challenge his detention and on-going legal and physical custody, under 8 U.S.C. § 1226(a), INA § 236(a), contravening his rights under the Immigration and

Nationality Act and the Fifth Amendment's Due Process Clause.

4.      On or about January 29, 2024, U.S. Customs and Border Protection officers apprehended A.M. near San Ysidro, California, after he had **already effected an entry into the United States.**  *See* Exhibit A, Notice to Appear.  He claimed a fear of persecution rather than apply for admission, and the officers consciously selected to place him in removal proceedings with due process protections under 8 U.S.C. § 1229(a), INA § 240.

5.      Despite Petitioner's proper and lawful appearances for more than one year and half, on June 3, 2025, the government moved an immigration court judge to dismiss the proceedings that had been scheduled as an individual merits hearing, stating it would be quicker to remove applicants from the country way without notice or an opportunity to be heard, as a matter of the new administration's policy; U.S. Immigration and Customs Enforcement officers arrested and detained A.M., purportedly under 8 U.S.C. § 1225(b)(1), INA § 235(b)(1).

6.      The immigration judge stated that Petitioner had "a right to seek his asylum claim, just not in immigration court".

7.      Though the government knew that A.M. was and is represented because they whisked him away from court, had the Notice of Entry of Appearance, received an updated G-28 that day, confirmed having the correct information, and Petitioner had requested his attorney, A.M. is informed and believes the government did not provide him his counsel, in spite of interrogations, scheduled court hearings, and agency actions.

8.      Plaintiff-Petitioner believes he was told to sign away his rights on or about June 3, 2025, outside of counsel, did not sign or was deprived of a translator or counsel, and then told he must be fingerprinted and interrogated all outside of the presence of counsel or a translator of the writings.

9.      ICE detained A.M. and then issued him two new Notices to Appear on or about June 16, 2025.  A.M. timely appealed the IJ's order granting that motion,

meaning that the IJ's order was – and is – not final, and those proceedings remained – and are still –pending.  Thus, **ICE had no authority to detain him under 8 U.S.C. §1225(b)(1), INA §235(B)(1), and assert expedited removal.** A.M. lacks the threshold inadmissibility necessary for expedited removal, which is available only for those inadmissible under 8 U.S.C. §§1182(a)(6)(C) or (a)(7), INA §§212(a)(6)(C), (a)(7).

10.     Absent review in this Court, no other neutral adjudicator will examine A.M.'s plight: Respondents continue --- unchecked --- to place custodial restrictions on him or place him back in custody.  He thus urges this Court to review the lawfulness of his initial detention and collateral and on-going custodial consequences; declare that his detention under 8 U.S.C. § 1225(b)(1), INA § 235(b)(1), is unlawful; order either his continued release or that Respondents provide him with a bond hearing complying with the procedural requirements in *Singh v. Holde*r, 638 F.3d 1196 (9th Cir. 2011); and, at a minimum, order the government to **restore his pre-detention status (including his release on his own recognizance, reinstated asylum clock-eligibility for a work permit, and stopping Respondents' and their agents' ongoing control and deprivation of his liberty with house inspections, telemonitoring, in person check-ins, reporting requirements, and physical tracking.**  A.M. was in Respondents' legal and physical custody at the Otay Mesa Detention Center in San Diego, California.  As set forth herein, as the statutory and judicial interpretation of "custody" encompasses a broad range of restraints on liberty, Petitioner-Plaintiff requests relief from the oppressive conditions that are tantamount to being in ongoing legal and physical custody.

## EXHAUSTION OF REMEDIES

Plaintiff-Petitioner has exhausted all administrative remedies and no further ones are available.

///

3

**JURISDICTION AND VENUE**

11.    This action arises under the United States Constitution and the Immigration and Nationality Act, 8 U.S.C. §1101 et seq. INA §101 et seq. to challenge A.M.'s detention under the INA and any inherent or plenary power the government may claim to continue to impose restrictions on him.

12.    This Court has subject matter jurisdiction under 28 U.S.C. § 2241 *et seq.* (habeas corpus), as protected under Art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. §1651 (All Writs Act).  A.M. is presently still under Respondents' legal and physical custody under the United States' color of authority, and this custody violates the U.S. Constitution, laws, or treaties. Its jurisdiction is not limited by a petitioner's nationality, status as an immigrant, or any other classification. *See Boumediene v. Bush*, 553 U.S. 723, 747 (2008).

13.    Federal jurisdiction exists under 28 U.S.C. §1331 (federal question). This court has supplemental jurisdiction over Plaintiff' claims arising under state law pursuant to 28 U.S.C.§ 1367 (a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

14.    This case arises under the First, Fourth, Fifth, Fourteenth Amendments to the United States Constitution, federal asylum statutes, the Administrative Procedure Act.  the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq*. and its regs.; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

15.    An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651. The Court may grant relief pursuant to; 28 U.S.C. § 2243;

the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*. and the Court's inherent equitable powers.

16.   Venue is proper in the Southern District of California pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the  events, acts, or omissions giving rise to the claims occurred in the County of San Diego including at the time of filing Petitioner is detained in the Respondents' custody, in the Southern District of California; Respondents JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego, SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection, GREGORY J. ARCHAMBEAULT, are believed to reside in this district; Respondents are agencies or officers of the United States in their official capacity.

## PARTIES

### A. Petitioner-Plaintiff ("Petitioner")

17.   Plaintiff-Petitioner is a 34-year-old Western Sahrawi man who has been a human rights Defender at an internationally well-respected non-governmental organization that has presented to the United Nations and European Commission of Human Rights. He fled that country because he suffered past persecution and fears future persecution there.   He arrived in the United States on or about January 29, 2024, to seek asylum.

18.   A.M. is diabetic and has medical complications due to past persecution and requires access to daily medications and consistent medical care.

19.   The U.S. government has publicly stated that those with asylum claims would proceed with their credible fear and asylum rights as a matter of law.

20.   However, after lawfully presenting himself for his asylum hearing, he was arrested at the downtown Courthouse on June 3, 2025.

21.   Respondents had Petitioner's attorneys contact because he was yanked away from his hearing.  Petitioner provided Respondents with his G-28 Notice of Entry of Appearance as an Attorney in an abundance of Caution.

22.   Plaintiff-Petitioner's legal representation endeavored to connect with him. Initially he could not be found in the system; the following day he could not be found and was "being processed".   Subsequently, Plaintiff's Counsel reached out to his ICE Officer, CORE CIVIC, INC. and by and through Respondents' Counsel. Counsel was not been able to speak with him while he was in detention reflecting concern of the admonitions about those Petitioner who are unrepresented cannot access counsel.

23.   Plaintiff have seen immigration officers waiting in court presumably to arrest him/her at prior court appearances if the case had concluded and believes that he/she and/or their witnesses face likely civil immigration arrest in court following conclusion of the hearing.

24.   There is overwhelming medical evidence that the incarceration and monitoring of a person will have a negative impact on their well-being especially where there are other traumatic factors at work, and that damage can be permanent.

