Emily E. Howe, State Bar No. 293964
LAW OFFICES OF EMILY E. HOWE
405 Via del Norte, Ste B
La Jolla CA 92037
Telephone: (619) 800-6605
Email: emh@howelaws.com

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.M. | Case No.: 25CV1412 JO AHG |
| Plaintiff-Petitioner(s), | |
| vs. | **CONSOLIDATED FIFTH** *AMENDED* **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DEPARTMENT OF JUSTICE; EXECUTIVE OFFICE OF IMMIGRATION REVIEW; CHRISTOPHER LAROSE, warden of Otay Mesa Detention Center; PAMELA BONDI, Attorney General of the United States, in her official capacity, KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY, TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego, SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection, GREGORY J. ARCHAMBEAULT, Director of U.S. Immigration and Custom Enforcement and Removal Operations (ERO), San Diego, CORE CIVIC, INC. DOES 1 through 20, Defendant-Respondent(s). | |

Plaintiff-Petitioner and asylum seeker A.M. respectfully petitions this Court for a writ to address the collateral consequences under 28 U.S.C.§2241 and for declaratory and injunctive relief to remedy Respondents' unlawful diversion and detention of Petitioner at a federal courtroom launching him into a bureaucratic nightmare, and reinstate Petitioner's pre-detention status quo, and states:

## **INTRODUCTION**

### *"It's de ja vu all over again"*

1. Petitioner-Plaintiff Asylum seeker A.M. is a 34-year-old Western Sahara ("Sahrawi") man, who fled for his life from Western Sahara, a United Nations' recognized non-self-governing, occupied territory by Morocco. He endeavored to comply with all the rules in seeking humanitarian protection and faces arbitrary and evolving changing of the goalposts and was **detained at what had been scheduled as his individual merits hearing or "asylum trial".** He alleges being subjected to an unlawful detention and deprivation of his rights, while pursuing his asylum claims at court in San Diego.

2. Petitioner-Plaintiff filed a *habeas corpus* petition under 28 U.S.C. §2241 and complaint for declaratory and injunctive relief **for a judicial check on Respondents' administrative decisions and procedural deprivations** to detain him and initiate expedited removal proceedings against him under 8 U.S.C. §1225(b)(1)(A), INA § 235(b)(1)(A), despite lacking such authority because **A.M. was—and still is—in pending removal proceedings under 8 U.S.C. § 1229a, INA § 240, and A.M. does not satisfy either threshold inadmissibility ground for expedited removal proceedings.** There was no final order of removal nor were Respondents lawfully in place to deprive him of his liberty or freedom of movement.

3. And because the government still purports to have legal custody of him with continued custodial monitoring, including mandated house visits, where he's not allowed to leave under §1225(b)(1) expedited removal proceedings, it has not

1

provided him with an individualized bond hearing to challenge his detention and on-going legal and physical custody, under 8 U.S.C. §1226(a), INA §236(a), contravening his rights under the Immigration and Nationality Act and the Fifth Amendment's Due Process Clause.

4.    On or about January 29, 2024, U.S. Customs and Border Protection officers apprehended A.M. near San Ysidro, California, after he had **already effected an entry into the United States.** (ECF No. 103, Exhibit A, Notice to Appear.) He claimed a fear of persecution rather than apply for admission, and the officers consciously took his biometrics and selected to place him in removal proceedings with due process protections under 8 U.S.C. §1229(a), INA § 240.

5.    Despite Petitioner's proper and lawful appearance for more than one year and half, on June 3, 2025, the government moved an immigration court judge to dismiss the INA §240 proceedings that had been scheduled as an individual merits hearing or "asylum trial", stating it would **be quicker to remove applicants from the country this way** without notice or an opportunity to be heard, as a matter of the new administration's policy; U.S. Immigration and Customs Enforcement officers arrested and detained A.M., without dialogue, alleging purportedly under 8 U.S.C. § 1225(b)(1), INA § 235(b)(1).

6.    The immigration judge asked for a federal court order or directive requiring the adjudication of asylum during removal proceedings and stated that Petitioner had "a right to seek his asylum claim, just not in immigration court". *See* Audio Recording of Immigration Court Hearing (San Diego Immigr. Ct., June 3, 2025), Administrative Record.

7.    Plaintiff-Petitioner is informed and believes he could hear and see the masked men hovering at the courtroom door. Though the government knew that A.M. was and is represented because they whisked him away from court, had the G-28 Notice of Entry of Appearance of an Attorney, received an updated G-28 that day, confirmed having the correct information, and Petitioner had requested

2

his attorney, A.M. is informed and believes the government did not provide him his counsel during his detention, in spite of multiple interrogations, scheduled court hearings, and agency actions. (Exhibit B, Notice of Entry of Appearance).

8.    Plaintiff-Petitioner believes he was told to sign away his rights on or about June 3, 2025, outside of counsel, did not sign, though deprived of a translator or counsel, and then told he must be fingerprinted and interrogated all outside of the presence of counsel or a translator of the writings. (Exhibit C, Declined to Sign.)

9.    ICE detained A.M. and then issued him two new Notices to Appear on or about June 16, 2025. A.M. timely appealed the IJ's order granting that motion, meaning that the IJ's order was – and is – not final, and those proceedings remained – and are still –pending. Thus, **ICE had no authority to detain him under 8 U.S.C. §1225(b)(1), INA §235(B)(1), and assert expedited removal.** A.M. lacks the threshold inadmissibility necessary for expedited removal, which is available only for those inadmissible under 8 U.S.C. §§1182(a)(6)(C) or (a)(7), INA §§212(a)(6)(C), (a)(7).

10.    Defendants Executive Office of Legal Review (EOIR) have refused to docket or acknowledge any motion to appeal or even the joint filing co-signed by Defendant Chief Counsel Jason Aquilar. This is against the Administrative Procedures Act as "agency action unlawfully withheld," because the applicant is legally entitled to that process.

11.    Absent review in this Court, no other neutral adjudicator will examine A.M.'s plight: Respondents continue --- unchecked --- to place custodial restrictions on him, place him back in custody. He thus urges this Court to review the lawfulness of the arbitrary and capricious delay in Plaintiff's I-589 Application for Asylum, and for Withholding of Removal ("I-589"); his initial detention at the asylum hearing, and collateral and on-going custodial consequences; declare that his detention under 8 U.S.C. § 1225(b)(1), INA § 235(b)(1), is unlawful; order either his continued release or that Respondents

3

provide him with a bond hearing complying with the procedural requirements in *Singh v. Holde*r, 638 F.3d 1196 (9th Cir. 2011); and, at a minimum, order the government to **restore his pre-detention status (including his release on his own recognizance, reinstated asylum clock-eligibility for a work permit, and stopping Respondents' and their agents' ongoing control and deprivation of his liberty with house inspections, telemonitoring, in person check-ins, reporting requirements, and physical tracking.**

12.  A.M. was in Respondents' legal and physical custody at the Otay Mesa Detention Center in San Diego, California and conditions imposed by the government such as frequent home visits, reporting requirements, surveillance are a constructive detention impacting his freedom of movement and prolonging the deprivation of liberty.  As set forth herein, as the statutory and judicial interpretation of "custody" encompasses a broad range of restraints on liberty, Plaintiff-Petitioner requests relief from the oppressive conditions depriving him of his liberty that are tantamount to being in ongoing custody.

## <u>EXHAUSTION OF REMEDIES</u>

13.  Plaintiff-Petitioner has no adequate administrative remedy available. Exhaustion is not required because the claims are collateral and not inextricably linked to removal proceedings and raises systemic constitutional/due process violations from a bureaucratic mess.

14.  Petitioner had no judicial order of removal and was engaged in statutory immigration proceedings with a right to a full and fair hearing and the right to appeal under Immigration and National Act §240, codified at 8.U.S.C.§1229a when he was detained by masked men at the courthouse; he was not a flight risk; upon efforts to preserve his rights and a stay of removal, all were thwarted:  (i) USCIS rejected his asylum claim between the brief stint of leaving the court and filing that day due to the case before the Executive Office of Immigration Review, (ii) Bureau of Immigration & Appeals took the filing fees but did not accept as his

4

240 proceedings were restored, (iii) the Respondents' agents noted applications for discretionary stays of removal are not being accepted or approved. When he filed his petition, he was in physical custody.

15.    BIA is not the venue for an unconstitutional detention and the collateral consequences. Plaintiff exhausted all available administrative remedies to the extent required by law, and his only remedy is by this judicial action. Exhaustion is not required where there is futility, constitutional claims, irreparable harm and/or lack of agency jurisdiction.

## FACTUAL BACKGROUND

16.    Plaintiff-Petitioner A.M. is and has been a human right defender and a leader at a well-acclaimed international non-governmental organization and has contributed to critical reporting to the United Nations, European Commission on Human Rights, Cornell Law School Legal Clinic, Robert Kennedy Human Rights, and global organizations.  He was a champion who fled for his life when he refused to promote Morocco on an international stage.

17.    On or about January 29, 2024, U.S. Customs and Border Patrol (CBP) officers apprehended A.M. in or about San Ysidro Port of Entry, after he had already effected an entry into the United States. A.M. entered and presented himself to seek asylum and claim a fear of persecution on or about January 30, 2024.

18.    After a CBP officer briefly detained him, a supervisory officer representing the government made a conscious decision to release him with a Notice to Appear under 8 U.S.C. 1182(a)(6)(A)(i), INA§212(a)(6)(A)(i) of the Immigration and Nationality Act, as an 'alien' being present in the United States without being admitted or paroled.

19.    The DHS officers released A.M. on his own recognizance finding he was not a risk of flight or danger to the community, which is why he was permitted to apply for his asylum proceeding outside of custody.

20. He was considered entry without inspection, *not* an arriving alien.

21. In spring of 2024, an immigration judge at the Immigration Court in San Diego granted A.M.'s request to appear in San Diego and file his I-589 application for asylum.

22. A.M. complied with the rules, notices, and appeared in court prepared to present his lawful claim with I-589 filings in July of 2024, appeared in August, supplemented on October 15, 2024, further briefed the court on January 7, 2025, presented himself in February, and filed supporting evidence in the spring of 2025.

23. On February 5, 2025, his individual merits hearing was set for June. He properly submitted his case prior to the fifteen (15) days under (8 C.F.R. § 1003.31(c))*;* Immigration Court Practice Manual ch. 3.1(d)(i)–(ii)(A) (2025).

24. In mid-May, he was prepared to present his asylum claims at his scheduled individual merits hearing for June 3, 2025.

25. A.M. was about eligible to apply for work authorization with the Employment Authorization Document (EAD)(Form I-765); his asylum clock had been tolled for A.M. to seek representation and had fully prepared his case over the course of nearly five hundred (500) days. (Exhibit D, Employment Clock)

26. Plaintiff-Petitioner's witnesses were prepared to testify that day even in spite of recent hospitalization and unknown availability at a later date.