**B. Respondents-Defendants ("Respondents")**

25.   Respondent CHRISTOPHER J. LAROSE is the Senior Warden at the Otay Mesa Detention Center.  Respondent is a legal custodian of Petitioner. He is sued in his official capacity.

26.   Respondent PAMELA BONDI is the Attorney General of the United States, which is a cabinet-level department of the United States Government.  In this capacity, she directs each of the component agencies within DHS: ICE, USCIS, and CBP. As a result, Respondent BONDI has responsibility for the administration and enforcement of the immigration laws pursuant to 8 U.S.C.§1103, is empowered to grant asylum, or relief (see 8 U.S.C. §§1103(a)(1),(g)), and oversees the Executive Office for Immigration Review, the office that entered an order dismissing removal proceedings against A.M. She is sued in her official capacity,

27.   Respondent KRISTI NOEM is the Secretary of the U.S. Department of Homeland Security ("DHS"), which is a cabinet-level department of the United

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR HABEAS

States Government.  *See* 8 U.S.C. §1103(a); 1103(a); 8 C.F.R. § 2.1. In this capacity, she has responsibility for the administration of the immigration laws pursuant to 8 U.S.C.  1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of Petitioner.  She is sued in her official capacity;

28.   Respondent U.S. DEPARTMENT OF HOMELAND SECURITY, is a cabinet-level department of the United States federal government and sub-agency of DHS that is responsible for the initial processing and detention of noncitizens. Its components include Immigration and Customs Enforcement ("ICE"). Respondent DHS is a legal custodian of Petitioner.

29.   Respondent TODD LYONS is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). ICE is a component of the DHS, 6 U.S.C.§271, and an "agency" within the meaning of the Administrative Procedure Act, 5 U.S.C.§701(b)(1). It is the agency responsible for enforcing immigration laws, and its detention of A.M. Respondent Lyons is the senior official responsible for ICE's policies, practices, and procedures, including those relating to the courthouse arrest and detention of immigrants during their removal procedures. Plaintiff is informed and believes Respondent Lyons signed the authorized memo of increased immigration enforcement near courthouses. Respondent Lyons has policymaking knowledge and custody of Plaintiff.  Respondent is sued in his official capacity.

30.   Respondent JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego. Respondent Aguilar is responsible for the Office of the Principal Legal Advisor (OPLA) and ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Respondent Aguilar is believed to be the person responsible for executing relevant provisions of ICE Directive Enforcement Actions in or Near Courthouses, issued on January 21, 2025, and a legal custodian of Petitioner. Respondent Aguilar is sued in his policymaking capacity, not a legal counsel role.

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR HABEAS

Respondent Aguilar is sued in his official capacity.

31.   Respondent SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection. Respondent Aki is responsible for the Office of the Principal Legal Advisor (OPLA) and ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Plaintiff is informed and believes that Respondent Aki is sued in his policymaker role under a policymaking memo that divests authority to the Assistant Field Office Director and Assistant Special Agents in Charge. Respondent Aki is sued in his official capacity.

32.   Respondent GREGORY J. ARCHAMBEAULT, Director of U.S. Immigration and Custom Enforcement and Removal Operations (ERO) San Diego, which is responsible for ICE enforcement and the detention facilities, including the Otay Mesa Detention Facility and San Diego Area.  Respondent Archambeault's place of business is in the Southern District of California; he is believed to reside in the County of San Diego, and he is an immediate legal custodian responsible for the arrest and detention of Petitioner. He is sued in his official capacity

33.   Respondent U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT is the subagency of DHS that is responsible for carrying out removal orders and overseeing detention. Respondent ICE is a legal custodian of Petitioner.

34.   Respondent EXECUTIVE OFFICE OF IMMIGRATION REVIEW (EIOR) is the federal agency that administers the immigration court system, which decides whether an individual should be allowed to stay in the country or not.

35.   Respondent OTAY MESA DETENTION CENTER/CORE CIVIC, INC. is the private prison company, believed to earn multi-millions of dollars on the detention of the individual humans beings detained at the Otay Mesa Detention Center. Core Civic is a legal custodian of Petitioner.

36.   Plaintiff is informed and believes there are other Respondents DOES 1 through 10 are agents who usurped their power as detailed herein.

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR HABEAS

37.   Plaintiff is informed and believes there are DOES 11 through 20, who are responsible for U.S. government, the Office of the Principal Legal Advisor (OPLA) and ICE's policies, practices, and procedures, including those relating to the detention of immigrants against their due process rights.

## FACTUAL BACKGROUND

38.   Plaintiff-Petitioner A.M. is and has been a human right defender and a leader at a well-acclaimed international non-governmental organization and has contributed to critical reporting to the United Nations, European Commission on Human Rights, Cornell Law School Legal Clinic, Robert Kennedy Human Rights, and global organizations.

39.   He was a champion who fled for his life when he refused to promote Morocco on an international stage.

40.   On or about January 29, 2024, U.S. Customs and Border Patrol ("CBP") officers apprehended A.M. in or about San Ysidro Port of Entry, after he had already effected an entry into the United States. A.M. entered and presented himself to seek asylum and claim a fear of persecution on or about January 30, 2024.

41.   After a CBP officer briefly detained him, a supervisory officer representing the government made a conscious decision to release him with a Notice to Appear under 8 U.S.C.§1182(a)(6)(A)(i), INA§212(a)(6)(A)(i) of the Immigration and Nationality Act, as an 'alien' being present in the United States without being admitted or paroled.

42.   The DHS officers released A.M. on his own recognizance.

43.   He was considered entry without inspection, *not* an arriving alien.

44.   In spring of 2024, an immigration judge at the Immigration Court in San Diego granted A.M.'s request to appear in San Diego and file his I-589 application for asylum.

45.   A.M. complied with the rules, notices, and appeared in court prepared to present his lawful claim with I-589 filings in July of 2024, appeared in August 6,

supplemented on October 15, 2024, further briefed the court on January 7, 2025, presented himself in February and filed supporting evidence in the spring of 2025.

46.    On February of 2025, his individual merits hearing was set for June. He properly submitted his case prior to the fifteen (15) days under 8 C.F.R. § 1003.31 (c).

47.    In mid-May, he was prepared to present his asylum claims at his scheduled individual merits hearing for June 3, 2025.

48.    A.M. was finally about eligible to apply for work authorization with the Employment Authorization Document (EAD)(Form I-765); his asylum clock had been tolled for A.M. to seek representation and had fully prepared his case over the course of nearly five hundred (500) days. *See* Exhibit B, Employment Authorization Document.

49.    Plaintiff-Petitioner's witnesses were prepared to testify that day even in spite of recent hospitalization and unknown availability at a later date.

50.    At or about the end of May of 2025, Respondents started to show up at the immigration courts at valid asylum hearings and arrest the applicants at their court hearings in San Diego, at or about 880 Front Street, Edward J. Schwartz Federal Building and U.S. Courthouse, and stating that they will remove those applicants who are apprehended and withdrew the notice and opportunity to be heard.