27. In an abundance of caution, due to the recent raids of witnesses and court attendees, Petitioner re-submitted his witness list for a subsequent time with the words 'Motion' to clarify that the request was via *WebEx* or telephonically. Plaintiff-Petitioner was prepared and willing to testify at his merits hearing, independent of them.

28. On May 30, 2025, Petitioner is informed and believes the same day as a memo ordered an increase in court dismissals, the court converted the trial into a master calendar hearing. (Exhibit E, memorandum to the Executive Office of Immigration Review (EOIR) Judges.)

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

29.   Noticeably upon entry, the courthouse climate had changed. Petitioner is informed and believes he could **hear ICE agents by the door throughout the hearing.**  Half a dozen men, covered in full face masks, were hovering by the courtroom doors. As Petitioner stepped outside of the doorway, Petitioner was summarily arrested within the Edward J. Schwartz building, and in spite of the court expressly stating A.M. has a lawful right to seek asylum, withholding of removal, or convention against torture under the Immigration and Nationality Act.

30.   Even though the pretense for the change in the hearing was listing the words 'motion' on an already filed document and all motions should have been filed in mid-May, the court allowed the government to verbally move to dismiss the case, without any notice and without an opportunity to be heard.

31.   Petitioner is informed that Respondents knew or should have known that this deprivation of the notice and right to be heard was an overt intentional tactic and policy abuse to prevent the adjudication of a strong asylum claim and remove A.M. without due process forcing him into terrifying and ambiguous proceedings of immediate removal or indefinite detention when he had been fully compliant.

32.   Petitioner was told to sign away his rights on document he could not read without his attorney or a translator present on June 3, 2025, absent the presence of counsel.

33.   Plaintiff is informed and believes Defendants and their representatives were contacted with contact information and told not to interrogate Petitioner without the presence of counsel.  (Exhibit F, Correspondence.)

34.   Nonetheless, Petitioner was then again interrogated without the presence of counsel on June 9, 2025.

35.   Thereafter, Petitioner was interrogated for a third time and told to sign and fingerprint a form on mandatory custodial requirements.

36.   Subsequent release from custody does not remove the court's jurisdiction over the habeas corpus petition. Furthermore, the passage explains that there are

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

other forms of liberty restraints, beyond physical imprisonment, that are sufficient to support the issuance of habeas corpus.

### Habeas Corpus and Lack of Due Process

37.    In recent statements, behavior, and practice, Respondents-Defendants have demonstrated little interest or regard for adhering to America's foundational and bedrock principles of due process, habeas corpus, and rule of law. Recently, on or about May 20, 2025, at his confirmation hearing, Respondent-Defendant KRISTI NOEM[1] erroneously responds: "Habeas corpus is a constitutional right that the president has to be able to remove people from this country".

38.    Here, in San Diego, A.M. who presented himself lawfully for his asylum hearing was separated from his attorney and upon is informed and believes, not clearly advised on why he is being detained or explained the process protecting his procedural and substantive due process rights, after the United States government withdrew his notice to appear in court to terminate his asylum case.  Respondents' agents could not advise on the process, next steps or ensure protections.

39.    He is seeking asylum, withholding of removal, and CAT protections because he fears being killed arbitrarily imprisoned, beaten and tortured by the Moroccan police since they have already done so to him. A.M. was assaulted, tortured, and threatened with death due to his whistleblowing, activism, and refusal to promote the Moroccan government on a national stage which constitutes persecution on account of his political opinion. He is persecuted for his Sahrawi race and ethnicity. His family members have been killed or forced to flee due to the human rights activism on the abuses, torture, and injustices in A.M.'s past persecution raises a presumption of eligibility for relief, a

---

[1] *See* Testimony of Kristi Noem, Dep't of Homeland Sec. (May 20, 2025), *available* at https://www.bbc.com/news/videos/ce8113z7k17o; https://www.c-span.org/classroom/document/?23993

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

presumption the Government is unable to rebut.

40.   Upon leaving Petitioner's June 3, 2025, hearing, Defendants DHS/ICE agents unlawfully arrested Petitioner and took him into custody without reasonable suspicion or probable cause and contrary to incontrovertible evidence that he had filed for asylum. Declaration of A.M. As Petitioner left the immigration courtroom, he was detained by plainclothes ICE agents. Contrary to. regulations, Defendants could not identify any individualized change of circumstances has occurred or provide an opportunity to contest re-detention since Petitioner was released by CBP on or January 30, 2024.  Petitioner has not attempted to flee and has attended all scheduled court appearances.

41.   That day[2] reportedly became the most immigrant arrests in recent history, including at the Edward J. Schwartz Federal Building and Courthouse in San Diego, California. Upon efforts to preserve his rights and a stay of removal, all were thwarted.

42.   As a part of an official memo, Respondents, including leadership and agents of the U.S. Immigration and Customs Enforcement, planned to and did arrest noncitizens, detaining them at the courthouse without notice or an opportunity to be heard, set for immediate expulsion from the United States at an unprecedented speed.  Worse yet, ICE adopted a policy permitting removals to third countries[3] with no notice, six hours' notice, or 24 hours' notice, providing no

---

[2] Julia Ainsley, ICE arrests record number of immigrants in single day, including hundreds at scheduled appointments, NBC News (June 4, 2024), https ://www.nbcnews.com/politics/ national-securi ty/trump-admin-tellsimmigration-judges-dismiss-cases-tactic-speed-arrest-rcna2l2138; U.S. Immigration & Customs Enft, ICE Dallas Leads DHS Effort Removing 122 Illegal Aliens Aboard Special High Risk Charter Flight (June 9, 2025), https ://www.ice.gov/news/releases/ ice-dallas-leads-dhs-effort-removing-122-illegal-aliens-aboard-special-high-risk-charter.
[3] Edward Wong et al, *Inside the Global Deal-Making Behind Trump's Mass Deportations*, N.Y. Times, June 25, 2025. On June 25, 2025, the New York Times reported that seven countries—Costa Rica, El Salvador, Guatemala, Kosovo, Mexico, Panama, and Rwanda—had agreed to accept deportees who are not their own citizens. *Id*.

meaningful opportunity to be heard.

43.    Petitioner respectfully seeks this Court enjoin the abusive, overly broad, and harassing practice of using the courthouses to conduct civil courthouse arrests without a bench warrant, impose indefinite 'mandatory' detention, and forced removal without due process as asylum seekers and other noncitizens lawfully appear for their mandated courtroom appearances.

44.    Respondents' actions reflect the recent unparalleled levels of practices that violate the immigration laws, statutory law, foreign treatises, international refugee law, and the U.S. Constitution including but not limited to the current practice of:

(i) the **overzealous courthouse arrests of *anyone*** whom the government has "information that believes the target…will be at a specific location" like the federal building and U.S. courthouse,

(ii)    **deprivation of due process in detaining applicant Petitioner of his liberty** who are lawfully asserting their rights to seek asylum,

(iii)    **unlawful policy, practice, or conduct** of revoking the notice to appear to place into immediate removal and deprive noncitizens and asylum seekers of due process, has a profound chilling effect on the fundamental pillars of the rule of law, access to the courts, and access to justice.

This unlawful government behavior of courthouse arrests was enjoined in *Elizeo Velazquez-Hernandez, et al., v. U.S. Immigration and Customs Enf't, et al.*, No. 3:20-CV-2060 (DMS)(KSC), 2020 WL 6712223 (S.D. Cal. Nov. 16, 2020). Courts[4] have similarly prohibited this conduct.

45.    Respondents' actions violate their own memos, the constitution and

---

[4] [1] See, e.g. *State of New York v. U.S. Immigration & Customs Enf't*, No. 19-cv-8876, 2020 WL 2117584 (S.D.N.Y. May 12, 2020); *Nken v. Holder*, 556 U.S. 418 (2009) (recognizing the importance of fair process in immigration hearings).*Elizeo Velazquez-Hernandez, et al., v. U.S. Immigration and Customs Enf't, et al.*, No. 3:20-CV-2060 (DMS)(KSC), 2020 WL 6712223 (S.D. Cal. Nov. 16, 2020); *Trump v. J.G.G.*: No. 24A931 (U.S. Apr. 7 2025); *Make the Road New York v. Noem*: No. 1:25-cv-00190-JMC (D.D.C. filed 2025); *Mohammed h. v. Trump*, No.25-1576(JWB/DTS, 2025 U.S. Dist. LEXIS 117197, at *15 (D. Minn. June 17, 2025); *Gunaydin v. Trump*, No. 25-CV-01151 (JMB/DLM), 2025 U.S. Dist. LEXIS 99237 (D. Minn. May 21, 2025).

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

statutory protections. On or about May 27, 2025, Respondents revoked its own rules without notice that prohibited arrests at or within the courthouses but also have not followed its own published guidance. The **expansive quotas[5]** under the ICE Directive Enforcement Actions have incentivized improper actions in or near Courthouses. Defendants-Respondents have the universe of their information.

46.    Plaintiff-Petitioner is informed and believes that separate hours of independent research and conversations with legal observers to discover that Respondents shifted the protections from the Mayorkas memo and reverted to refusing to recognize courthouses as "Sensitive Locations" and maintains that Respondents in the **San Diego Field Office leadership** in particular "The Assistant Field Office Director and Assistant Special Agents in Charge" possesses full authority and discretion to civilly arrest individuals in and around any courthouse.

47.    Shortly after taking office, the President issued ICE Directive *Enforcement Actions in or Near Courthouses* (Jan. 21, 2025) DHS Directive *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025) and where such action is not precluded by laws imposed by the jurisdiction in which the civil immigration enforcement action will take place.[6] The new memorandum supersedes the Mayorkas memorandum entitled 'Guidelines for Enforcement Actions in or Near Protected Areas' (October 27, 2021), replacing with ICE Policy No. 11072.4 Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses. (May 27, 2025). *Id.*

48.    Plaintiff-Petitioner is informed and believes Respondents-Defendants' engaged in a concerted effort to dismiss their cases to deprive them of due

---

[5] José Olivares, Trump Administration Sets Quota to Arrest 3,000 People a Day in Anti-Immigration Agenda, The Guardian (May 29, 2025), https://www.theguardian.com/us-news/2025/may/29/trump-ice-arrest-quota; Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

[6] *See* Memorandum on ICE Directive *Enforcement Actions in or Near Courthouses* (Jan. 21, 2025); DHS Directive *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025); *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (May 27, 2025).

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

process.[7] Plaintiff-Petitioner is informed and believes that there were complaints of detainees were removed or deported on the same day.