51.    In an abundance of caution, due to the recent raids of witnesses and court attendees, Petitioner re-submitted his witness list for a subsequent time with the words 'Motion' to clarify that the request was via *WebEx* or telephonically. Plaintiff-Petitioner was prepared and willing to testify at his merits hearing, independent of those witnesses.

52.    On May 30, 2025, Petitioner is informed and believes the same day as a memo ordered an increase in court dismissals, the court converted the trial into a master calendar hearing. *See* Exhibit C, memorandum to the Executive Office of Immigration Review (EOIR) Judges.

53.    Noticeably upon entry, the courthouse climate had changed. Petitioner is informed and believes he could **hear ICE agents by the door throughout the hearing.**  Half a dozen men, covered in full face masks, were hovering by the courtroom doors. As Petitioner stepped outside of the doorway, Petitioner was summarily arrested within the Edward J. Schwartz building, and in spite of the court expressly stating A.M. has a lawful right to seek asylum, withholding of removal, or convention against torture under the Immigration and Nationality Act.

54.    Even though the pretense for the change in the hearing was listing the words 'motion' on an already filed document and all motions should have been filed in mid-May, the court allowed the government to verbally move to dismiss the case, without any notice and without an opportunity to be heard.

55.    Petitioner is informed that Respondents knew or should have known that this deprivation of the notice and right to be heard was an overt intentional tactic and policy abuse to prevent the adjudication of a strong asylum claim and remove A.M. without due process forcing him into terrifying and ambiguous proceedings of immediate removal or indefinite detention when he had been fully compliant.

56.    Petitioner was told to sign away his rights on June 3, 2025, absent the presence of counsel.  *See* Exhibit D, Declined to Sign.

57.    Defendants and their representatives were contacted with contact information and told not to interrogate Petitioner.

58.    Nonetheless, Petitioner was interrogated without the presence of counsel on June 9, 2025.

59.    Thereafter, Petitioner was interrogated for a third time and told to sign and fingerprint a form on mandatory custodial requirements.

60.    Subsequent release from custody does not remove the court's jurisdiction over the habeas corpus petition. Furthermore, the passage explains that there are other forms of liberty restraints, beyond physical imprisonment, that are sufficient to support the issuance of habeas corpus.

*Habeas Corpus and Lack of Due Process*

61.   In recent statements, behavior, and practice, Respondents-Defendants have demonstrated little interest or regard for adhering to America's foundational and bedrock principles of due process, habeas corpus, and rule of law. Recently, on or about May 20, 2025, at his confirmation hearing, Respondent-Defendant KRISTI NOEM[1] erroneously responds: "Habeas corpus is a constitutional right that the president has to be able to remove people from this country".

62.   Here, in San Diego, A.M. who presented himself lawfully for his asylum hearing was separated from his attorney and upon is informed and believes, not clearly advised on why he is being detained or explained the process protecting his procedural and substantive due process rights, after the United States government withdrew his notice to appear in court to terminate his asylum case.  Respondents' agents could not advise on the process, next steps or ensure protections.

63.   He is seeking asylum, withholding of removal, and CAT protections because he fears being killed arbitrarily imprisoned, beaten and tortured by the Moroccan police since they have already done so to him. A.M. was assaulted, tortured, and threatened with death due to his whistleblowing, activism, and refusal to promote the Moroccan government on a national stage which constitutes persecution on account of his political opinion. He is persecuted for his Sahrawi race and ethnicity. His family members have been killed or forced to flee due to the human rights activism on the abuses, torture, and injustices in A.M.'s past persecution raises a presumption of eligibility for relief, a presumption the Government is unable to rebut.

64.   Upon leaving Petitioner's June 3, 2025, hearing, Defendants DHS/ICE

---

[1] *See* Testimony of Kristi Noem, Dep't of Homeland Sec. (May 20, 2025), *available* at https://www.bbc.com/news/videos/ce8113z7k17o; https://www.c-span.org/classroom/document/223993

12

agents arrested Petitioner and took him into custody. Declaration of A.M. As Petitioner left the immigration courtroom, he was detained by plainclothes ICE agents. No change of circumstances has occurred since Petitioner was released by CBP on or January 30, 2024. Petitioner has not attempted to flee and has attended all scheduled court appearances.

65. That day reportedly became the most immigrant arrests in recent history, including at the Edward J. Schwartz Federal Building and Courthouse in San Diego, California. Upon efforts to preserve his rights and a stay of removal, all were thwarted.

66. On June 4, 2025, with uncertainty and lack of clarity, after filing for administrative relief, A.M. petitioned this court for a writ of habeas corpus, a complaint for declaratory and injunctive relief, and emergency temporary restraining order (which this court granted), for fear of those in immigration custody in danger of imminent removal from the United States (less than 24-hour notice) – and this court could potentially permanently lose jurisdiction. Petitioner fears the danger of the very same misconduct and being transferred outside of the Southern District of California *en route* to removal without a notice to appear, indefinite detention, and the lack of the opportunity to be heard of himself and those similarly situated.

67. As a part of an official memo, Respondents, including leadership and agents of the U.S. Immigration and Customs Enforcement, planned to and did arrest noncitizens, detaining them at the courthouse without notice or an opportunity to be heard, set for immediate expulsion from the United States at an unprecedented speed.

68. Petitioner respectfully seeks this Court protect him from the collateral consequences of the abusive, overly broad, and harassing practice of using the courthouses to conduct civil courthouse arrests without a bench warrant, impose indefinite 'mandatory' detention, and forced removal without due process as asylum seekers and other noncitizens lawfully appear for their mandated courtroom appearances.

13

69.    Respondents' actions reflect the recent unparalleled levels of practices that violate the immigration laws, statutory law, foreign treatises, international refugee law, and the U.S. Constitution including but not limited to the current practice of:

(i)    the **overzealous courthouse arrests of *anyone*** whom the government

has "information that believes the target…will be at a specific location" like the federal building and U.S. courthouse,

**(ii) deprivation of due process in detaining applicant Petitioner of his liberty** who are lawfully asserting their rights to seek asylum,

**(iii)    unlawful policy, practice, or conduct** of revoking the notice to appear to place into immediate removal and deprive noncitizens and asylum seekers of due process, has a profound chilling effect on the fundamental pillars of the rule of law, access to the courts, and access to justice.

This unlawful government behavior of courthouse arrests was enjoined in *Elizeo Velazquez-Hernandez, et al., v. U.S. Immigration and Customs Enf't, et al.*, No. 3:20-CV-2060 (DMS)(KSC), 2020 WL 6712223 (S.D. Cal. Nov. 16, 2020). Courts have prohibited this conduct of unfair process or warrantless court arrests[3].

70.    Respondents' actions violate their own memos, the constitution and statutory protections. On or about May 27, 2025, Respondents revoked its own rules without notice that prohibited arrests at or within the courthouses but also have not followed its own published guidance. The **expansive quotas[4]** under the ICE Directive Enforcement Actions have incentivized improper actions in or near

---

[3] [1] See, e.g. *State of New York v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876, 2020 WL 2117584 (S.D.N.Y. May 12, 2020); *Nken v. Holder*, 556 U.S. 418 (2009) (recognizing the importance of fair process in immigration hearings).