49.    With these Directives and memos, the President abandoned past programs and protections and called for the deportation of **anyone potentially removable, i.e. lawful green card holders, parolees, and in practice, asylum seekers--- with published mandatory quotas of 3,000 daily removals in disregard of the fundamental principles of due process.**

50.    Despite widespread opposition to this practice, Respondents have not only refused to stop it but has issued official policies authorizing civil courthouse arrests. DHS's courthouse arrest policies, and its extensive practice of conducting civil arrests at asylum hearings, are unprecedented in United States history.

51.    At the same time, Respondents have prohibited that the use of Web Ex or virtual appearances by Plaintiff-Petitioner and required that asylum seekers appear physically in person in the federal immigration court.

52.    Plaintiff is informed and believes **Respondents are authorizing their agents to be wearing Balaclava, full face covering masks**, while hovering at or about the courtroom doors or encountering members of the public.

53.    **Curiously enough, the updated memo expressly provides, "ICE officers should generally avoid enforcement near non-criminal or specialized courts.**

54.    Plaintiff-Petitioner have complained of intimidating, aggressive arrests, no notice, and chaotic scenes in which the public were refused entry or deterred from asserting their lawful rights in the federal building and courthouse:

55.    In mid-May of 2025 Respondents' commenced immigration raids at or about the Edward J. Schwartz Building.

---

[7] *See e.g.*, Chris Gross, Molly Sheets, *ICE agents arrest migrants at courthouses in San Diego*, Across Country CBS 8 San Diego, May 22, 2025, https://www.cbs8.com/article/news/local/ice-agents-arrest-migrants-at-courthouses-in-san-diego/509-1b3d0519-2132-49fa-ad76-fdb58af37a32 ; *See e.g.*, Alex Cheney, *ICE tactics spark fear as migrant arrested post-hearing in San Diego, Across US,* CBS 8 San Diego, May 27, 2025, *available at:* https://www.cbs8.com/article/news/local/ice-tactics-migrants-arrested-post-hearing-san-diego/509-e66acde1-18bd-42d5-b40b-1bb479d963e4;

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

56.   By way of example, on or about May 22, 2025, Plaintiff-Petitioner is informed and believes that Respondents' resulted in the arrest of the wrong persons, including a man who hyperventilates and collapses to the ground.  DOES Officers used force against asylum seekers, shoved attorneys and members of the public.

57.   On or about May 23, Plaintiff-Petitioner is informed and believes Respondents detained at least 7 and perhaps more asylum seekers.

58.   On or about May 27, Plaintiff is informed and believes that ICE conducts warrantless arrests at or about the courtroom doors and re-filed his witness list with the words "motion" to emphasize the request that his witnesses appear virtually.

59.   On or about May 30, 2025, Plaintiff is informed and believes DOE Officers arrested an individual seeking legal representation. Defendants instructed the DEPARTMENT OF JUSTICE EXECUTIVE OFFICE OF IMMIGRATION REVIEW to increase dismissals of court cases.  On that day, Plaintiff-Petitioner's individual merits hearing was converted to a Master Calendar hearing.

60.   On or about June 2, 2025, Plaintiff is informed and believes ICE officers are continued to make warrantless arrests, detaining and separating parents from their children without notice or an opportunity to be heard.

61.   On June 3, 2025, Petitioner-Plaintiff was detained by respondents for more than 367 hours, depriving him of his liberty without due process of law. This detention was not authorized by any provision of the Immigration and Nationality Act, was not pursuant to any lawfully issued judicial warrant or order of detention, and was not based on any individualized determination of flight risk or danger to the community.

62.   During this unlawful detention, Petitioner was deprived of his medications and was not provided access to counsel or translation before being told to sign away his rights.

Following the unlawful detention, Respondents informed Petitioner that his previous asylum application would not be recognized, and Petitioner is required to restart the entire application from the beginning.

63.    On July 21, 2025, the court informed Petitioner that the administrator's were fixing the asylum clocks to include the previously accrued time.    Plaintiff is informed and believes the government has fixed other work permit clocks.

64.    On June 23 and July 3, 2025, the Supreme Court issued a stay of a national class-wide preliminary injunction issued in *D.V.D. v. U.S. Department of Homeland Security*, No. CV 25-10676-BEM, 2025 WL 1142968, at *1, 3 (D. Mass. Apr. 18, 2025), which required ICE to follow statutory and constitutional requirements before removing an individual to a third country. *U.S. Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (2025) (mem.); *id.*, No. 24A1153, 2025 WL 1832186 (U.S. July 3, 2025).[8]

65.    On August 2, 2025, Plaintiff was informed that he would have to restart the process from the beginning.  A.M. requested for a custody redetermination, asking an immigration judge to grant him bond.  Therein, she explained that her timely notice of appeal rendered the IJ's order nonfinal; the discretionary detention authority at 8 U.S.C. rendered the IJ's order nonfinal; the discretionary detention authority at 8 U.S.C.§1226(a), INA§236(a), continued to govern, and that the IJ thus retained jurisdiction to redetermined the government custody's decision. And she explained how she did not present a danger to persons or property, is not a threat to national security, and did not pose a risk of flight under the factors in *Matter of Guerra,* 24 I.&N. Dec. 37, 38 (BIA 2006).

---

[8] Though the Supreme Court's order was unreasoned, the dissent noted that the government had sought a stay based on procedural arguments applicable only to class actions. *Dep't of Homeland Sec. v. D.V.D.,* 145 S. Ct. 2153, 2160 (2025) (Sotomayor, J., dissenting). Thus, "even if the Government [was] correct that classwide relief was impermissible" in *D.V.D.*, Respondents still "remain[] obligated to comply with orders enjoining [their] conduct with respect to individual plaintiffs" like Mr. XXX. *Id.* In short, the Supreme Court's decision does not override this Court's authority to grant individual injunctive relief. *See Nguyen v. Scott*, No. 2:25-CV-01398, 2025 WL 2419288, at *20–23 (W.D. Wash. Aug. 21, 2025).

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

66.  On September 4, 2025, Plaintiff-Petitioner filed a class action to protect himself on behalf of himself and others similarly situated.

67.  On or about September 17, 2025, Defendants Jason Aguilar and Office of Principal Legal Advisor filed a joint motion to fix Petitioner's asylum clock. Defendants DEPARTMENT OF JUSTICE'S EXECUTIVE OFFICE OF IMMIGRATION REVIEW refused to file the motion.  (Exhibit G, Joint Motion.)

68.  On September 22, 2025, the immigration court informed Petitioner that Defendant Executive Office of Immigration Review dealt with the asylum clock and he could not see or access any motions since the administrator had refused to file it.

69.  Defendants have continued to show up at Plaintiff-Petitioner's house, which is traumatizing to him as he experienced previous persecution.

70.  This directive to restart the asylum process has effectively erased the nearly two years of effort already pursuing his claim, resulted in hundreds of hours in time, costs, stress, and resources, postponing his eligibility to obtain work authorization while awaiting the adjudication of his claims.

71.  Defendants provide no lawful basis for requiring Petitioner to restart the whole asylum process, and are rejecting any formal notice or opportunity to be heard prior to detention, even when their senior leadership have filed a joint motion to address the concerns.

72.  Plaintiff has been in the country nearly two years and should be eligible for to file for his work permit. Currently, the asylum clock is stopped.

73.  As a result of Respondents' actions, Petitioner has suffered, and continues to suffer significant and irreparable harm, including but not limited to prolonged inability to work, psychological, physiological, and emotional  distress, economic hardship, and uncertainty regarding his status to be protected from persecution. (Exhibit H, medical records.)

74.  DHS has made clear that *anyone* who is subject to arrest by DHS may be

15

arrested in the courthouse, and courthouse arrests are not limited to defendants in criminal matters – the arrests are of asylum seekers, witnesses, or anyone **DHS believes is a "targeted alien…" who is or will be present at a specific location."**

75.   To be clear, Defendants- Respondents have already had Plaintiff in custody and processed his biometrics and backgrounds, including all information necessary for civil immigration enforcement purposes. They have no interest or need in re-arrest for those reasons. Respondents' only interest is to keep Plaintiff incarcerated or removed expeditiously from the country

76.   Plaintiff-Petitioner have established that his incarceration or on-going monitoring is not required for his immigration cases, as he reliably appeared for all court hearings.

*Common Law and Constitutional protections*

77.   ICE incarceration of A.M. interferes with the public's access to the federal building and the courthouses. In addition to deviating from prior policy, **the U.S. Supreme Court long ago recognized a privilege against civil arrests for those attending court on official business—a privilege that traces its roots back to English common law and rests on the common-sense principle that the judicial system cannot function if parties and witnesses fear that their appearance in court will be a trap.**

58.   DHS's decision to flout the long-standing common-law privilege against civil courthouse arrests and to commandeer the courtrooms of the Southern District of California for federal civil immigration purposes has led Plaintiff-Petitioner(s) to reasonably fear civil arrest should they appear in court at their upcoming court dates. They know that when their case ends, an immigration agent lurking in the courtroom will be ready to civilly arrest them and place them in removal proceedings. DHS's policy to civilly arrest them in court following the conclusion of their misdemeanor prosecutions forces the Petitioner-Plaintiff to choose between

16

coming to court as ordered and exercising their common-law right to be free from civil arrest in court.

59.    In addition to the Plaintiff- Petitioner' own fear of civil arrest, the First[9], Fifth[10], and Fourteenth Amendment rights to receive equal protection and present witnesses and fails APA review. DHS arrests that merely place a person in immigration proceedings are civil arrests. *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1974) (holding that deportation proceedings are "purely" civil); *Arizona v. United States*, 567 U.S. 387, 407 (2012) (holding that "it is not a crime for a removable alien to remain present" in the United States and that deportation proceedings are civil, even if criminal conduct is the reason for the deportation).

60.    First, DHS's courthouse arrest policies are arbitrary and capricious in violation of the Administrative Procedures Act (APA) because the policies are insufficiently explained, fail to consider all relevant factors, and depart from prior policy without reasoned explanation. Further, DHS's implementation of the policies is inconsistent. ICE's policy states that arrests will take place "inside" the courthouses or at "non-public entrances and exits," but arrests do not always take place inside the courthouse. For example, officers chased a client and his lawyer down Broadway Street adjacent to the courthouse and arrested the client. The lawyer asked the officers to identify themselves and to produce a warrant, and the officers refused and further ordered the lawyer to back away under threat of arrest if he did not cooperate. ICE arrests outside of a courthouse are an arbitrary and capricious application of its policy. *See Washington v. U.S. Dep't of Homeland Sec.*, No. C19-2043 TSZ, 2020 WL 1819837, at *26–27 (W.D. Wash. Apr. 10, 2020) (ICE's practice of arresting immigrants outside courthouses, presents a plausible claim that the policy is arbitrary and capricious under the APA).