[4] José Olivares, Trump Administration Sets Quota to Arrest 3,000 People a Day in Anti-Immigration Agenda, The Guardian (May 29, 2025), https://www.theguardian.com/us-news/2025/may/29/trump-ice-arrest-quota;
Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877

14

Courthouses. Defendants-Respondents have the universe of their information.

71.    Plaintiff-Petitioner is informed and believes that separate hours of independent research and conversations with legal observers to discover that Respondents shifted the protections from the Mayorkas memo and reverted to refusing to recognize courthouses as "Sensitive Locations" and maintains that Respondents in the **San Diego Field Office leadership** in particular "The Assistant Field Office Director and Assistant Special Agents in Charge" possesses full authority and discretion to civilly arrest individuals in and around any courthouse.

72.    Shortly after taking office, the President issued ICE Directive *Enforcement Actions in or Near Courthouses* (Jan. 21, 2025) DHS Directive *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025) and where such action is not precluded by laws imposed by the jurisdiction in which the civil immigration enforcement action will take place.[5] The new memorandum supersedes the Mayorkas memorandum entitled 'Guidelines for Enforcement Actions in or Near Protected Areas' (October 27, 2021), replacing with ICE Policy No. 11072.4 Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses. (May 27, 2025). *Id.*

73.    Plaintiff-Petitioner is informed and believes Respondents-Defendants' engaged in a concerted effort to dismiss their cases to deprive them of due process.[6] Plaintiff-Petitioner is informed and believes that there were complaints of detainees were removed or deported on the same day.

74.    With these Directives and memos, the President abandoned past programs and protections and called for the deportation of **anyone potentially removable, i.e. lawful green card holders, parolees, and in practice, asylum**

---

[5] *See* Memorandum on ICE Directive *Enforcement Actions in or Near Courthouses* (Jan. 21, 2025); DHS Directive *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025);  *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (May 27, 2025).

[6] *See e.g.,* Chris Gross, Molly Sheets, *ICE agents arrest migrants at courthouses in San Diego*, Across Country CBS 8 San Diego, May 22, 2025, https://www.cbs8.com/article/news/local/ice-agents-arrest-migrants-at-courthouses-in-san-diego/509-1b3d0519-2132-49fa-ad76-fdb58af37a32; *See e.g.,* Alex Cheney, *ICE tactics spark fear as migrant arrested post-hearing in San Diego, Across US,* CBS 8 San Diego, May 27, 2025, *available at:* https://www.cbs8.com/article/news/local/ice-tactics-migrants-arrested-post-hearing-san-diego/509-e66acde1-18bd-42d5-b40b-1bb479d963c4.

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR HABEAS

**seekers--- with published mandatory quotas of 3,000 daily removals in disregard of the fundamental principles of due process.**

75.   Despite widespread opposition to this practice, Respondents have not only refused to stop it but has issued official policies authorizing civil courthouse arrests. DHS's courthouse arrest policies, and its extensive practice of conducting civil arrests at asylum hearings, are unprecedented in United States history.

76.   At the same time, Respondents have prohibited that the use of Web Ex or virtual appearances by Plaintiff-Petitioner and required that asylum seekers appear physically in person in the federal immigration court.

77.   Plaintiff is informed and believes **Respondents are authorizing their agents to be wearing Balaclava, full face covering masks**, while hovering at or about the courtroom doors.

78.   **Curiously enough, the updated memo expressly provides, "ICE officers should generally avoid enforcement near non-criminal or specialized courts.**

79.   Petitioner-Plaintiff have complained of intimidating, aggressive arrests, no notice, and chaotic scenes in which the public were refused entry or deterred from asserting their lawful rights in the federal building and courthouse:

80.   In mid-May of 2025 Respondents' commenced immigration raids at or about the Edward J. Schwartz Building.

81.   By way of example, on or about May 22, 2025, Plaintiff is informed and believes that Respondents' resulted in the arrest of the wrong persons, including a man who hyperventilates and collapses to the ground.  DOES Officers used force against asylum seekers, shoved attorneys and members of the public.

82.   On or about May 23, Plaintiff is informed and believes Respondents detained at least 7 and perhaps more. On or about May 27, Plaintiff is informed and believes that ICE conducts  warrantless arrests at or about courtroom doors.

83.   On or about May 30, 2025, Plaintiff is informed and believes DOE Officers arrested an individual seeking legal representation.

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR HABEAS

84.   On or about June 2, 2025, Plaintiff is informed and believes ICE officers are continued to make warrantless arrests, detaining and separating parents from their children without notice or an opportunity to be heard.

85.   During this week Plaintiff is informed and believes another dozen of applicants were detained at their asylum hearings via warrantless arrests and continue to be detained.

86.   On or about June 9, 2025, Plaintiff is informed and believes a DOE Supervisor stated an attorney must determine who would be detained of his two clients, it was irrelevant to him who was detained.

87.   On July 21, 2025, the immigration court told Petitioner he would have to refile his previous asylum application.

88.   On August 2, 2025, Plaintiff was informed that he would have to restart the process from the beginning.  *See* Exhibit E, Asylum clock.

89.   This directive to restart the asylum process has erased the time, costs, stress, and resources that Petitioner already spent pursuing his claim, postponing his eligibility to obtain work authorization while awaiting the adjudication of his claims.

90.   As a result of Respondents' actions, Petitioner has suffered, and continues to suffer significant harm, including but not limited to prolonged inability to work, psychological distress, economic hardship, and uncertainty regarding his status to be protected from persecution.

91.   DHS has made clear that *anyone* who is subject to arrest by DHS may be arrested in the courthouse, and courthouse arrests are not limited to defendants in criminal matters – the arrests are of asylum seekers, witnesses, or anyone **DHS believes is a "targeted alien…" who is or will be present at a specific location."**

92.   To be clear, Defendants- Respondents have already had Plaintiff in custody and processed their biometrics and backgrounds, including all information necessary for civil immigration enforcement purposes. They have no interest or

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR HABEAS

need in re-arrest for those reasons. Respondents' only interest is to keep Plaintiff incarcerated or removed expeditiously from the country

93.   Plaintiff-Petitioner has established that his incarceration or on-going monitoring is not required for his immigration cases, as he reliably appeared for all court hearings.

*Common Law and Constitutional protections*

94.   ICE practices are interfering with the public's access to the federal building and the courthouses. In addition to deviating from prior policy**, the U.S. Supreme Court long ago recognized a privilege against civil arrests for those attending court on official business—a privilege that traces its roots back to English common law and rests on the common-sense principle that the judicial system cannot function if parties and witnesses fear that their appearance in court will be a trap.**

95.   DHS's decision to flout the long-standing common-law privilege against civil courthouse arrests and commandeer the courtrooms of the Southern District of California for federal civil immigration purposes has led Plaintiff-Petitioner(s) to reasonably fear civil arrest should he appear in court at his upcoming court dates.