61.    Second, Congress never authorized DHS to conduct civil courthouse arrests

---

[9] *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002).
[10] *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

because it never abrogated the longstanding and well-settled common-law privilege against such arrests. The Supreme Court has recognized that the common-law privilege against civil courthouse arrests is "well settled." *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916). When Congress acts in an area governed by "long-established and familiar" common-law principles, Congress is presumed to retain those principles. *United States v. Texas*, 507 U.S. 529, 534 (1993). Here, where Congress granted the federal government a general civil-arrest power to enforce civil immigration laws, Congress retained traditional common-law limitations on that arrest power—including that such arrests cannot be made against parties and witnesses attending court on official business. Because the INA does not grant the federal government authority to conduct civil courthouse arrests in violation of the common-law privilege, DHS's policies authorizing such arrests, and its policies to conduct such arrests, exceed DHS's statutory authority and must be set aside under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2).

62.    Third, DHS's policies violate the Constitutional right of access to the courts, which prohibits "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits." *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002). Conditioning litigants' ability to access the courts on risking civil arrest creates precisely such impermissible frustration. Indeed, common-law courts created the privilege against civil courthouse arrest to prevent the intolerable chilling effect of such arrests, explaining that the fear of arrest would "prevent [parties and witnesses'] approach," obstructing "the administration of justice." *Halsey v. Stewart*, 4 N.J.L. 366, 368 (N.J. 1817). Plaintiff found, however, that if they come to court as ordered they face the specter of civil courthouse arrest whether they win or lose their case.

63.    Fourth, DHS conducts the civil courthouse arrests without a judicial warrant authorizing the arrests as required by law. 8 U.S.C. § 1357(a)(2). Pursuant

to section 1357(a)(2), **DHS must have "reason to believe" that the arrestee is violating immigration law *and* that the arrestee is "likely to escape before a warrant can be obtained. . . ."** But Petitioner-Plaintiff consistent appearance at court demonstrates otherwise. DHS could have sought a warrant in the months while Plaintiff' cases were pending.  DHS did not. Failure to obtain a warrant during the pendency of the cases is the product of indolence, not necessity, and it violates Petitioner-Plaintiff' statutory and constitutional rights.

   *The common-law privilege against civil arrest*

64.    The common-law privilege against civil arrest while attending court on official business is longstanding, tracing its origins back at least to the English courts in the eighteenth century.

65.    In England, and in the early years of this country, civil arrest, or civil capias, was a common means for initiating civil proceedings. *See* Nathan Levy, Jr., *Mesne Process in Personal Actions at Common Law and the Power Doctrine*, 78 Yale L.J. 52, 61-70 (1968). The possibility that such civil arrests could take place in court, however, posed a significant problem for the judiciary: If a party or witness's appearance in a case could be used as a trap for a civil arrest in *another* case, many parties and witnesses would not attend court. To avoid this problem, courts both in England and the United States—including the U.S. Supreme Court—recognized and strictly enforced an "inflexib[le]" privilege against the civil arrest of parties or witnesses attending court. *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923). As the Supreme Court explained, "the due administration of justice requires that a court shall not permit interference with the progress of a case pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation." *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932).

66.    DHS's reinstated the previously enjoined practice of civilly arresting

people in the federal building and courthouses of the Southern District of California who are present for official court business unduly infringes upon Plaintiff' shared common-law right to be free from civil courthouse arrest:

### *DHS officers are routinely present in the U.S. courthouses in the Southern District of California to effectuate civil immigration arrests of Plaintiff when they appear in court for their asylum hearings*

67.    Immigration agents are believed to have arrested scores of people and plan to do so for even more in perhaps the hundreds or thousands inside the federal building and courthouses of the Southern District of California.

68.    Defendants- Respondents agents attend these hearings so they can effectuate a civil courthouse arrest. That means ICE officers are present and poised to conduct administrative arrests at every immigration hearing in the Southern District of California where the government requests dismissals.

69.    When immigration officers attend the Plaintiff' hearings, they patrol the hallways and hover next to the exit of the courtroom at the time of the proceeding.

70.    The officers are equipped with handcuffs and plan to effectuate a civil arrest to place the defendant in immigration custody at the conclusion.

### *DHS officers conduct courthouse arrests without official warrants in or about the U.S. Courthouses in the Southern District of California*

71.    On information and belief, Plaintiff believe that DHS intends to effectuate warrantless immigration arrests of Plaintiff coming to court, while present at court, or leaving court in connection with their pending immigration cases.

72.    *If at all, Defendants-Respondents have deployed administrative signed by staff, not court-ordered judicial warrants by a magistrate or federal judge.*

73.    Plaintiff-Petitioner have been out of custody for months, are in compliance with the conditions including attending all court hearings, and they do not present a risk of flight before DHS could obtain a warrant.

1
2

***DHS's civil courthouse arrest policies harm Plaintiff by forcing them to appear in court believing that they could be subjected to an unlawful civil arrest in the courthouse at any time.***

3
4
5
6

74.    Plaintiff-Petitioner are appearing for their defensive asylum hearings. At this 'trial', their credibility would surely be challenged on cross examination. But the Plaintiff-Petitioner are all alleged to be undocumented aliens in the United States and their character witnesses may be similarly undocumented.

7
8
9
10
11
12

75.    Plaintiff'-Petitioner' decision on whether to testify at trial and call character witnesses, or other witnesses, in support of their asylum case is chilled by the looming presence of immigration officers in court, targets certain groups, and used to harass or retaliate. Plaintiff fear that full exercise of their rights to present a defense could lead to the arrest of undocumented witnesses or members of the public who come to court to observe the proceedings.

13

**A. Asylum, Withholding of Removal, Convention Against Torture**

14
15

76.    Plaintiff-Petitioner sought fairness, due process protection, and the rule of law in the United States:

16
17
18

77.    A.M. has long filed an asylum application and requested a credible fear interview. He fears for detention and harm from Morocco and now faces arbitrary detention in the United States.

19
20
21
22
23
24
25
26
27

78.    A.M. is still under the conditions of expedited removal despite Respondents having knowledge of their claims for asylum and credible fear of persecution the Convention against Torture. The agency's refusal to provide a meaningful credible fear determination, arrest, resetting the clock, and detaining the asylum seeker violates procedural due process and statutory rights under 8 U.S.C. § 1158 and § 1231(b)(3).  The restarting of proceedings is highly prejudicial and serves no legitimated government basis other than to harass, intimidate, delay, and increase taxpayers' money especially as A.M. was scheduled for his asylum individual merits hearing on the day he was arrested.

28

79.    Plaintiff-Petitioner assert their rights to be free from *civil* arrest in this

21

Complaint. To be clear, Plaintiff do not argue that the Defendants-Respondents could not effectuate criminal arrests in the courthouse. **Notably, DHS arrests that merely place a person in immigration proceedings are civil arrests.** *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1974) (holding that deportation proceedings are "purely" civil; administrative warrants do not confer the same authority as a judicial warrant); *Arizona v. United States*, 567 U.S. 387, 407 (2012) (holding that "it is not a crime for a removable alien to remain present" in the United States and that deportation proceedings are civil).

80.   DHS officers attend asylum and immigration hearings relating to whether they have experienced persecution, likely to be persecuted, eligible for asylum, withholding of removal or and ready to civilly arrest Petitioner-Plaintiff once the hearings are pre-determined to be dismissed.  The anticipated arrests occur regardless of the veracity or strength of the claim - whether it be through a Government or Court's granting the motion to dismiss– the officers are waiting to effectuate a warrantless civil arrest at or about the courtroom.

81.   Petitioner is informed and believes this opaque and obfuscatory policy, procedure, and/or practice is denying credible claims to statutory protections, and subjecting eligible applicants with colorable claims to persecution, torture, or death against United States and international law.

   **B. Custodial Detention from Expedited Removal Restrictions**

82.   Defendants-Respondents' refer to Section 235(b)(1) of the Immigration and Nationality Act (INA), for the conditions of release of Petitioner and still maintain that alleged noncitizens subject to expedited removal be detained *throughout* the process, changing the rules for Petitioner here.

83.   Expedited removal has applied to those who were in the country less than fourteen (14) days and within 100 miles of the border. 8 C.F.R. 2385.3(b).

84.   Defendants-Respondents used dismissing a section 240 case to trigger removal to evade procedural due process and statutory protections.

85.   Defendants-Respondents' refer to Section 235(b)(1) of the Immigration and Nationality Act (INA), as mandating that noncitizens subject to expedited removal be detained *throughout* the process, changing the rules for all those impacted here.

86.   Specifically, this Court has jurisdiction under 28 U.S.C. §2241 to review A.M.'s detention and the challenge to his placement in expedited removal proceedings. Federal district courts possess broad authority to issue writs of habeas corpus when a person is held "in custody in violation of the Constitution or laws or treaties of the United States" (28 U.S.C. § 2241(c)(3)), and this authority extends to immigration detention challenges that survived the REAL ID Act's jurisdictional restrictions. Unlike challenges to the outcome of completed expedited removal proceedings, A.M.'s claim that he was improperly subjected to expedited removal in the first instance falls within the statutory exception exception permitting review of whether the noncitizen is eligible for such review. *See 8* U.S.C. § 1252(e)(2), INA § 242(e)(2).  Because A.M. sought the habeas remedy of release from unlawful detention rather than further administrative review, his petition presents precisely the type of threshold legality-of-detention question that §2241 was designed to address. *See INS v. St. Cyr*, 533 U.S. 289, 301 (2001); *see also Lopez-Marroquin* v. *Barr*, 955 F.3d 759, 759 (9th Cir. 2020) (citing *Singh*, 638 F.3d at 1211-12)). And no court has ruled on the legality of A.M.'s detention.

87.   The government nowhere claims that §1182(a)(6)(C) applies to A.M. And although he may be an "applicant for admission" under 8 U.S.C. § 1225(a)(1), INA § 235(a)(1), he at no time made the predicate "application for admission" for §1182(a)(7)(A)(i) to apply to him. *See Matter of Y-N-P-*, 26 I. & N. Dec. 10, 13 (BIA 2012) ("[B]eing an 'applicant for admission' under section 235(a)(1) is distinguishable from 'applying . . . for admission to the United States.'" (quoting Poveda v. United States AG, 692 F.3d 1168 (11th Cir. 2012))).

88.   Defendants-Respondents' actions are retaliatory for those engaging in

protected activity like filing an asylum claim or appearing at their mandated court cases. The government should not be forcing expedited removal as Petitioner-Plaintiff have a right and sought a motion to appeal at the Bureau of Immigration of Appeals. BIA could not find Petitioner's A# to seek an emergency stay.

89.    At or about the end of May of 2025, Respondents started to show up at the immigration courts at valid asylum hearings and arrest the applicants at their court hearings in San Diego, at or about 880 Front Street, Edward J. Schwartz Federal Building and U.S. Courthouse, and stating that they will remove those applicants who are apprehended and withdrew the notice and opportunity to be heard.