96.   In addition to the Plaintiff- Petitioner' own fear of civil arrest, the First, Fifth, and Fourteenth Amendment rights to receive equal protection and present witnesses and to a public trial are violated because the policy instills fear in potential witnesses and court observers who have reason to fear civil arrest at or about the Edward J. Schwartz federal building and U.S. courthouse.

97.   First, DHS's courthouse arrest policies are arbitrary and capricious in violation of the Administrative Procedures Act (APA) because the policies are insufficiently explained, fail to consider all relevant factors, and depart from prior policy without reasoned explanation. Further, DHS's implementation of the policies is inconsistent. ICE's policy states that arrests will take place "inside" the

18

courthouses or at "non-public entrances and exits," but arrests do not always take place inside the courthouse. For example, officers chased a client and his lawyer down Broadway Street adjacent to the courthouse and arrested the client. The lawyer asked the officers to identify themselves and to produce a warrant, and the officers refused and further ordered the lawyer to back away under threat of arrest if he did not cooperate. ICE arrests outside of a courthouse are an arbitrary and capricious application of its policy. *See e.g., Washington v. U.S. Dep't of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837, at *26–27 (W.D. Wash. Apr. 10, 2020) (ICE's practice of arresting immigrants outside courthouses, presents a plausible claim the policy is arbitrary and capricious under the APA).

98.    Second, Congress never authorized DHS to conduct civil courthouse arrests because it never abrogated the longstanding and well-settled common-law privilege against such arrests. The Supreme Court has recognized that the common-law privilege against civil courthouse arrests is "well settled." *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916). When Congress acts in an area governed by "long-established and familiar" common-law principles, Congress is presumed to retain those principles. *United States v. Texas*, 507 U.S. 529, 534 (1993). Here, where Congress granted the federal government a general civil-arrest power to enforce civil immigration laws, Congress retained traditional common-law limitations on that arrest power—including that such arrests cannot be made against parties and witnesses attending court on official business. Because the INA does not grant the federal government authority to conduct civil courthouse arrests in violation of the common-law privilege, DHS's policies authorizing such arrests, and its policies to conduct such arrests, exceed DHS's statutory authority and must be set aside under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2).

99.    Third, DHS's policies violate the Constitutional right of access to the courts, which prohibits "systemic official action [that] frustrates a plaintiff or

plaintiff class in preparing and filing suits." *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002). Conditioning litigants' ability to access the courts on risking civil arrest creates precisely such impermissible frustration. Indeed, common-law courts created the privilege against civil courthouse arrest to prevent the intolerable chilling effect of such arrests, explaining that the fear of arrest would "prevent [parties and witnesses'] approach," obstructing "the administration of justice." *Halsey v. Stewart*, 4 N.J.L. 366, 368 (N.J. 1817). Plaintiff found, however, that if they come to court as ordered they face the specter of civil courthouse arrest whether they win or lose their case.

100. Fourth, DHS conducts the civil courthouse arrests without a judicial warrant authorizing the arrests as required by law. 8 U.S.C. § 1357(a)(2). Pursuant to section 1357(a)(2), **DHS must have "reason to believe" that the arrestee is violating immigration law *and* that the arrestee is "likely to escape before a warrant can be obtained. . . ."** But Petitioner-Plaintiff consistent appearance at court demonstrates otherwise. DHS could have sought a warrant in the months while Plaintiff' cases were pending. DHS did not. Failure to obtain a warrant during the pendency of the cases is the product of indolence, not necessity, and it violates Petitioner-Plaintiff' statutory and constitutional rights.

*The common-law privilege against civil arrest*

101. The common-law privilege against civil arrest while attending court on official business is longstanding, tracing its origins back at least to the English courts in the eighteenth century.

102. In England, and in the early years of this country, civil arrest, or civil capias, was a common means for initiating civil proceedings. *See* Nathan Levy, Jr., *Mesne Process in Personal Actions at Common Law and the Power Doctrine*, 78 Yale L.J. 52, 61-70 (1968). The possibility that such civil arrests could take place in court, however, posed a significant problem for the judiciary: If a party or witness's appearance in a case could be used as a trap for a civil arrest in *another*

20

case, many parties and witnesses would not attend court. To avoid this problem, courts both in England and the United States—including the U.S. Supreme Court—recognized and strictly enforced an "inflexib[le]" privilege against the civil arrest of parties or witnesses attending court. *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923). As the Supreme Court explained, "the due administration of justice requires that a court shall not permit interference with the progress of a case pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation." *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932).

103. DHS's reinstated the previously enjoined practice of civilly arresting people in the federal building and courthouses of the Southern District of California who are present for official court business unduly infringes upon Plaintiff' shared common-law right to be free from civil courthouse arrest:

***DHS officers are routinely present in the U.S. courthouses in the Southern District of California to effectuate civil immigration arrests of Plaintiff when they appear in court for their asylum hearings***

104. Immigration agents are believed to have arrested scores of people and plan to do so for even more in perhaps the hundreds or thousands inside the federal building and courthouses of the Southern District of California.

105. Defendants- Respondents agents attend these hearings so they can effectuate a civil courthouse arrest. That means ICE officers are present and poised to conduct administrative arrests at every immigration hearing in the Southern District of California where the government requests dismissals.

106. When immigration officers attend the Plaintiff' hearings, they patrol the hallways and hover next to the exit of the courtroom at the time of the proceeding.

107. The officers are equipped with handcuffs and plan to effectuate a civil arrest to place the defendant in immigration custody at the conclusion.

***DHS officers conduct courthouse arrests without official warrants in or about the U.S. Courthouses in the Southern District of California***

108.  On information and belief, Plaintiff believe that DHS intends to effectuate warrantless immigration arrests of Plaintiff coming to court, while present at court, or leaving court in connection with their pending immigration cases, and there's no guarantees for him.

***If at all, Defendants-Respondents have deployed administrative signed by staff, not court-ordered judicial warrants by a magistrate or federal judge.***

109.  Plaintiff-Petitioner has been out of custody for months, are in compliance with the conditions including attending all court hearings, and they do not present a risk of flight before DHS could obtain a warrant.

***DHS's civil courthouse arrest policies harm Plaintiff by forcing them to appear in court believing that they could be subjected to an unlawful civil arrest in the courthouse at any time.***

110.  Plaintiff-Petitioner appear for his defensive asylum hearings. Plaintiff-Petitioner's decision on whether to testify at trial is chilled by the looming presence of immigration officers in court, targets certain groups, and used to harass or retaliate. Plaintiff fear that full exercise of their rights to present a defense could lead to the arrest of undocumented witnesses or members of the public who come to court to observe the proceedings.