90.    Indeed, under the Ninth Circuit's en banc holding in *Torres v. Barr*, 976 F.3d 918 (9th Cir. 2020) (en banc), § 1182(a)(7)(A)(i), which applies "at the time of application for admission"—in contrast to 8 U.S.C. § 1182(a)(6)(A)(i), INA § 212(a)(6)(A)(i) (applying to those "present in the United States without being admitted or paroled")—cannot apply to A.M. because it applies only at "the time when a noncitizen seeks permission to physically enter United States territory." *Id*. at 924. And when A.M. encountered the CBP officers, he had already effected an entry by crossing into the territorial limits of the United States, while actually and intentionally evading inspection at the nearest inspection point and free from restraint. *See, e.g.*, *Matter of Pierre*, 14 I. & N. Dec. 467, 468 (BIA 1973) (describing the traditional entry test).

91.    Nor does *United States v. Gambino-Ruiz*, 91 F.4th 981 (9th Cir. 2024), permit applying § 1182(a)(7)(A)(i) here. A.M.'s request for asylum did not constitute an application for admission. *See,* e.g., *Matter of V-X-*, 26 I&N Dec. 147, 152 (BIA 2013) (holding asylum is not an admission); id. at 151 n.3 ("8 CFR § 1208.14(c) contemplates that an inspection for inadmissibility will occur only "[i]f the asylum officer A.M.s not grant asylum.").

92.    Further, ICE itself elsewhere asserts that 8 U.S.C. § 1226(a), INA 236(a)—and not 8 U.S.C. § 1225(b), INA § 235(b)—governs the arrest and

detention of noncitizens who entered without inspection and are later apprehended in the interior. In documenting the arrest of such noncitizens, ICE typically records that the person was arrested and detained under § 1226(a) (unless the person has committed an offense subjecting them to § 1226(c) detention).

93.    And for its part, the BIA recently published a precedent decision stating its new view that 8 U.S.C. § 1225(b)(2)(A), INA § 1225(b)(2)(A)—and not 8 U.S.C. § 1225(b)(1), INA § 1225(b)(1)—governs the detention of those whom, like A.M., the government encounters shortly after they enter the United States and places in removal proceedings under 8 U.S.C. § 1229a, INA § 240, and that such statute controls "until certain proceedings have concluded." *See Matter of Q. Li*, 29 I. & N. Dec. 66, 69 (BIA 2025) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018)). Thus, even under the BIA's new reading of the statute, contrary to the government's contentions to an IJ, A.M. cannot lawfully be detained under 8 U.S.C. § 1225(b)(1), INA § 235(b)(1).

94.    Consequently, this Court should determine that A.M.'s detention under 8 U.S.C. § 1225(b)(1), INA §235(b)(1), is unlawful, and order either he be restored to pre-detention requirement timelines or that Respondents provide A.M. a bond hearing complying with the procedural requirements in *Singh*. And if this Court determines, consistent with the BIA's recent holding in *Matter of Q. Li*, that 8 U.S.C. § 1225(b)(2)(A), INA § 1225(b)(2)(A), authorizes his continued monitoring and custodial obligations, it should still order the government to cease processing A.M. under the obligations of the expedited removal authority, as they have contended has occurred, now that he's returned to 240 proceedings.

95.    On June 4, 2025, with uncertainty and lack of clarity, A.M. petitioned this court for a writ of habeas corpus, a complaint for declaratory and injunctive relief, and emergency temporary restraining order (which this court granted), for fear of those in immigration custody in danger of imminent removal from the United

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

States (less than 24-hour notice) – and fear this court could permanently lose jurisdiction. Petitioner fears of the imminent danger of being transferred outside of the Southern District of California *en route* to removal without a notice to appear, indefinite detention, and the lack of the opportunity to be heard.

96.    Respondents released him, but have him doing in person check-ins, telemonitoring, and home visits, and had placed GPS restrictions on him. Those custodial monitoring from the unlawful detention and the reoccurrence of the deprivation of his liberty exist to date.

## JURISDICTION AND VENUE

97.    This action arises under the United States Constitution and the Immigration and Nationality Act, 8 U.S.C. §1101 et seq. INA §101 *et seq*. to challenge A.M.'s detention under the INA and any inherent or plenary power the government may claim to continue to impose restrictions on him.

98.    This Court has subject matter jurisdiction under 28 U.S.C. §2241 *et seq*. (habeas corpus), as protected under Art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. §1651 (All Writs Act). A.M. is presently still under Respondents' legal custody under the United States' color of authority, and this custody violates the U.S. Constitution, laws, or treaties. Its jurisdiction is not limited by a petitioner's nationality, status as an immigrant, or any other classification. *See Boumediene v. Bush*, 553 U.S. 723, 747 (2008).

58.    This Court has original jurisdiction pursuant. Federal jurisdiction exists under 28 U.S.C. §1331 (federal question). This court has supplemental jurisdiction over Plaintiff' claims arising under state law pursuant to 28 U.S.C.§ 1367 (a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

59.    This case arises under the First, Fourth, Fifth, Fourteenth Amendments to

the United States Constitution, federal asylum statutes, the Administrative Procedure Act (APA), 5 U.S.C.§§551 *et seq*, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq*. and its regulations.; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

60.   An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651. The Court may grant relief pursuant to; 28 U.S.C. § 2243; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*, injunctive relief under 5 U.S.C.§702 and the Court's inherent equitable powers.  The United States has waived sovereign immunity under the APA. *See* 5 U.S.C §702

61.   Venue is proper in the Southern District of California pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the  events, acts, or omissions giving rise to the claims occurred in the County of San Diego, in the Southern District of California; Venue is further proper in this District under 28 §1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, Petitioner and Defendants reside in this district. Respondents JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego, SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection, GREGORY J. ARCHAMBEAULT, are believed to reside in this district; Respondents are agencies or officers of the United States in their official capacity.

## PARTIES

### A. Petitioner-Plaintiff ("Petitioner")

62.   Plaintiff-Petitioner is a 34-year-old Western Sahrawi man who has been a human rights Defender at an internationally well-respected non-governmental organization that has presented to the United Nations and European Commission of

27

Human Rights. He fled that country because he suffered past persecution and fears future persecution there.   He arrived in the United States on or about January 29, 2024, to seek asylum.

63.   A.M. is diabetic and has medical complications due to past persecution and requires access to daily medications and consistent medical care.

64.   The U.S. government has publicly stated that those with asylum claims would proceed with their credible fear and asylum rights as a matter of law.

65.   However, after lawfully presenting himself for his asylum hearing, he was arrested at the downtown Courthouse on June 3, 2025.

66.   Respondents had Petitioner's attorneys contact because he was yanked away from his hearing.  Petitioner provided Respondents with his G-28 Notice of Entry of Appearance as an Attorney in an abundance of caution.

67.   Plaintiff-Petitioner's legal representation endeavored to connect with him. Initially he could not be found in the system; the following day he could not be found and was "being processed".  Subsequently, Plaintiff's Counsel reached out to his ICE Officer, CORE CIVIC, INC. and by and through Respondents' Counsel was not able to speak with him during his detention.

68.   Plaintiff have seen immigration officers waiting in court presumably to arrest him/her at prior court appearances if the case had concluded and believes that he and his witnesses face likely civil immigration arrest in court following conclusion of the hearing.

69.   There is overwhelming medical evidence that the incarceration of a person will have a negative impact on their well-being especially where there are other traumatic factors at work, and that damage can be permanent.

### B. Defendants-Respondents ("Respondents")

70.   Respondent CHRISTOPHER J. LAROSE is the Senior Warden at the Otay Mesa Detention Center.  Respondent instructs detention policies and was a legal custodian of Petitioner. He is sued in his official capacity.

71.   Respondent PAMELA BONDI is the Attorney General of the United States, which is a cabinet-level department of the United States Government.  In this capacity, she directs each of the component agencies within DHS: ICE, USCIS, and CBP. As a result, Respondent BONDI has responsibility for the administration and enforcement of the immigration laws pursuant to 8 U.S.C.§1103, is empowered to grant asylum, or relief (see 8 U.S.C. §§1103(a)(1),(g)), and oversees the Executive Office for Immigration Review, the office that entered an order dismissing removal proceedings against A.M. She is sued in her official capacity.

72.   Respondent KRISTI NOEM is the Secretary of the U.S. Department of Homeland Security ("DHS"), which is a cabinet-level department of the United States Government.  *See* 8 U.S.C. §1103(a); 1103(a); 8 C.F.R. § 2.1. In this capacity, she has responsibility for the administration of the immigration laws pursuant to 8 U.S.C.  1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of Petitioner. She is sued in her official capacity.

73.   Respondent U.S. DEPARTMENT OF HOMELAND SECURITY, is a cabinet-level department of the United States federal government and sub-agency of DHS that is responsible, *inter alia*, for the initial processing and detention of noncitizens. Its components include Immigration and Customs Enforcement ("ICE"). Respondent DHS is a legal custodian of Petitioner.

74.   Respondent TODD LYONS is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). ICE is a component of the DHS, 6 U.S.C.§271, and an "agency" within the meaning of the Administrative Procedure Act, 5 U.S.C.§701(b)(1). It is the agency responsible for enforcing immigration laws, and its detention of A.M. Respondent Lyons is the senior official responsible for ICE's policies, practices, and procedures, including those relating to the courthouse arrest and detention of immigrants during their removal procedures. Plaintiff is informed

29

and believes Respondent Lyons signed the authorized memo of increased immigration enforcement near courthouses. Respondent Lyons has policymaking knowledge and custody of Plaintiff. Respondent is sued in his official capacity.

75. Respondent JASON AGUILAR, Chief Counsel for Immigration and Customs Enforcement San Diego. Respondent Aguilar is responsible for the Office of the Principal Legal Advisor (OPLA) and ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Respondent Aguilar is believed to be the person responsible for executing relevant provisions of ICE Directive Enforcement Actions in or Near Courthouses, issued on January 21, 2025, and a legal custodian of Petitioner. Respondent Aguilar is sued in his policymaking capacity, not a legal counsel role. Respondent Aguilar is sued in his official capacity.

76. Respondent SIDNEY AKI, Director of Field Operations, San Diego Field Office U.S. Customs and Border Protection. Respondent Aki is responsible for the Office of the Principal Legal Advisor (OPLA) and ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Plaintiff is informed and believes that Respondent Aki is sued in his policymaker role under a policymaking memo that divests authority to the Assistant Field Office Director and Assistant Special Agents in Charge. Respondent Aki is a legal custodian of Petitioner. Respondent Aki is sued in his official capacity.