## A. Asylum, Withholding of Removal, Convention Against Torture

111. Plaintiff-Petitioner sought fairness, due process protection, and the rule of law in the United States:

112. A.M. is still under the conditions of expedited removal despite Respondents having knowledge of their claims for asylum and credible fear of persecution the Convention against Torture. The agency's refusal to allow counsel at a meaningful credible fear determination, arrest, resetting the clock, and detaining the asylum seeker violates procedural due process and statutory rights under 8 U.S.C. § 1158 and § 1231(b)(3).  The restarting of proceedings is highly prejudicial

and serves no legitimate government basis other than to harass, intimidate, delay, and increase taxpayers' money especially as A.M. was scheduled for his asylum individual merits hearing on the day he was arrested.

113.  Plaintiff-Petitioner assert their rights to be free from *civil* arrest in this Complaint. To be clear, Plaintiff do not argue that the Defendants-Respondents could not effectuate criminal arrests in the courthouse. **Notably, DHS arrest of him that merely place a person in immigration proceedings are civil arrests.** *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1974) (holding that deportation proceedings are "purely" civil; administrative warrants do not confer the same authority as a judicial warrant); *Arizona v. United States*, 567 U.S. 387, 407 (2012) (holding that "it is not a crime for a removable alien to remain present" in the United States and that deportation proceedings are civil).

114. DHS officers attend asylum and immigration hearings relating to whether they have experienced persecution, likely to be persecuted, eligible for asylum, withholding of removal or and ready to civilly arrest Petitioner-Plaintiff once the hearings are pre-determined to be dismissed.  The anticipated arrests occur regardless of the veracity or strength of his claim - whether it be through a Government or Court's granting the motion to dismiss– the officers are waiting to effectuate a warrantless civil arrest at or about the courtroom.

115. Petitioner is informed and believes this opaque and obfuscatory policy, procedure, and/or practice is denying credible claims to statutory protections, and subjecting eligible applicants with colorable claims to refoulement, persecution, torture, or death against United States and international law.

 **B. Custodial Detention from Expedited Removal Restrictions**

116. Defendants-Respondents' refer to Section 235(b)(1) of the Immigration and Nationality Act (INA), for the conditions of release of Petitioner and still maintain that alleged noncitizens subject to expedited removal be detained *throughout* the process, changing the rules for Petitioner here.

117. Expedited removal has applied to those who were in the country less than fourteen (14) days and within 100 miles of the border. 8 C.F.R. 2385.3(b)

118. Specifically, this Court has jurisdiction under 28 U.S.C. § 2241 to review A.M.'s detention and the challenge to his placement in expedited removal proceedings. Federal district courts possess broad authority to issue writs of habeas corpus when a person is held "in custody in violation of the Constitution or laws or treaties of the United States" (28 U.S.C. § 2241(c)(3)).  Unlike challenges to the outcome of completed expedited removal proceedings, A.M.'s claim that he was improperly subjected to expedited removal in the first instance falls within the statutory exception permitting review of whether the noncitizen is eligible for such review. *See 8* U.S.C. §1252(e)(2), INA § 242(e)(2).  Because A.M. sought the habeas remedy of release from unlawful detention rather than further administrative review, his petition presents precisely the type of threshold legality-of-detention question that §2241 was designed to address. *See INS v. St. Cyr*, 533 U.S. 289, 301 (2001); *see also Lopez-Marroquin* v. *Barr*, 955 F.3d 759, 759 (9th Cir. 2020) (citing *Singh*, 638 F.3d at 1211-12)). And no court has ruled on the legality of A.M.'s detention.

119.    The government nowhere claims that §1182(a)(6)(C) applies to A.M. And although he may be an "applicant for admission" under 8 U.S.C. § 1225(a)(1), INA § 235(a)(1), he at no time made the predicate "application for admission" for §1182(a)(7)(A)(i) to apply to him. *See Matter of Y-N-P-*, 26 I. & N. Dec. 10, 13 (BIA 2012) ("[B]eing an 'applicant for admission' under section 235(a)(1) is distinguishable from 'applying . . . for admission to the United States.'" (quoting Poveda v. United States AG, 692 F.3d 1168 (11th Cir. 2012))).

120. Indeed, under the Ninth Circuit's en banc holding in *Torres v. Barr*, 976 F.3d 918 (9th Cir. 2020) (en banc), § 1182(a)(7)(A)(i), which applies "at the time of application for admission"—in contrast to 8 U.S.C. § 1182(a)(6)(A)(i),

INA § 212(a)(6)(A)(i) (applying to those "present in the United States without being admitted or paroled")—cannot apply to A.M. because it applies only at "the time when a noncitizen seeks permission to physically enter United States territory." *Id*. at 924. And when A.M. encountered the CBP officers, he had already effected an entry by crossing into the territorial limits of the United States, while actually and intentionally evading inspection at the nearest inspection point and free from restraint. *See, e.g.*, *Matter of Pierre*, 14 I. & N. Dec. 467, 468 (BIA 1973) (describing the traditional entry test).

121.  Nor does *United States v. Gambino-Ruiz*, 91 F.4th 981 (9th Cir. 2024), permit applying § 1182(a)(7)(A)(i) here. A.M.'s request for asylum did not constitute an application for admission. *See,* e.g., *Matter of V-X-*, 26 I&N Dec. 147, 152 (BIA 2013) (holding asylum is not an admission); id. at 151 n.3 ("8 CFR § 1208.14(c) contemplates that an inspection for inadmissibility will occur only "[i]f the asylum officer A.M.s not grant asylum.").

122. Further, ICE itself elsewhere asserts that 8 U.S.C. § 1226(a), INA 236(a)—and not 8 U.S.C. § 1225(b), INA § 235(b)—governs the arrest and detention of noncitizens who entered without inspection and are later apprehended in the interior. In documenting the arrest of such noncitizens, ICE typically records that the person was arrested and detained under § 1226(a) (unless the person has committed an offense subjecting them to § 1226(c) detention).

123.  And for its part, the BIA recently published a precedent decision stating its new view that 8 U.S.C. § 1225(b)(2)(A), INA § 1225(b)(2)(A)—and not 8 U.S.C. § 1225(b)(1), INA § 1225(b)(1)—governs the detention of those whom, like A.M., the government encounters shortly after they enter the United States and places in removal proceedings under 8 U.S.C. § 1229a, INA § 240, and that such statute controls "until certain proceedings have concluded." *See Matter of Q. Li*, 29 I. & N. Dec. 66, 69 (BIA 2025) (quoting *Jennings v. Rodriguez*, 583

U.S. 281, 298 (2018)). Thus, even under the BIA's new reading of the statute, contrary to the government's contentions to an IJ, A.M. cannot lawfully be detained under 8 U.S.C. § 1225(b)(1), INA § 235(b)(1).

124.  Consequently, this Court should determine that A.M.'s detention under 8 U.S.C. § 1225(b)(1), INA §235(b)(1), is unlawful, and order either he be restored to pre-detention requirement timelines or that Respondents provide A.M. a bond hearing complying with the procedural requirements in *Singh*. And if this Court determines, consistent with the BIA's recent holding in *Matter of Q. LI*, that 8 U.S.C. § 1225(b)(2)(A), INA § 1225(b)(2)(A), authorizes his continued monitoring and custodial obligations, it should still order the government to cease processing A.M. under the obligations of the expedited removal authority, as they have contended occurs now that he's returned to 240 proceedings.