77. Respondent GREGORY J. ARCHAMBEAULT, Director of U.S. Immigration and Custom Enforcement and Removal Operations (ERO) San Diego, which is responsible for ICE enforcement and the detention facilities, including the Otay Messa Detention Facility and San Diego Area. Respondent Archambeault's place of business is in the Southern District of California; he is believed to reside in the County of San Diego, and he is an immediate legal custodian responsible for the arrest and detention of Petitioner. He is sued in his official capacity

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR WRIT

78.   Respondent U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT is the subagency of DHS that is responsible for carrying out removal orders and overseeing detention. Respondent ICE is a legal custodian of Petitioner.

79.   Respondent EXECUTIVE OFFICE OF IMMIGRATION REVIEW (EIOR) is the federal agency within the U.S. Department of Justice that administers the immigration court system, which decides whether an individual should be allowed to stay in the country or not.

80.   Respondent CORE CIVIC, INC. is the private prison company, believed to earn multi-millions of dollars on the detention of the individual humans beings detained at the Otay Mesa Detention Center. Core Civic is a legal custodian of Petitioner.

81.   Plaintiff is informed and believes there are other Respondents DOES 1 through 10 are agents who usurped their power as detailed herein.

82.   Plaintiff is informed and believes there are DOES 11 through 20, who are responsible for U.S. government, the Office of the Principal Legal Advisor (OPLA) and ICE's policies, practices, and procedures, including those relating to the detention of immigrants against their due process rights.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Statutory Violation

### (All Defendants-Respondents)

83.   All of the allegations are repeated and realleged as if fully set herein.

84.   The Administrative Procedures Act provides that courts "shall... hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C§705(2)(B).

85.   The Immigration and Nationality Act (INA") provides specific and limited grounds for the detention of asylum seekers, none of which authorize the courthouse detention that Petitioner experienced.

86.    Respondents lack statutory authority to detain A.M. under 8 U.S.C. §1225(b)(1), INA § 235(b)(1), because that statute requires that the individual be an "arriving alien" (8 U.S.C. § 1225(b)(1)(A)(i), INA § 235(b)(1)(A)(i)) or fall within specific designations (8 U.S.C. § 1225(b)(1)(A)(iii), INA § 235(b)(1)(A)(iii)), and be inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) or 1182(a)(7), INA §§ 212(a)(6)(C), (a)(7).

87.    The expedited removal process under 8 U.S.C. § 1225(b)(1)(A)(i) does not provide for administrative remedies or judicial review, which is a significant procedural aspect of the process.

88.    As A.M. does not meet these criteria, his detention must be governed by 8 U.S.C. § 1226(a), INA § 236(a), which provides discretionary detention authority and requires ICE to make an individualized custody determination.

89.    Under § 1226(a), individuals may be detained as a matter of discretion, released on their own recognizance, or released on a bond.  Petitioner A.M. had been released and was deprived a liberty interest that had been granted to him at the courtroom door.

90. Further, the United States has failed to follow immigration-specific arrest and processing regulations.  Regulations governing immigration enforcement require that warrantless arrests conform to the standards in 8 C.F.R.§287.8 (c).

91. Specifically, for any arrest, immigration officers must have reason to believe that an immigration committed an offense against the United States or was present illegally. 8 C.F.R.§286.8(c)(2)(i). And for a warrantless arrest, officers must also have reason to believe that an individual is "likely to escape before a warrant can be obtained." 8 C.F.R.§287.8(c)(2)(ii).

92.    At the time of his detention and at the times since, A.M. was in the §240 proceedings, appeal, or placed back in §240 proceedings seeking asylum; he posed no danger to any person or the community at large.  Therefore, Petitioner-

Plaintiff's arrest and detention contravene regulations governing immigration arrests in violation of the *Accardi* doctrine.

93.   Respondents' failure to apply the correct statutory framework violates the INA and exceeds the government's detention authority 'voluntary departure, notice or an opportunity to respond, or asylum protections.

The application of the unstated process is therefore ultra vires.

## SECOND CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1101, *et seq.*

### (All Defendants-Respondents)

94.   All of the foregoing allegations are repeated as if fully set forth herein.

95.   The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

96.   The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. §1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C. § 1229a(a)(3).

97.   Such proceedings are governed by the provisions of 8 U.S.C. § 1229a, and implementing regulations at 8 C.F.R. §§1239, *et seq.*, and 1240, *et seq.* Immigration judges are employees of the Department of Justice, housed under the Executive Office for Immigration Review.

98.   The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States. Because the current process or conduct provides for the removal of Petitioner without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

99.   As a result, the application of the Directive to Petitioner, which will result in his removal from the United States, is contrary to law.

///

///

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

### **THIRD CLAIM FOR RELIEF**

### **Violation of 8 U.S.C. § 1158, Asylum**

### **(All Defendants-Respondents)**

100. All of the allegations are repeated and realleged as if fully set herein.

101. The United States is legally obligated to provide protections to those who qualify as refugees or asylum seekers under U.S. immigration and international law. *See I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421, 436 (1987). Asylum is one form of protection that is available for a person who seeks protection from the United States because they have suffered persecution or fear persecution due to "race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. §1101(a)(42)(A). The Immigration and National Act (INA) establishes procedures for asylum applications that do not permit Respondents to nullify arbitrarily and capriciously properly filed applications or to require applicants to restart the whole process without legal justification.

102. INA§208(1)(1) gives any noncitizen who is physically present in or who arrives in the United States a statutory right to seek asylum. INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, shall apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C §1158(a)(1).

103. Petitioner arrested at or about an asylum hearing violates federal asylum law because it impedes his ability to pursue his asylum claims, which is precisely what occurred as Petitioner-Plaintiff is forced to restart the whole process as though he just arrived in the country.

104. Defendants-Respondents' application of Expedited Removal to Petitioner

prevents him from applying for asylum under 8 U.S.C. § 1158(a)(1) and is contrary to law. *See* 5 U.S.C.§706(2)(A).

## FOURTH CLAIM FOR RELIEF

### Violation of International Refugee Law and
### 8 U.S.C. § 1231(b)(3), Withholding of Removal
### (All Defendants-Respondents)

105. Plaintiff realleges all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

106. The United States is a signatory to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees.

107. As implemented through the Refugee Act of 1980, these international obligations prohibit actions that would undermine an asylum seeker's right to seek protection from persecution and to have their claims fairly adjudicated.

108. Respondents' actions in detaining Petitioner and requiring a restart of the asylum process violate U.S. obligations under international refugee law by imposing arbitrary procedural obstacles that impede Petitioner's ability to pursue asylum protections.

109. Further, the "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. §1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

110.    Respondents' process or refusal to follow the statutory process violates the withholding of removal statute because it does not provide adequate safeguards to ensure that Petitioner is not returned to a country where it is more likely than not he would face persecution. By refusing to grant Plaintiff the procedural protection to which he is entitled, Defendants have withheld and unreasonably delayed actions mandated by statute. 5 U.S.C. §706(1). Accordingly, Respondents' actions against Petitioner are contrary to law.

1

2

3

4

5

### FIFTH CLAIM FOR RELIEF

**Violation of the Foreign Affairs Reform and Restructuring Act of 1998**

**("FARRA") codified at 8 U.S.C. § 1231 note**

**Convention Against Torture**

**(All Defendants-Respondents)**

6    111.    Plaintiff realleges all prior paragraphs as incorporated fully herein.

7    112.    The United States is bound by the United Nations Convention Against

8

9    Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment

10   ("CAT"), which prohibits returning any individual to a country where it is more

11   likely than not that they would be subjected to torture. ( "It shall be the policy of

12   the United States not to expel, extradite, or otherwise effect the involuntary return

13   of any person to a country in which there are substantial grounds for believing the

14   person would be in danger of being subjected to torture, regardless of whether the

15   person is physically present in the United States."); 28 C.F.R. § 200.1; *id.*

16   §§ 208.16-208.18, 1208.16-1208.18. CAT protection is mandatory.

17   113.    Article 3 of the CAT, as implemented by the Foreign Affairs Reform and

18

19   Restructuring Act of 1998 (FARRA), and its regulations at 8 C.F.R. § 208.16–18,

20   require that no person be removed to a country where they are likely to face torture

21   at the hands of the government or with its acquiescence.

22   114.    Petitioner has expressed a credible and well-supported fear of torture upon

23

24   return to Morocco, supported by evidence including country conditions,

25   medical/psychological documentation, affidavits, and testimony. Defendants stated

26   he was being processed for removal from the country. By hauling him away from

27   his asylum hearing, Defendants' process violate FARRA because it does not

28

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
PETITION FOR WRIT

provide adequate safeguards to ensure that Plaintiff is not returned to a country where it is more likely than not he would face torture. *See* 5 U.S.C.§702(2)(A).

115.    **Unreasonable Delay/Nonaction,** by refusing to grant Plaintiff the procedure to which he is entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute. U.S.C. §706(1).

<u>**SIXTH CLAIM FOR RELIEF**</u>

**Alien Tort Statute (28 U.S.C.§1350) Tort in Violation of the Law of Nations (All Defendants-Respondents)**

116.    All of the allegations are repeated and realleged as if set forth herein.

117.  Plaintiff-Petitioner, a noncitizen brings this action under the Alien Tort Statute (ATS), 28 U.S.C.§1350, which grants federal district courts original jurisdiction over any civil action by an alien for a tort "committed in violation of the law of nations or treaty of the United States".

118.  Plaintiff-Petitioner allege Defendants detained, intimidated, harassed, deprived Plaintiff of his liberty in connection with his asylum proceedings, and committed a tort against Plaintiff causing injury, loss, and damages (including loss of income, inability to support self, costs of restarting).

119.  Defendant's conduct violated the norm of the law of nations.  Specifically Defendants' conduct violated the prohibition against non-refoulement, arbitrary detention, cruel, inhuman, or degrading treatment, or the interference with fundamental liberty rights.

120.    As a result Defendant's violation of the law of nations suffered harm.

121. The current practice contravenes the Alien Tort Claim Act and is entitled to relief for the violation of the law of nations..

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**Violation Under the First Amendment**

**(Right to Petition the Government)**
**(All Defendants-Respondents)**

122.    Plaintiff reallege all prior paragraphs of this complaint and incorporate

the same herein by this reference as if fully set below.

123.    The First Amendment to the United States guarantees fundamental freedoms, including freedom of assembly, freedom of speech, the right to petition the government, free exercise—including the detainees.

124.    The Immigration and Nationality Act (INA) guarantees noncitizens the right to counsel in connection with inadmissibility and deportability proceedings. 8 U.S.C. §1362; see also 8 U.S.C. § 1229a(b)(4)(A); *62*, 210 F.3d 967, 971 (9th Cir. 2000); *Orantes-Hernandez v. Thornburgh,* 919 F.2d 549, 564 (9th Cir. 1990)(affirming injunction prohibiting, inter alia, immigration officers from interfering with communication between detainees and attorneys).