125. Respondents released him, but have him doing in person check-ins, telemonitoring, and home visits, and had placed GPS restrictions on him.  Those custodial monitoring from the unlawful detention and the reoccurrence of the deprivation of his liberty exist to date.

## CAUSES OF ACTION
## FIRST CLAIM FOR RELIEF
### Statutory Violation
### (All Respondents)

126. All of the allegations are repeated and realleged as if fully set herein.

127.  Respondents lack statutory authority to detain A.M. under 8 U.S.C. §1225(b)(1), INA § 235(b)(1), because that statute requires that the individual be an "arriving alien" (8 U.S.C. § 1225(b)(1)(A)(i), INA § 235(b)(1)(A)(i)) or fall within specific designations (8 U.S.C. § 1225(b)(1)(A)(iii), INA § 235(b)(1)(A)(iii)), and be inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7), INA §§ 212(a)(6)(C), (a)(7).

128. The expedited removal process under 8 U.S.C. § 1225(b)(1)(A)(i) does not provide for administrative remedies or judicial review, which is a significant procedural aspect of the process.

129. As A.M. does not meet these criteria, his detention must be governed by 8 U.S.C. § 1226(a), INA § 236(a), which provides discretionary detention authority and requires ICE to make an individualized custody determination.

130. Under § 1226(a), individuals may be detained as a matter of discretion, released on their own recognizance, or released on a bond.

131. Respondents' failure to apply the correct statutory framework violates the INA and exceeds the government's detention authority 'voluntary departure, notice or an opportunity to respond, or asylum protections.

The application of the unstated process is therefore ultra vires.

## SECOND CLAIM FOR RELIEF

### Ultra Vires, Violation of 50 U.S.C. § 21, et seq.

### (All Respondents)

132.  All of the allegations are repeated and realleged as if fully set herein.

133. The government has not provided an explanation for its actions or the appliable law but has incarcerated countless individuals alleged to be noncitizens at their court hearings. Notably, even the Alien Enemy Act (AEA) does not authorize the removal of noncitizens without due process from the United States absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory incursion" into the United States by a "foreign nation or government." *See* 50 U.S.C. § 21.

134. However, Petitioner was subject to immediate removal without any guarantees the Respondents-Defendants will afford the privilege of voluntary departure, notice or an opportunity to respond, or asylum protections.

135. The application of the unstated process is therefore ultra vires.

## THIRD CLAIM FOR RELIEF

**Violation of 8 U.S.C. § 1101,** *et seq.*

**(All Respondents)**

136. All of the foregoing allegations are repeated as if fully set forth herein.

137. The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

138. The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C. § 1229a(a)(3).

139. Such proceedings are governed by the provisions of 8 U.S.C. § 1229a, and implementing regulations at 8 C.F.R. §§ 1239, *et seq.*, and 1240, *et seq.* Immigration judges are employees of the Department of Justice, housed under the Executive Office for Immigration Review.

140. The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States. Because the current process or conduct provides for the removal of Petitioner without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

141. As a result, the application of the Directive to Petitioner, which will result in their removal from the United States, is contrary to law.

## <u>FOURTH CLAIM FOR RELIEF</u>

**Violation of 8 U.S.C. § 1158, Asylum**

**(All Respondents)**

142. All of the allegations are repeated and realleged as if fully set herein.

143. The Immigration and National Act (INA) establishes procedures for asylum applications that do not permit Respondents to nullify arbitrarily and capriciously properly filed applications or to require applicants to restart the whole process without legal justification.

144. INA provides, "[a]ny alien who is physically present in the United

States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, shall apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C §1158(a)(1).

145.  Petitioner arrested at or about an asylum hearing violates federal asylum, law because it impedes his ability to pursue his asylum claims.

146. Respondents' application of Expedited Removal to Petitioner prevents him from applying for asylum under 8 U.S.C. § 1158(a)(1) and is contrary to law.

## FIFTH CLAIM FOR RELIEF

### Violation of International Refugee Law and
### 8 U.S.C. § 1231(b)(3), Withholding of Removal
### (All Respondents)

147. Plaintiff reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

148. The United States is a signatory to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees.

149. As implemented through the Refugee Act of 1980, these international obligations prohibit actions that would undermine an asylum seeker's right to seek protection from persecution and to have their claims fairly adjudicated.

150. Respondents' actions in detaining Petitioner and requiring a restart of the asylum process violate U.S. obligations under international refugee law by imposing arbitrary procedural obstacles that impede Petitioner's ability to pursue asylum protections.

151. Further, the "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

152. Respondents' Process violates the withholding of removal statute because it does not provide adequate safeguards to ensure that Petitioner are not returned to a country where it is more likely than not they would face persecution. Accordingly, Respondents' actions against Petitioner are contrary to law.

## SIXTH CLAIM FOR RELIEF

**Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") codified at 8 U.S.C. § 1231 note**

**Convention Against Torture**

**(All Respondents)**

153.  Plaintiff realleges all prior paragraphs as incorporated fully herein.

154. The United States is bound by the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), which prohibits returning any individual to a country where it is more likely than not that they would be subjected to torture.

155. Article 3 of the CAT, as implemented by the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), and its regulations at 8 C.F.R. § 208.16–18, require that no person be removed to a country where they are likely to face torture at the hands of the government or with its acquiescence.

156. Petitioner has expressed a credible and well-supported fear of torture upon return to Morocco, supported by evidence including country conditions, medical/psychological documentation, affidavits, and testimony.

## SEVENTH CLAIM FOR RELIEF

***Ultra Vires*, Violation of 50 U.S.C. § 22**

**(All Respondents)**

157. All of the allegations are repeated and realleged as if set forth herein.

158. The Directive requires that noncitizens whose removal is authorized unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR HABEAS

to settle their affairs before departing. *See* 50 U.S.C. § 22. The Directive on its face denies Petitioner any time under Section 22 to settle their affairs, because it declares everyone subject to Expedite Removal, including asylum seekers who have already filed their I-589 and established they are afraid of returning to their country due to torture, persecution, or death.

159. The current practice contravenes 50 U.S.C. § 22 and is *ultra vires.*

## EIGHTH CLAIM FOR RELIEF
### Violation of Due Process
### (Access to Counsel, Right to Counsel, Petition the Government)
### (All Respondents)

160.   Plaintiff realleg all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

161. The First Amendment to the United States guarantees fundamental freedoms, including freedom of assembly, freedom of speech, the right to petition the government, free exercise—including the detainees.

162.  The Fifth Amendment guarantees non-citizens a right to a fair hearing. Noncitizens seeking asylum are guaranteed Due Process under the Fifth Amendment. *Reno v. Flores,* 507 U.S. 292, 306 (1993)

163.  The Immigration and Nationality Act (INA) guarantee noncitizens the right to counsel in connection with inadmissibility and deportability proceedings. 8 U.S.C. §1362; see also 8 U.S.C. § 1229a(b)(4)(A); *62,* 210 F.3d 967, 971 (9th Cir. 2000); *Orantes-Hernandez v. Thornburgh,* 919 F.2d 549, 564 (9th Cir. 1990)(affirming injunction prohibiting, inter alia, immigration officers from interfering with communication between detainees and attorneys).