125.    Immigrant detains held pending a credible fear interview possess a First Amendment right to receive legal advice from their detained counsel.

126.    Defendants-Respondents' policies, practices, and conduct denies access to counsel and obstructs certain freedoms such as detainees' right to receive their counsels legal advice.

127. If Petitioner is removed, he will lose the ability to challenge the removal process on behalf of himself and others, to which they are subjected.  No such right exists to pursue a challenge to the detention after removal from the United States. *See Doe v. McAleenan,* 415 F. Supp.3d 971, 979 (S.D. Cal. 2019), modified, 2019 WL 6605882 (S.D. Cal. Dec. 3, 2019)(nothing that "non-reviewable erroneous decision" of removal amounts to irreparable harm*); see also Goldie's Bookstore, Inc. v. Superior Ct, of State of Cal.* 738 F.2d 466, 472)(9th Cir. 1984)("An alleged constitutional infringement will often alone constitute irreparable harm.")

128. Plaintiff has no plain adequate or complete remedy at law. The relief sought is necessary to prevent continued and future irreparable injury.

## EIGTH CLAIM FOR RELIEF

### Violation of the Fourth Amendment

### (All Defendants-Respondents)

129.    Plaintiff realleg all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

104. The Fourth Amendment guarantees against unlawful searches and seizures.

105. "Investigatory stops are justified only if there was reasonable suspicion that "criminal activity [was] afoot." *U.S. v. Willis,* 431 F. 3d 709, 714 (quoting *United States v. Arvizu, 534 U.S. 266, 273 (2002).* "Reasonable suspicion is formed by 'specific, articulable facts which, together with objective reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity". *U.S. v. Lopez-Soto,* 205 F. 3d 1101, 1105 (9th Cir. 2000)*(quoting United States v. Michael R., 90 F.3d 340, 246 (9th Cir. 1996).* The Government bears the burden of providing "specific and articulable facts" to support reasonable suspicion. See *Terry v. Ohio,* 392 U.S. 1, 21 (1968).

106. The government has not provided any "specific or articulable facts" to support a finding a reasonable suspicion.

## NINTH CLAIM FOR RELIEF

### Violation of the U.S. Constitution

### (All Defendants-Respondents)

107.   Plaintiff realleg all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

108. The Due Process Clause of the Fifth Amendment provides for fair and

39

adequate hearing and an opportunity to be heard and prohibits the federal government from depriving any person—including noncitizens seeking asylum—of liberty without due process of law. Const. amend. V.

109. The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to Petitioner-Plaintiff A.M.

110. An individual's interest in not being detained is "the most elemental of liberty interests [.] *Hamdi v. Rumsfeld*, §542 U.S. 507, 529, 124 S. Ct. 2633, 159 L.Ed. 2d 578 (20024. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

111. "[M] ere unauthorized presence in the United States is not a crime." *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012). DHS's warrantless courthouse arrests are not in response to new criminal activity; rather, DHS's warrantless courthouse arrests are used to place people in civil immigration removal proceedings.

112. Due process requires at minimum, notice and an opportunity to be respond to government actions before deprivation of a legally protected interest. *See Matthews v. Eldridge, 424* U.S. 319, 333 (1976).

113. The Due Process clause of the Constitution, Congressional statutes and implementing regulations as well as precedential decisions narrow DHS's authority to unilaterally revoke any noncitizen's conditional parole and re-arrest the noncitizen at any time.  8 U.S.C.§1226(b); 8 C.F.R.§236.1(c)(9).

114. The Board of Immigration Appeals has clearly identified limits to DHS's authority to re-detain noncitizens: "where a previous bond determinization has been made by an immigration judge, no change should be made by [DHS] absent a change of circumstance", a position adopted by the Ninth Circuit. *Matter of Sugay,* 17 I.&N. Dec. 637, 640 (BIA 1981); *see also Panosyan v. Mayorkas,* 854

F. App'x 787, 788 (9th Cir. 2021)("Thus , absent changed circumstances…ICE cannot re-detain Panosyan.")

115. This year, multiple federal courts in California have agreed that immigration re-detention after being released into the community warrants a hearing. *See, e.g. Diaz v. Kaiser,* No. 3:25-CV-05071, 2025 WL 1676854 (N.D. Cal. June 14, 2025); *Singh v. Andrews,* No. 1:25-CV-00801, 2025 WL 1918679 (E.D. Cal. July 11, 2025); *Pinchi v. Noem, ---F.*Supp. 3d--, ---, No. 5:25-cv-05632-PCP, 2025 WL 2084921 (N.D. Cal. July 24, 2025); *Rodriguez-Flores v. Semaia,* No. 2:25-CV-06900 (C.D. Cal. Aug. 14, 2025).

116. Plaintiff A.M. has a life and liberty interest under the Due Process Clause.

117. A.M. was denied a fair opportunity to present their case, Respondents' actions prevented a lawful hearing and intimidated from accessing the courts.

118. Defendants' arrest of Petitioner at an asylum hearing violates procedural due process because it furthers no legitimate purpose other than chill or prevent access to the court system with those attempting to comply, not to mention a compelling government interest.

119. The mechanics of how Defendants detained A.M. at the courthouse occur is unnecessary, confusing, and not related to advancing the government's interest.

120. Defendants' detention denied Plaintiff from settling his affairs and further violates due process.

121. To comport with the requirements of due process, the government must provide notice of the third country removal and an opportunity to respond. Due process requires "written notice of the country being designated" and "the statutory basis for the designation, i.e., the applicable subsection of § 1231(b)(2)." *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1019 (W.D. Wash. 2019); *accord D.V.D. v. U.S. Dep't of Homeland Sec.*, No. 25-cv-10676-BEM, 2025 WL 1453640, at *1 (D. Mass. May 21, 2025); *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999).

122. In addition to *Zadvydas*'s protections, a series of regulations provide extra process for someone who, like Petitioner-Plaintiff is re-detained following a period of release. Title 8 C.F.R. § 241.4(*l*) applies to re-detention generally, while 8 C.F.R. § 241.13(i) applies to persons released after providing good reason to believe that they will not be removed in the reasonably foreseeable future, *see Rokhfirooz v. Larose*, No. 25-CV-2053-RSH-VET, 2025 WL 2646165, at *2 (S.D. Cal. Sept. 15, 2025), as Petitioner-Palintiff plainly was.

123. These regulations permit an official to "return[s] [the person] to custody" because they "violate[d] any of the conditions of release." 8 C.F.R. § 241.13(i)(1); *see also id*. § 241.4(*l*)(1). Otherwise, they permit revocation of release only if the appropriate official (1) "determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future," *id*. § 241.13(i)(2), and (2) makes that finding "on account of changed circumstances." *Id*.

No matter the reason for re-detention, the re-detained person is entitled to "an initial informal interview promptly," during which they "will be notified of the reasons for revocation." *Id*. §§ 241.4(*l*)(1), 241.13(i)(3). The interviewer must "afford[] the [person] an opportunity to respond to the reasons for revocation," allowing them to "submit any evidence or information" relevant to re-detention and evaluating "any contested facts." *Id*.

ICE is required to follow its own regulations. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see Nat'l Ass'n of Home Builders v. Norton, 340 F. 3d 835, 852 (9th Cir.); Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004) ("The legal proposition that agencies may be required to abide by certain internal policies is well-established."). A court may review a re-detention decision for compliance with the regulations. *See Phan v. Beccerra*, No. 2:25-CV-01757, 2025 WL 1993735, at *3 (E.D. Cal. July 16, 2025); *Nguyen v. Hyde*, No. 25-cv-11470-MJJ, 2025 WL 1725791, at *3 (D. Mass. June 20, 2025) (citing *Kong v. United States*, 62 F.4th 608, 620 (1st Cir. 2023)).

42

Courts have determined that where ICE fails to follow its own regulations in revoking release, the detention is unlawful and the petitioner's release must be ordered. *See, e.g. Rokhfirooz v. La Rose,* No. 3:25-cv-02053 (RSH-VET), ____ (S.D. Cal. Sept. 15, 2025); Orellana v. Baker, No. 25-1788-TDC, 2025 WL 2444087, at *25-26 (D.Md.Aug. 25, 2025); *Y-Z-L-H v. Bostock*, No. 3:25-CV-965-SI, 2025 WL 1898025, at *12(D.Or. July 9, 2025), *M.S.L. v. Bostock*, No. 6:25-cv-1204-AA, 2025 WL 2430267, at *10 (D. Or. Aug. 21, 2025); *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 163 (W.D.NY. 2025); *Rombot v. Souza*, 296 F. Supp. 3d 383, 387 (D. Mass. 2017).

Having previously encountered Petitioner-Plaintiff and released him in the country based on the determination that he was not a danger to the community or a flight risk and on his own recognizance while awaiting section 240 procedures, and having arrested him under a warrant issued under section 236 (8 U.S.C.§1226), Respondents may not detain him under expedited removal processes set forthi n section 235 (8U.S.C.§1225(b)). *See Noori v. Larose,* No. 25-CV-1824-GPC-MSB, 20255 WL 2800149*14(S.D.Ca. Oct. 1, 2025)("[T]hough he has not been present in this country for a 2-year period he has been paroled into the United States.Therefore, the Court finds that Petitioner could not be subject to §1225.")(emphasis original); Aviles-Mena v . Kaiser, No. 25-CV-06783-RFL, 2025 WL 2578215 *2-5 (N,D. Cal. Sept. 5, 2025)("[W]hen ICE affirmatively chooses to release an individual on parole, it has made the determination that it no longer intends to fast-track their removal and that it will proced with the standard removal process under 8 U.SC.§1229a")

None of the prerequisites to detention apply here. Petitioner-Palintiffwas not returned to custody because of a conditions violation. And there are no changed circumstances that justify re-detaining him. The same treaty has applied since 2008, and the same MOU has applied since 2020. Of course, ICE may be planning

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT

to try again to remove Petitioner-Plaintiff But absent any evidence for "why obtaining a travel document is more likely this time around[,] Respondents' intent to eventually complete a travel document request for Petitioner does not constitute a changed circumstance." *Hoac v. Becerra*, No. 2:25-CV-01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025) (citing *Liu v. Carter*, No. 25-3036-JWL, 2025 WL 1696526, at *2 (D. Kan. June 17, 2025)). Nor has Petitioner-Plaintiff received the interview required by regulation. Exh. A at ¶ 9. No one from ICE has ever invited him to contest his detention. *Id.*

Numerous courts have released re-detained immigrants after finding that ICE failed to comply with applicable regulations. *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 166 (W.D.N.Y. 2025); *You v. Nielsen*, 321 F. Supp. 3d 451, 463 (S.D.N.Y. 2018); *Rombot v. Souza*, 296 F. Supp. 3d 383, 387 (D. Mass. 2017); *Zhu v. Genalo*, No. 1:25-CV-06523 (JLR), 2025 WL 2452352, at *7–9 (S.D.N.Y. Aug. 26, 2025); *M.S.L. v. Bostock*, No. 6:25-CV-01204-AA, 2025 WL 2430267, at *10–12 (D. Or. Aug. 21, 2025); *Escalante v. Noem*, No. 9:25-CV-00182-MJT, 2025 WL 2491782, at *2–3 (E.D. Tex. July 18, 2025); *Hoac v. Becerra*, No. 2:25-cv-01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025); *Liu*, 2025 WL 1696526, at *2; *M.Q. v. United States*, 2025 WL 965810, at *3, *5 n.1 (S.D.N.Y. Mar. 31, 2025). That includes Judge Huie earlier this month. *Rokhfirooz*, 2025 WL 2646165.