164.  Immigrant detainees held pending a credible fear interview possess a First Amendment right to receive legal advice from their counsel.

165. Defendants-Respondents' policies, practices, and conduct are denying access to counsel and obstructs certain freedoms such as detainees' right to receive their counsel's legal advice.

31

166. Plaintiffs have no plain adequate or complete remedy at law. The relief sought is necessary to prevent continued and future irreparable injury.

## NINTH CLAIM FOR RELIEF

### Violation of the U.S. Constitution

### (All Respondents)

167.    Plaintiff reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

168.   The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent", 533 U.S. 678, 693 (2001)).

169. The Fourth Amendment guarantees against unlawful searches and seizures.

170. The Due Process Clause of the Fifth Amendment provides for fair and adequate hearing and an opportunity to be heard and  prohibits the federal government from depriving any person—including noncitizens seeking asylum—of liberty without due process of law.

171. The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to Petitioner-Plaintiff A.M.

172. The Fourteenth Amendment guarantees equal protection.

173. A.M. have a life and liberty interest under the Due Process Clause.

174. A.M. was in formal removal proceedings with an asylum claim subject to protections under the U.S. Constitution.

175. A.M. was denied a fair opportunity to present his case, Respondents' actions prevented a lawful hearing and intimidated from accessing the courts.

176. Moreover, A.M.'s detention is harsh and cruel as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—expedited removal—are unlawful for the reasons discussed supra. Here, there is every indication that his "detention is not to

facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

177. The arrest at an asylum hearing violates procedural due process because it furthers no legitimate purpose other than chill or prevent access to the court system with those attempting to comply, not to mention a compelling government interest.

178. The mechanics of how ICE courthouse arrests occur is unnecessary, confusing, and not related to advancing the governments interest.

179. Respondents' arbitrary actions in detaining Petitioner, continuing to deprive him of his liberty, and requiring a restart of the asylum process also violate substantive due process protections against government action that "shocks the conscience" or interferes with rights "implicit in the concept of ordered liberty."

## TENTH CLAIM FOR RELIEF

### Violation of Habeas Corpus

### (All Respondents)

180. Plaintiff realleges all prior paragraphs of this complaint and incorporate the same herein by this reference.

181. The protection of habeas corpus is enshrined in Article I, section 9 of the United States Constitution.

182. Though Respondent's released Petitioner, after having him fingerprint to sign away his rights; the misconduct is capable of repetition, yet evading review;

183. Detainees have the right to file for habeas corpus to challenge the legality of their detention or raise claims related to their detention or the basis of removal.

184. The detention of Petitioner under Expedited Removal has violated and continues to violate his right to habeas corpus. *See* 28 U.S.C. §2241; U.S. Const. art. I, § 9, cl. 2 (Suspension Clause).

## ELEVENTH CLAIM FOR RELIEF

### (Administrative Procedure Act)("APA")

### (All Respondents)

185. All of the allegations are repeated and re-alleged as though set herein.

186. The APA prohibits agency action that is arbitrary and capricious.

187. Respondents' actions in detaining Petitioner and requiring Petitioner to restart the asylum application process constitute "final agency action" within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 704.

188. The detention of asylum seekers at their immigration hearings without a legitimate justification is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and accordingly violates the APA. 5 U.S.C. §706.

189. Respondents' actions were taken "without observance of procedure required by law" in violation of the APA, 5 U.S.C. § 706(2)(D), including but not limited to the failure to provide adequate notice and opportunity to be heard regarding Petitioner's detention and the requirement to restart the asylum process.

190. Under the APA, a "person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel…." 5 U.S.C. § 555(b)

191. Plaintiff compelled to appear before an agency for a credible fear interview and are denied the accompaniment, representation, and advice of counsel before and during such interviews, in violation of the APA.

192. The APA instructs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

193. Respondents' actions exceed their statutory authority and there is no legitimate purpose in detaining Petitioner at the asylum hearing as they were about to adjudicate their claims and now expended substantial time, costs, and resources

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR HABEAS

to detain or monitor him.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner-Plaintiff respectfully requests that this Court:

A. Assume and maintain Jurisdiction over this matter and order Respondents do not transfer Petitioner out of this district's jurisdiction during the pendency of his proceedings.

B. Issue a writ of habeas corpus and the continued relief for Petitioner, ordering Respondents to refrain from any further unlawful detention of Petitioner at courthouse facilities or other locations without proper legal authority. (*See* 28 U.S.C §2243).

C. Enter an order granting relief of a return to pre-detention timeline and status; (including but not limited to, ordering the issuance of Petitioner's work authorization in accordance with applicable regulations accounting for the time that has already elapsed since Petitioner's original asylum application was filed).

D. Enter an order enjoining Respondents from restarting the asylum application process or taking any action that nullifies the previously filed asylum application.

E. Enter an order granting the restoration of the individual merits hearing or affirmative asylum adjudication and return to the pre-detention status quo.

F. Declare Respondent's courthouse detention of Petitioner was unlawful and violated in excess of Defendants' statutory jurisdiction, constitutional authority, or limitations under the Administrative Procedures Act, 5 U.S.C. § 706(2)(C).

G. Award Petitioner's counsel reasonable attorney's fees and costs or Equal Access to Justice Act (EAJA), 28 U.S.C. §2412(d), 5 U.S.C. §504, or any statutory relief.

35

H. Grant such other further relief as this Court deems just and proper.

DATED: August 19, 2025                    Respectfully submitted,

                                          LAW OFFICES OF EMILY E. HOWE

                                          *By /s/* Emily Howe
                                          _____
                                           Emily Howe
                                          Attorneys for Plaintiff
                                          emh@howelaws.com

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR HABEAS

**VERIFICATION BY SOMEONE ACTING ON PETITIONER'S BEHALF PURSUANT TO 28 U.S.C § 2242.**

The undersigned is an attorney admitted to practice in the courts of California and is the attorney of record in this action.  I do attest and declare under the laws of the United States:

I represent A.M. in his habeas proceedings and requests for relief.  A.M. was being held in detention at the Otay Mesa Detention Center and has reported on custodial obligations.

I have reviewed the record of his detention and discussed the matter with A.M. and his supporters via interpreters and translators.  I verify that the information contained in the foregoing petition is true and correct to the best of my knowledge and belief based on that record, his supporters' testimony, and petitioners, by and through their counsel of record, to which I believe their recollection to be true. The grounds of deponent's belief as to all matters stated upon deponent's knowledge are based upon a review of the facts, pleadings, proceedings in this matter, as well as conversations, and believe the foregoing statements are true and made in good faith.

DATED: August 19, 2025

Respectfully submitted,

LAW OFFICES OF EMILY E. HOWE

By /s/ Emily Howe

Emily Howe

Attorney for Petitioner

FOURTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR HABEAS