"[B]ecause officials did not properly revoke petitioner's release pursuant to the applicable regulations, that revocation has no effect, and [Mr. XXX] is entitled to his release (subject to the same Order of Supervision that governed his most recent release)." *Liu*, 2025 WL 1696526, at *3.

124. Respondents' arbitrary actions in detaining Petitioner, continuing to deprive him of his liberty, and requiring a restart of the asylum process also violate

---

44

substantive due process protections against government action that "shocks the conscience" or interferes with rights "implicit in the concept of ordered liberty."

### TENTH CLAIM FOR RELIEF

### Violation of Habeas Corpus

### (All Defendants-Respondents)

125.    Plaintiff-Petitioner realleges all prior paragraphs of this complaint and incorporate the same herein by this reference.

126. The protection of habeas corpus is enshrined in Article I, section 9 of the United States Constitution.

127. *Habeas* is the vehicle for unlawful detention, unlawful revocation of supervision or post hoc misclassification, and custodial are not barred under §1252(b)(9) under and §1252(g). *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482–87 (1999*); see also Jennings v. Rodriguez*, 138 S. Ct. 830, 840– 41 (2018); *Zadvydas v. Davis*, 533 U.S. 678, 688–702 (2001); Gao v. LaRose, No. 25-cv-2084-RSH-SBC, 2025 U.S. Dist. LEXIS 190572, at *4–6 (S.D. Cal. Sept. 26, 2025).'

128.    Petitioner is unquestionably protected by the Fifth Amendment as he was detained in the interior of the United States (not at the international border). *Zadvydas v. Davis, 533 U.S. 678, 693 (2001)*('[T]he Due Process Clause applies to all 'persons; within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.") The *Zadvydas* grace period lasts for "six months after a final order of removal—that is, three months after the statutory removal period has ended." *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1102 n.5 (9th Cir. 2001).

129. Immigration detention is a form of private civil confinement that "constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas, 441 U.S. 418, 4253 (197*The Supreme Court found that the immigrant's liberty interests were weightier. *Id*. The Court had

45

never countenanced "potentially permanent" "civil confinement," based only on the government's belief that the person would misbehave in the future. *Id*.

130.    Here, there was no order of removal. Though Respondent's released Plaintiff-Petitioner, without counsel of record and with signing away his rights, this detention is systemic or likely to recur, and therefore, is capable of repetition, yet evading review; the denial of being able to access his work authorization has direct practical effects, even if physical custody has ended.

131. Detainees have the right to file for habeas corpus to challenge the legality of their detention or raise claims related to their detention or the basis of removal.

132. Even if jurisdiction stripping provisions apply and §1252€(2) does not provide a jurisdictional basis for Petitioner-Plaintiff's habeas claims, the "colorable constitutional claim" exception provides an independent basis for the Court's jurisdiction since noncitizens in the interior of the United States, like Petitioner-Plaintiff A.M. is entitled to constitutional protections. *See Webster v. Doe,* 486 U.S. 592, 603 (1988)(stating a "serious constitutional question…would arise if a federal statute were to deny any judicial forum for a colorable constitutional claim")(internal citation omitted).

133. The detention and on-going custodial conditions of A.M. has violated and

133.  continues to violate his right to habeas corpus. *See* 28 U.S.C. §2241; U.S. Const. art. I, § 9, cl. 2 (Suspension Clause).

## **ELEVENTH CLAIM FOR RELIEF**

### **(Administrative Procedure Act)("APA")**

### **(All Defendants-Respondents)**

134. All of the allegations are repeated and re-alleged as though set herein.

135. The APA prohibits agency action that is arbitrary and capricious.

136. Respondents' actions in detaining Petitioner and requiring Petitioner to restart the asylum application process constitute "final agency action" within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 704.

46

137. The detention of asylum seeker at their immigration hearings without a legitimate justification is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and thereafter, by refusing to grant Plaintiff access to the procedures specified in the INA, Defendants have withheld and unreasonably delayed actions mandated by statute, and accordingly violates the APA. 5 U.S.C. §706.

138. Under the **Arbitrary & Capricious** doctrine the APA instructs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

139. Under **Ultra Vires/Beyond Statutory Authority** the APA provides that courts "shall…hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitation." 5 U.S.C. §706(2)(C).

140. Respondents' actions were taken "without observance of procedure required by law" in violation of the APA, 5 U.S.C. § 706(2)(D), including but not limited to the failure to provide adequate notice and opportunity to be heard regarding Petitioner's detention and the requirement to restart the asylum process

141. Under the APA, a "person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel…." 5 U.S.C. § 555(b).

142. The government has not provided an explanation for its actions or the appliable law but grabbed Plaintiff at what had been scheduled for his individual merits hearing and are believed to have incarcerated countless individuals alleged to be noncitizens at their court hearings. Notably, even the Alien Enemy Act (AEA) does not authorize the removal of noncitizens without due process from the United States absent a "declared war" or a "perpetrated, attempted, or threatened"

"invasion or predatory incursion" into the United States by a "foreign nation or government." *See* 50 U.S.C. § 21.

143. Under the Administrative Procedures Act ("APA"), federal agencies must, "within a reasonable time, each agency shall proceed to conclude a matter presented to it." See 5 U.S.C. §555(b). Courts are empowered by the APA to "compel agency action unlawfully withheld or unreasonably delayed." *Id.; see* U.S.C. 706(1). Pursuant to APA, a personal adversely affected by agency action is entlted to judicial review. *See* 5 U.S.C.§702. Agency action includes a failure to act. *See* U.S.C.§551(13). Plaintiff compelled to appear before an agency for a credible fear interview and are denied the accompaniment, representation, and advice of counsel before and during such interviews, in violation of the APA.

144. Under 8 C.F.R. § 274a.12(c) and 8 C.F.R. § 274a.13, the government must adjudicate EAD applications in certain circumstances:

•      Pending asylum applications (including those based on detained parolees or released detainees)

145.  By transforming discretionary custody into de facto mandatory detention for Plaintiff showing up for his asylum hearing, §1003.19(i)(2) exceeds the statutory power Congress delegated.

146. Plaintiff challenges only the reasonable of Defendants' delay, inaction, or actions in diverting and detaining Plaintiff, not the granting or denial of this finding.

147. Respondents' actions exceed their statutory authority and there is no legitimate purpose in detaining Petitioner at the asylum hearing as they were about to adjudicate their claims and now expended substantial time, costs, and resources to detain or monitor, causing ongoing  harm to Plaintiff.

DISPUTED FACTS

***This Court must hold an evidentiary hearing on any disputed facts.***

Resolution of habeas petition may require an evidentiary hearing. *Owino v.*

48

*Napolitano*, 575 F.3d 952, 956 (9th Cir. 2009). Petitioner-Plaintiff hereby requests such a hearing on any material, disputed facts.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner-Plaintiff respectfully requests that this Court:

Assume and Maintain Jurisdiction over this matter and order Respondents do not transfer Petitioner out of this district's jurisdiction during the pendency of his proceedings.

A. Issue a writ and the continued relief for Petitioner, ordering Respondents to refrain from any further unlawful re-detention of Petitioner at courthouse facilities or other locations without proper legal authority under 8 C.F.R.§§241.4(l), 241.13(i) and require any advance notice and opportunity to be heard. (*See* 28 U.S.C §1231(a)(6); §2243, and any other applicable statutory or regulatory procedures).

B. Enter an order granting relief and compelling Defendants to perform their duties of a return to pre-detention timeline and status; (including but not limited to, ordering the restoration of Petitioner's work authorization in accordance with applicable regulations accounting for the time that has already elapsed since Petitioner's original asylum application was filed).

C. Enter an order requiring DHS/USCIS to accept-adjudicate the joint application, expunge false A file entries, and enjoin Respondents from restarting the asylum application process or taking any action that nullifies the previously filed asylum application in violation of the Immigration and Nationality Act, the Administrative Procedures Act, and the Due Process Clause of the Fifth Amendment, and other applicable laws.

D. Enter an order granting the restoration of the individual merits hearing or affirmative asylum adjudication and return to the pre-detention status quo.

E. Declare Respondent's courthouse detention without an individualized

49

dtermination of Petitioner was unlawful and violated in excess of the statutory jurisdiction, constitutional authority, or limitations under the Administrative Procedures Act, 5 U.S.C. § 706(2)(C).

F.  Award Petitioner reasonable attorney's fees and costs or Equal Access to Justice Act (EAJA), 28 U.S.C. §2412(d), 5 U.S.C. §504, or statutory relief.

G.  Grant such other further relief as this Court deems just and proper.

DATED: November 10, 2025                    Respectfully submitted,

                                    LAW OFFICES OF EMILY E. HOWE

                                    *By /s/* Emily Howe
                                    Emily Howe
                                    Attorneys for Plaintiff
                                    emh@howelaws.com

///

**VERIFICATION BY SOMEONE ACTING ON PETITIONER'S BEHALF PURSUANT TO 28 U.S.C § 2242.**

The undersigned is an attorney admitted to practice in the courts of California and is the attorney of record in this action.  I do attest and declare under the laws of the United States:

I represent A.M. in his habeas proceedings and requests for relief.  A.M. was being held in detention at the Otay Mesa Detention Center and has reported on custodial obligations.

I have reviewed the record of his detention and discussed the matter with A.M. and his supporters via interpreters and translators.  I verify that the alleged factual information contained in the foregoing petition is based on information and belief and true and correct to the best of my knowledge and belief based on that record, his supporters' testimony, and petitioners, by and through their counsel of record, to which I believe their recollection to be true.  The grounds of deponent's belief in the attached declarations as to all matters stated upon deponent's knowledge are based upon a review of the facts, pleadings, proceedings in this matter, as well as conversations, and believe the foregoing statements are true and made in good faith.

DATED: November 10, 2025                Respectfully submitted,

LAW OFFICES OF EMILY E. HOWE

By /s/ Emily Howe

Emily Howe

Attorney for Petitioner

FIFTH *AMENDED* COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR WRIT